**DRUMMOND & SQILLACE, PLLC**

Stephen L. Drummond, Esq. (SLD 7359)

sdrummond@dswinlaw.com

JoAnn Squillace, Esq. (JS 4217)

jsquillace@dswinlaw.com

175-61 Hillside Avenue, Suite 205

Jamaica, New York 11432

(718) 298-5050; (718) 298-5554(fax)

**CAROL GREEN VON KAUL, P.A.**

Carol N. Green, Esq. (CG 1102)

cgreen@vonkaul.legal

150 NW 70th Avenue, Suite 4

Plantation, Florida 33317

(954) 692-6026

*Attorneys for Plaintiff MICHAEL MAY A/K/A FLOURGON*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------------------------------------X

MICHAEL MAY a.k.a. FLOURGON, an individual,

                         Plaintiff,

      -against-

DESTINY HOPE CYRUS a.k.a. MILEY RAY CYRUS, an individual, THERON THOMAS, an individual, TIMOTHY THOMAS, an individual, SONY CORPORATION OF AMERICA, a New York corporation, SONY MUSIC HOLDINGS, INC. f.k.a. SONY MUSIC ENTERTAINMENT, a Delaware corporation, SONY MUSIC, a Delaware corporation, RCA RECORDS, a Delaware corporation, MICHAEL LEN WILLIAMS II a.k.a. MIKE WILL MADE IT/ MIKE WILL MADE-IT/MIKE WILL, an individual, and LARRY RUDOLPH, an individual,

                         Defendants.

--------------------------------------------------------------------------------------------------------------X

## COMPLAINT AND JURY DEMAND

## COMPLAINT FOR COPYRIGHT INFRINGEMENT

Plaintiff MICHAEL MAY a.k.a. FLOURGON (hereinafter "May"), through his undersigned attorneys, hereby alleges, upon information and belief, as follows:

1

## PARTIES

1.      That at all relevant times herein mentioned, Plaintiff MICHAEL MAY (hereinafter "May") is a songwriter and a resident of Jamaica, West Indies and is the sole author/creator of the musical composition entitled "*We Run Things*" and is the legal and/or beneficial owner of a copyright interest in and to that musical composition.

2.      That at all relevant times herein mentioned, Plaintiff May created, authored and released his original, creative and unique musical composition/song/work entitled "We Run Things" in or about 1988 and/or earlier.

3.      That all relevant times herein mentioned, Plaintiff May is also known as, goes by the name of, creates under the name of, authors under the name of, sings under the name of and/or performs under/as the name, to wit: "Flourgon" including, but not limited to, Plaintiff May's 1988 original and creative musical work/composition/song entitled "We Run Things".

4.      That at all relevant times herein mentioned, upon information and belief, Defendant DESTINY HOPE CYRUS a.k.a. MILEY RAY CYRUS (hereinafter "Cyrus"), is a singer and songwriter, who is a resident of the State of California and, at all material times, is and was doing business in the State of New York and within this judicial district. On information and belief, Plaintiff alleges that Defendant Cyrus co-wrote, performed and continues to perform the infringing musical composition "*We Can't Stop*."

5.      That at all relevant times herein mentioned, upon information and belief, Defendant THERON THOMAS (hereinafter "Theron"), one half of the duo known as Rock City a.k.a. R. City, was born in St. Thomas, U.S. Virgin Islands. Upon information and belief, Defendant Theron is a songwriter and music producer, is a resident of the State of Georgia and, at all

relevant times herein, is and was doing business in the State of New York and within this judicial district.

6.     That at all relevant times herein mentioned, upon information and belief, Defendant Theron co-wrote Defendants' "*We Can't Stop*," the infringing musical composition herein.

7.     That at all relevant times herein mentioned, upon information and belief, Defendant TIMOTHY THOMAS (hereinafter "Timothy"), is Defendant Theron's brother and is the other half of the Rock City duo was born in St. Thomas, U.S. Virgin Islands. Upon information and belief, Defendant Timothy is a songwriter and music producer, is a resident of the State of Georgia and, at all relevant times herein, is and was doing business in the State of New York and within this judicial district.

8.     That at all relevant times herein mentioned, upon information and belief, Defendant Thomas co-wrote "*We Can't Stop*," the infringing musical composition herein.

9.     That at all relevant times herein mentioned, upon information and belief, Rock City is the American musical duo formed in 2003, consisting of Defendants Theron and Timothy Thomas from Saint Thomas, U.S. Virgin Islands. Defendants Theron and Timothy use the stage names Uptown AP and A.I. , respectively, and are a songwriting and record production team including, upon information and belief, for Defendant Cyrus herein.

10.     That at all relevant times herein mentioned, upon information and belief, Defendants Timothy and Theron freely acknowledge that their collective inspiration for the production of the arrangements present within Defendants' "*We Can't Stop*" was largely rooted in Caribbean musical influence.

11.     That at all relevant times herein mentioned, Defendant SONY CORPORATION OF AMERICA (hereinafter "SCA") is a corporation existing under the laws of the State of New

York, admitted and authorized to conduct business in the State of New York, and has offices/headquarters in the County of New York, State of New York. Defendant SCA, which is based in New York City and is a subsidiary of Sony Corporation, is the U.S. headquarters of Sony under which all Sony companies operate in the United States.

12.     That at all relevant times herein mentioned, upon information and belief, Defendant SCA owns or co-owns the publishing rights in and to the Defendants' infringing musical composition *"We Can't Stop."*

13.     That at all relevant times herein mentioned, Defendant SONY MUSIC HOLDINGS, INC. f.k.a. SONY MUSIC ENTERTAINMENT (hereinafter "SMH"), a subsidiary of Defendant SCA, is a corporation existing under the laws of the State of Delaware, admitted and authorized to conduct business in the State of New York, and has offices in the County of New York, State of New York. Defendant SMH is an American music company owned by SCA that is incorporated as a general partnership of Defendant SCS.

14.     That at all relevant times herein mentioned, upon information and belief, Defendant SMH distributes the Defendants' infringing musical composition *"We Can't Stop."*

15.     That at all relevant times herein mentioned, Defendant SONY MUSIC (hereinafter "Sony Music") is a corporation existing under the laws of the State of Delaware, admitted and authorized to conduct business in the State of New York, and with offices/headquarters in the County of New York, State of New York.

16.     That at all relevant times herein mentioned, upon information and belief, Defendant Sony Music distributes the Defendants' infringing musical composition *"We Can't Stop."*

17.     That at all relevant times herein mentioned, Defendant RCA RECORDS (hereinafter "RCA") is a record label company owned by Defendant SMH, a subsidiary of Defendant SCA.

4

Defendant RCA is a corporation existing under the laws of the State of Delaware with its principal place of business in the State of New York and doing business throughout the State of New York including New York County.

18.     That at all relevant times herein mentioned, upon information and belief, Defendant RCA is the label of record for Defendant Cyrus RCA and released the Defendants' *"We Can't Stop"* record, which contains the infringing composition.

19.     That at all relevant times herein mentioned, upon information and belief, Defendant MICHAEL LEN WILLIAMS II a.k.a. MIKE WILL MADE IT a.k.a MIKE WILL MADE-IT a.k.a MIKE WILL (hereinafter "Mike Will") is a songwriter and music producer, is a resident of the State of California and, at all  relevant times herein, is and was doing business in the State of New York and within this judicial district.

20.     That at all relevant times herein mentioned, upon information and belief, Defendant Mike Will helped, participated in, assisted in, collaborated on and/or produced the Defendants' infringing musical composition *"We Can't Stop."*

21.     That at all relevant times herein mentioned, upon information and belief, Defendant LARRY RUDOLPH (hereinafter "Rudolf"), a former entertainment lawyer, is a talent manager of various artists, is a resident of the State of California and, at all relevant times herein, is and was doing business in the State of New York and within this judicial district.

22.     That at all relevant times herein mentioned, upon information and belief, Defendant Rudolph managed, controlled, governed, oversaw, ran and/or supervised Defendant Cyrus' career and performances of Defendants' infringing musical composition *"We Can't Stop."*

## JURISDICTION

23.     This Court has subject matter jurisdiction herein pursuant to 28 U.S.C. §1388(a) because of this Court's exclusive jurisdiction over copyright cases.

24.     Venue is proper pursuant to 28 U.S.C. § 1400(a) because the Defendants reside or may be found within this district and personal jurisdiction may be properly obtained over the Defendants.

## GENERAL ALLEGATIONS
### Plaintiff and "We Run Things"

25.     That at all relevant times herein mentioned, Plaintiff May is a Jamaican songwriter and recording artist who has released several hit reggae singles in the late 1980s and 1990s. He has recorded for various producers and collaborated with internationally-known reggae artists such as Freddie McGregor ("*Bless My Soul*"), Sanchez ("*Madly In Love*"), Ninjaman ("*Zip It Up*"), and ThrillerU ("*Girls Just Wanna Have Fun*").

26.     In or about the year 1988 and/or earlier, Plaintiff May solely authored/created the song "*We Run Things*," which was musically arranged with the assistance of Cleveland Browne, Haldane Browne and Wycliffe Johnson. "We Run Things" was released to the public in 1988 and became a cultural hit garnering significant sales and popularity both domestically in the Caribbean region and internationally. Specifically, in December 1988, Plaintiff May's "We Run Things" became a No. 1 hit in Jamaica, West Indies as reported by the Jamaica Gleaner. **_See_ Exhibit A.** The song was additionally met with great acclaim in the United Kingdom, Canada and the United States of America. Since its release, "*We Run Things*" remains a favorite for lovers of reggae music worldwide.

27.    Through Plaintiff May's own creativity and originality, he created the original, creative and unique lyrical phrase "We run things. Things no run we" which is featured prominently throughout his work. Plaintiff May's unique, creative and original lyrical phrase "We run things. Things no run we" is distinctly Plaintiff May's, having its roots in Jamaican Patois with its own unique phraseology and linguistic combinations that, when translated into English, is not grammatically correct. The literal English translation of "We run things. Things no run we" or its colloquial equivalent "We run tings. Tings no run we" is: "We run things. Things don't run we." The correct grammatical English translation is: "We run things. Things don't run us," or "We rule things. Things don't rule us."

28.    That at all relevant times herein mentioned, as solely created/authored by Plaintiff May in 1988, Plaintiff May's unique, creative and original lyrical phrase "We run things. Things no run we" describes an attitude of personal freedom and situational control, where an individual need not be constrained by fear or reproach as he/she is not controlled or ruled by one's circumstances – a substantially similar theme/attitude also copied and misappropriated from Plaintiff May's protected work/song/musical composition/lyrical phrase by defendants in Defendants' "We Can't Stop".

29.    That at all relevant times herein mentioned, Plaintiff May's protected content was completely original, creative and unique in 1988. Plaintiff May was the first to construct such a sequence using the phrase "We run things. Things no run we" and was the first musical artist to convey this unique, creative and original lyrical phrase/sequence into musical arrangement domestically in the Caribbean region, and internationally, with acclaim in the United Kingdom, Canada and the United States of America.

30.     That at all relevant times herein mentioned, Plaintiff May's linguistic/lyrical phrase/sequence created by Plaintiff May is creative, original, unique and copyrightable.

31.     In 2017, Plaintiff May sought from the United States Copyright Office formal ownership protections over this unique musical arrangement. In recognition of the uniqueness, originality and creativity embodied by Plaintiff May's bold musical integration of his unique, original and creative lyrical phrase, Plaintiff May was granted formal copyright protection of all musical arrangements contained within "*We Run Things*." ***See Exhibit B.***

## DEFENDANTS' INFRINGEMENT

32.     That at all relevant times herein mentioned, Defendants have exploited and continue to exploit and greatly profit from "*We Run Things*" in this jurisdiction, within the balance of all U.S. jurisdictions, throughout the international entertainment market and the world by reproducing, preparing derivative works, copying, distributing, selling, singing, licensing, publicly performing, and/or otherwise exploiting Defendants' "We Can't Stop."

33.     That at all relevant times herein mentioned, Defendants' infringement of Plaintiff May's protected work/content/musical composition/song/lyrical phrase is continuing to present date as Defendants' "We Can't Stop" continues to be sold, publicly performed, distributed and/or licensed by Defendants herein, and, as Defendants, despite industry practice, never sought a license or permission from Plaintiff May.

34.     That at all relevant times herein mentioned, Defendants' infringing acts herein include, but are not limited to, unlawfully creating, recording, manufacturing, producing, selling, publicly performing, concert touring, licensing, marketing, and/or distributing the musical composition and sound recording of Defendants' "We Can't Stop" containing Plaintiff May's protected work/content/song/musical composition/lyrical phrase.  Defendants' infringement is the unlawful

appropriation of Plaintiff May's copyrighted material including Plaintiff May's original, creative and unique lyrical phrase "We run things. Things no run we."

35.     That at all relevant times herein mentioned, without seeking to obtain any form of advance permission from Plaintiff May, upon information and belief, Defendants intentionally and unlawfully used Plaintiff May's original, creative and unique lyrical phraseology as the repeated chorus and hook in *"We Can't Stop."* With purposeful knowledge and intent, Defendants unlawfully misappropriated Plaintiff May's original, unique and creative lyrical phraseology in order to establish an overarching and pervasive theme for *"We Can't Stop."* As evidenced by its ongoing significant success, *"We Can't Stop"* features a theme of defiant audaciousness in the realm of self-discovery and self-governance. The entire theme of *"We Can't Stop"* would be hollow in sound and impact, and would fail to achieve stated success without the unique thrust of authenticity and the substantially similar theme of /provided by Plaintiff May's original, protected content.

36.     That at all relevant times herein mentioned, upon information and belief, upon public debut, *"We Can't Stop"* was immediately received and recognized as a theme song and mantra of sorts for an entirely new musical audience for Defendant Cyrus; Defendants' song's meteoric success is squarely attributable to the fact that legions of newfound fans throughout the world download, direct-request and zealously respond to live performances of this song on a routine basis.

37.     That at all relevant times herein mentioned, upon information and belief, for this reason, Defendant Cyrus intentionally performs and continues to perform to present date *"We Can't Stop"* during nearly every single live performance she conducts, regardless of locale.

38.     That, upon information and belief, Defendant Cyrus began her musical career as Hannah Montana in 2006 mainly within the U.S. based television market. Hannah Montana was a television program created and produced by Disney in 2006. Hannah Montana was quite purposefully marketed as an "all-American," wholesome musical and television character, whose trademark sound was purely pop in nature. In 2007 Defendant Cyrus' music landed her on Billboard Chart's "Top 200."

39.     That, upon information and belief, in August 2012, Defendant Cyrus dramatically chopped off her flowing blond hair, trading it for a very avant garde, short, spiked and partly-shaven, platinum hairstyle. During that time, she commented very heavily within various media outlets about becoming "edgy" in her new approach to life and music. In 2013, Defendant Cyrus signed with Defendant RCA Record Label and hired Defendant Rudolph as her new talent manager.

40.     That, upon information and belief, from the inception of her career, the focus of Defendant Cyrus' creative sound was exclusively oriented towards modern pop-music. Her music was bereft of any traces or hints of urban or Caribbean sound. However, in or about 2012 and 2013, Defendant Cyrus endeavored to revamp and overhaul her sound and personal image, seeking to reinvent her industry style and profile by urbanizing her musical sound.

41.     That, upon information and belief, in doing so, Defendant Cyrus exchanged her trademark "good girl" Disney profile for a gritty and hyper-sexualized image, quite often brazenly and defiantly invoking provocative and obscene statements, lyrics and gestures in her performances. While doing so, Defendant Cyrus dramatically changed her style of dress and personal vocalizations to reflect the grittiness, aggression and sultriness associated with U.S.-based hip-hop, R&B, urban and Caribbean music.

10

42.     That, upon information and belief, within this process of self-reinvention, Defendant

Cyrus sought production input and contribution from some of the most highly-celebrated musical

legends of hip-hop R&B, rap and urban music. Defendant Cyrus similarly and

contemporaneously sought parallel contributions from popular U.S. and Caribbean writing and

production fixtures including, but not limited to, Defendants Timothy, Theron and Mike Will as

she so collaborated/worked with for/on Defendants' "We Can't Stop",  Defendant Cyrus sought

this valuable writing production input in order to authenticate and add credibility by association

to her aggressive new sound.

43.     That, upon information and belief, most recently, Defendant Cyrus has very publicly

looked to American urban music and Caribbean music for inspiration in her evolving career and

Defendants' "*We Can't Stop*" has garnered a brand-new musical audience for Defendant Cyrus,

especially given the industry-status and popularity of her new-found association with Co-

Defendants Timothy, Theron and Mike Will within the realm of urban music.

44.     That, upon information and belief, the Caribbean, and in particular Jamaica, has long

been a source of creative inspiration for generations of international artists of all races, creeds,

colors and national origin. The Caribbean has been regarded for decades as a rich and attractive

source of artistic inspiration, offering dynamic, engaging, trend-setting and enticing cultural

enlightenment to artists and tourists alike, and, that for generations scores of American and

international artists have based their musical productions on hallmark sounds hailing from

various Caribbean communities and items.

45.     That, upon information and belief, throughout her highly-successful career, Defendant

Cyrus and her team have successfully sampled various songs from a cross-section of musical

artists for which Cyrus and her team have routinely gone through the proper industry channels of

protocol in order to seek and obtain advanced clearance for use of the subject, protected musical content. This repeated adherence to decades-old industry protocol demonstrates that Defendant Cyrus and her team are well versed in the necessity of securing advance clearance and the associated repercussions in absence of the same.

46.     That, at all relevant times herein mentioned, and upon information and belief, in 2013, Defendants Cyrus, Theron, Timothy, and Mike Will co-authored and produced the musical composition entitled *"We Can't Stop."* The composition of Defendants' "We Can't Stop" was recorded and performed by Defendant Cyrus and was released to the general public on Cyrus' fourth album, *Bangerz,* on June 3, 2013.   Defendants re-released "We Can't Stop" in 2014, continuing to re-release in 2015, continuing to re-release in 2016, continuing to re-release in 2017 and continuing to re-release same to present date for which same is released and continues to be release to present date to the public for sale.

47.     That at all relevant times herein mentioned, Defendants' *"We Can't Stop"* copies, misappropriates, takes, includes in its entirety, and/or is substantially similar to, Plaintiff May's unique, creative and original lyrical phrase *"We run things. Things no run we,"* by Defendants featuring/containing the substantially similar lyrical phrase in Defendants' song, to wit: "We run things. Things don't run we" prominently throughout the repeated chorus of Defendants' "We Can't Stop" --   which is repeated at least three (3) times in the Defendants' infringing composition.

48.     That at all relevant times herein mentioned, upon information and belief, the overarching theme of defiance seen in Defendants' *"We Can't Stop"* is nearly exclusively based upon and authenticated by the brash and defiant nature/self rule/self-control embodied by Plaintiff May's original, creative and unique lyrical phrase "We run things. Things no run we".

49.     That at all relevant times herein mentioned, Defendants', including but not limited to Defendant Cyrus', use/taking/copying/misappropriating of Plaintiff May's original, unique and creative lyrical phrase within Defendants' "*We Can't Stop*" fully establishes the memorable context for which Defendants' song is popularly known. Particularly, Plaintiff May's original, unique and creative lyrical phrase is used by Defendants to form the repeated chorus or "hook" of Defendants' "*We Can't Stop*".

50.     That at all relevant times herein mentioned, and based upon the foregoing, in all, the infringed material belonging to Plaintiff May accounts for approximately **Fifty Percent (50%)** of the substantive content of Defendants' "*We Can't Stop*" and, as such, Defendants' "*We Can't Stop*" owes the basis of its chart-topping popularity to and its highly-lucrative success to Plaintiff May's protected, unique, creative and original content from Plaintiff May's original, unique and creative musical composition of/in his 1988 hit "We Run Things".

51.     That at all relevant times herein mentioned, and upon information and belief, the entire theme of Plaintiff May's 1988 and/or earlier song "*We Run Things*" is about being reminded that as individuals we should not operate in fear or reproach, but rather with liberty and personal freedom as he/she is in charge, i.e. in situational control. This is evidenced by the song's opening lyrics "All manner of things, hold tight. Shock out, for we rule," and later followed by "We run things. Things no run we, . . . We rule dollars. Dollars don't rule we. . . We rule girls. Girls no rule we."

52.     That at all relevant times herein mentioned, and upon information and belief, substantially similar to "*We Run Things*," is the theme of Defendants' "*We Can't Stop*" as same is centered around being in control of one's own actions, where an individual has license and

personal freedom to do what he or she wants and not to be constrained by another person's dictates, as he/she is in charge.

53.     That at all relevant times herein mentioned, and upon information and belief, in Defendants' substantially similar lyrical and thematic version, Plaintiff May's original, creative and unique lyrical phrase is repeated by Defendants using the literal English translation, but substantially similar phraseology to Plaintiff May's, while wholly maintaining the unique Patois phraseology, "We run things. Things don't run we."

54.     That at all relevant times herein mentioned, and upon information and belief, Defendants' substantially similar version/copy describes a similar theme of personal liberty as evidenced in Defendants' song, i.e. "Don't take nothing from nobody. Yeah, yeah. It's our party, we can do what we want. It's our party, we can say what we want. It's our party, we can love who we want. We can kiss who we want. We can see who we want."

55.     That at all relevant times herein mentioned, and upon information and belief, Defendants undoubtedly had access to *"We Run Things"* prior to writing and releasing *"We Can't Stop"* given its wide commercial success and given Defendants' knowing of, including but not limited to Defendants Theron and Timothy, Plaintiff May's 1988 and/or earlier hit "We Run Things".

56.     That at all relevant times herein mentioned, and upon information and belief, in particular, Defendants Timothy and Theron of Rock City are Caribbean born and contributed significantly to the writing of *"We Can't Stop."* In 2015, Defendant Theron of the Rock City duo admitted in an interview with Vibe Magazine that:"…we incorporate Caribbean culture because that's who we are and that's the base of our creativity."[1]  Specifically, he added: "You have to

---

[1] Augustin, Camille, "Views From The Studio: Meet R. City, The Hardest Working Songwriters In Show Business" *Vibe E-Magazine,* July 17, 2015, https://www.vibe.com/2015/07/views-from-the-studio-r-city/.

listen like 'We run tings, tings don't run we' and 'Hands inna di air like we don't care,'" as they incorporate "that bottom of who we are, that root into the music."[2]

57.    That at all relevant times herein mentioned, and upon information and belief, Defendant Timothy, the second half of the Rock City duo, similarly admits in the same Vibe interview that: "We pull so many different melodies from Caribbean music because we like to believe Caribbean music has some of the best melodies in music."[3]

58.    That at all relevant times herein mentioned, and upon information and belief, Defendants Cyrus, Timothy, Theron, and Mike Will are seasoned music industry songwriters and industry professionals who are well-versed in the standard industry practices associated with the production of popular music. Defendants knew or should have known that the phrase "*We Run Things*" could not be used in a musical work by Defendants without a license and/or songwriting credit, as is customary standard practice in the music industry.

59.    That at all relevant times herein mentioned, and upon information and belief, Defendant Rudolph is a former entertainment attorney and therefore has actual and constructive knowledge of the standard industry practices.

60.    That at all relevant times herein mentioned, and upon information and belief, Defendants adhered to the established industry practice with this very same song regarding the interpolation of the song "*La Di Da Di*" being incorporated into Defendants' "We Can't Stop" as Defendants have duly provided writing credits to the songwriters of "*La Di Da Di*", to wit: Douglas E. Davis a.k.a. Doug. E Fresh and Richard Martin Lloyd Walters a.k.a. Slick Rick, for Defendants' use, copying, sampling and/or interpolation of "*La Di Da Di.*"

---

[2] *Id.*
[3] *Id.*

61.     That at all relevant times herein mentioned, and upon information and belief, Defendants knew and/or should have known that Plaintiff May's unique, original and creative lyrical phrase "We run things. Things no run we" was required to be cleared in a similar manner as Defendants did with Doug E. Fresh and Slick Rick's *"La Di Da Di"* for the very same Defendants' song of "We Can't Stop."

62.     That at all relevant times herein mentioned, and upon information and belief, Plaintiff May's unique, original and creative lyrical phrasing "We run things, Things no run we" is not syntactically correct, and is a conspicuous departure from proper English grammar with its improper sentence construction such that it is noticeably unique, creative and original thereby mandating further inquiry, which should have been conducted by Defendants herein.

63.     That at all relevant times herein mentioned, and upon information and belief, the failure of Defendants Cyrus, Timothy, Theron and Mike Will to deviate in any way from the syntactical uniqueness of Plaintiff May's original, creative and unique lyrical phrasing/protected content demonstrates Defendants' collective, willful and intentional efforts to unlawfully duplicate/copy/misappropriate/take Plaintiff May's protected content/unique, creative and original lyrical phrasing in his 1988 hit "We Run Things".

64.     That at all relevant times herein mentioned, and upon information and belief, had the Defendants performed a cursory search, they would have known that Plaintiff May's unique, creative and original 1988 and/or earlier hit "We Run Things" which was solely authored by Plaintiff May, preexisted Defendants' *"We Can't Stop*."

65.     That at all relevant times herein mentioned, and upon information and belief, had Defendants performed a basic Google search for Defendants' intended lyrics of *"We Can't Stop"*

16

in 2013, Plaintiff May's protected 1988 and/or earlier "*We Run Things*" would have appeared, further informing Defendants of Plaintiff May's copyrighted work.

66.    That at all relevant times herein mentioned, and upon information and belief, in addition to the unique, creative and original lyrics of Plaintiff May's "We Run Things", Defendants Cyrus, Timothy, Theron and Mike Will have substantially incorporated the vocal melody/cadence/inflection/vocal rhythm solely authored/created by Plaintiff May in his 1988 and/or earlier hit "We Run Things" into the vocal melody/rhythm/cadence/inflection of the repeated chorus of Defendants' "*We Can't Stop*" including, but not limited to, Defendants' use/copying/recording/singing/producing    the    substantially    similar    hook    that    they took/misappropriated from Plaintiff May, to wit: "We run things. Things don't run we".

67.    That at all relevant times herein mentioned, and upon information and belief, Defendants Timothy and Theron have already admitted to taking the melodies of Caribbean songs and incorporating them into their songwriting.  The combination of the substantial similarities of both lyrics and accompanying vocal melody/cadence/inflection/rhythm of and between Plaintiff May's "*We Run Things*" and Defendants' "*We Can't Stop*" goes beyond substantial and is liable to engender immediate recognition of copying by an observer that is familiar with both songs.

68.    That at all relevant times herein mentioned, and upon information and belief, musical misappropriations are considered so egregious in nature that even the industry's leading talents are not immune from becoming ensnared in content ownership feuds. For example, popular songstress Beyoncé has been involved in circumstances regarding alleged content theft, where such theft was taken seriously and, in some cases, resulted in presumably significant settlements in favor of the artist allegedly deprived of production credit or production compensation. This especially holds true when the subject material is covered by copyright protections.

17

69.      That at all relevant times herein mentioned, and upon information and belief, song writer Ricky Allen sued Beyoncé in Federal Court on December 10, 2009 for musical misappropriation in connection with theft of his copyrighted song "*Cater 2 U*."[4] According to relevant documentation, Allen registered the copyright for "*Cater 2 U*" with the Copyright Office/Library of Congress in Washington, D.C., in 2000.[5] In 2004, Beyoncé's ladies-group, Destiny's Child, released a song entitled "*Cater 2 U*" featuring the same exact music, lyrics and song title, as the preexisting, copyrighted song Allen registered with the Library of Congress.[6] The wildly successful musical trio reportedly settled the claim with Allen out of court for an undisclosed figure.[7]

70.      That at all relevant times herein mentioned, and upon information and belief, another example is Beyoncé's song "*Hold Up*" which features lyrics from two previous copyrighted works – the Yeah Yeah Yeahs' "*Maps*"[8] and Soulja Boy's "*Turn My Swag On.*" [9] The chorus in "*Maps*" includes the lyrics: "Wait, they don't love you like a love you."[10] "*Hold Up*" riffs off of these lyrics with the chorus: "Hold up, they don't love you like I love you / Slow down, they don't love you like I love you / Back up, they don't love you like I love you / Step down, they don't love you like I love you."[11]

[4] The Judiciary Report, "Beyonce Steals Song again", *The Judiciary Report*, Nov. 10, 2009,
http://www.judiciaryreport.com/beyonce_steals_song_again.htm.
[5] *Id.*
[6] Sam, "Beyonce Accused Of Song-Stealing; Due In Court Next Month?" ThatGrapeJuice.com, November 9, 2009,
http://thatgrapejuice.net/2009/11/beyonce-accused-songstealing-due-court-month/.
[7] Essence, "Destiny's Child Settles 'Cater 2 U' Lawsuit," *Essence.com*, December 4, 2009,
https://www.essence.com/2009/12/04/destinys-child-settles-cater-2-u-lawsuit.
[8] Payne, Chris, "Here's How Ezra Koenig Squeezed the Yeah Yeah Yeahs' 'Maps' Into Beyonce's 'Lemonade',"
*Billboard*, April 4, 2016, https://www.billboard.com/articles/columns/rock/7348295/beyonce-lemonade-credit-hold-up-ezra-koenig-yeah-yeah-yeahs-vampire-weekend.
[9] Feature, "Soulja Boy Responds To Beyoncé's 'Turn My Swag On' Homage," *Genius,* June 9, 2016,
https://genius.com/a/soulja-boy-responds-to-beyonces-turn-my-swag-on-homage.
[10] *Supra*, n. 8.
[11] *Id.*

71.     That at all relevant times herein mentioned, and upon information and belief, Soulja Boy's*"Turn My Swag On"* includes the lyrics: "Hopped up out the bed turn my swag on / Took a look in the mirror said what's up" while *"Hold Up"* interpolates this lyric with: "I hop up out the bed and get my swag on / I look in the mirror, say, 'What's up?'"[12] Similar to how *"Shake if Off"* repeats the words "play," "hate," "break," and "fake" at the end of the phrase, the lyrics in *"Hold Up"* repeat the phrase "What's Up" three times at the end of the phrase.[13]

72.     That at all relevant times herein mentioned, and upon information and belief, even though *"Hold Up"* did not use the lyrics from *"Turn My Swag On"* or *"Maps"* verbatim, the use of the lyrics from both of these songs was still cleared in advance with the copyright owners. This demonstrates the industry standard practice to clear such lyrical similarities.

73.     That at all relevant times herein mentioned, and upon information and belief, despite this industry standard practice, Defendants never sought or contemplated to secure a license or other permission from Plaintiff May herein.

74.     That at all relevant times herein mentioned, Defendants' infringing acts include, but are not limited to, unlawfully creating, recording, performing, manufacturing, producing, selling, licensing marketing and/or distributing the musical composition and sound recording of *"We Can't Stop."* Defendants' infringement amounts to the unlawful appropriation of Plaintiff May's copyrighted material including his original, unique and creative lyrical phrase "We run things. Things no run we" by containing in Defendants' "We Can't Stop", the repeated hook of the repeated chorus: "We run things. Things don't run we".

---

[12] *Supra*, n. 9.
[13] *Id.*

19

75.     That at all relevant times herein mentioned, Defendants' infringement includes the unlawful appropriation of Plaintiff May's vocal melody/cadence/rhythm/inflection contained in Plaintiff May's "We Run Things".

76.     That at all relevant times herein mentioned, and upon information and belief, Defendants continue to exploit, *"We Can't Stop"* to their significant financial enrichment and to the complete detriment and exclusion of Plaintiff May. Since the release of *"We Can't Stop,"* Defendants have continued to profit greatly from their reproduction, preparation, distribution, licensing and ongoing public performance of *"We Can't Stop."*

77.     That at all relevant times herein mentioned, and upon information and belief, Defendant Cyrus' popularity and earnings have dramatically increased by virtue of the popularization of *"We Can't Stop."* The wildly-popular song has opened new doors of economic opportunity and has generated new streams of income and wealth for her through a variety of entertainment and media channels.

78.     That at all relevant times herein mentioned, and upon information and belief, *"We Can't Stop"* was released by Defendants including, but not limited to, Defendant Cyrus on June 3, 2013.[14] Defendants re-released "We Can't Stop" in 2014, in 2015, in 2016, in 2017 and into present date as "We Can't Stop" is still presently released to the public for sale. This song was Defendant Cyrus' 'comeback' single, as it went on to become a worldwide commercial success, topping the charts in territories such as the United Kingdom.[15] Internationally, it enjoyed significant success across Europe, and peaked at number one in New Zealand.[16] *"We Can't Stop"*

---

[14] "Miley Cyrus' 'We Can't Stop' Single Due June 3," *Billboard*, May 19, 2013, retrieved September 10, 2013.

[15] Hung, Steffen. "Miley Cyrus – We Can't Stop," *charts.org.nz*, retrieved September 10, 2013; "Miley Cyrus earns first UK number one single with 'We Can't Stop' – Music News," *Digital Spy*, August 11, 2013, retrieved September 10, 2013.

[16] "Miley Cyrus – We Can't Stop," *Ultratop*, Hung Medien, retrieved August 25, 2013.

peaked at number 2 on the U.S. Billboard Hot 100, tying it with "*Party in the U.S.A.*" as Defendant Cyrus' highest-peaking single in the country at the time.[17]

79.     That at all relevant times herein mentioned, and upon information and belief, the song's music video set the VEVO record for most views within twenty-four hours of release, and became the first to reach one-hundred million (100,000,000) views on the site.[18]   The accompanying music video was released on June 19, 2013, with ten-million seven hundred thousand (10,700,000) views in its first day.[19]  It was also the fastest video to reach one-hundred million (100,000,000) views, having done so in thirty-seven (37) days.[20]

80.     That at all relevant times herein mentioned, and upon information and belief, upon release, "*We Can't Stop*" debuted at number 11 on Billboard's Hot 100 chart with first-week sales of two-hundred fourteen thousand (214,000) downloads. By August 2013, the song hit No. 2 on Billboard's Hot 100 chart and the song went on to become a massive worldwide hit for Defendant Cyrus, staying on the Billboard's Hot 100 for twenty-six (26) weeks. "*We Can't Stop*" has subsequently been certified 5x Platinum by the RIAA with over five million (5,000,000) copies sold.[21]

81.     That at all relevant times herein mentioned, and upon information and belief, the music video for "*We Can't Stop*" debuted on June 19, 2013 and has, to date, gained eight-hundred one million, one hundred and thirty-one-thousand, four hundred and forty-five (801,131,445) views on YouTube.[22]

---

[17] "Miley Cyrus -- Chart history," *Billboard*, retrieved August 25, 2013.
[18] "Miley Cyrus' 'We Can't Stop' Video Breaks VEVO Record," *Billboard*, July 29, 2013, retrieved September 10, 2013.
[19] *Id.*
[20] Lipshutz, Jason, "Miley Cyrus' 'We Can't Stop' Video Breaks VEVO Record," *Billboard*, July 29, 2013, retrieved August 25, 2013.
[21] *Id.*
[22] *Id.*

82.    That at all relevant times herein mentioned, and upon information and belief, on October 2, 2013, MTV aired the documentary *Miley: The Movement*, which chronicled the recording of her fourth studio album Bangerz, which was released on October 4, 2013.[23] The documentary was a commercial success, debuting at number one on the Billboard 200 with first week sales of two-hundred and seventy thousand (270,000) copies.[24]

83.    That at all relevant times herein mentioned, and upon information and belief, in late 2013, Defendant Cyrus was declared Artist of the Year by MTV.[25] On January 29, 2014, she played an acoustic concert show on MTV Unplugged, performing songs from *Bangerz* featuring a guest appearance by Madonna.[26] It became the highest rated MTV Unplugged in the past decade with over one million seven-hundred thousand (1,700,000) streams.[27] Defendant Cyrus launched her controversial *Bangerz* Tour in the same year of 2014 which received a generally positive reception.[28]

84.    That at all relevant times herein mentioned, and upon information and belief, during her appearance on the *Today* show on October 7, 2014, Defendant Cyrus first mentioned her intentions to tour in 2014.[29]   The tour was promoted by the American entertainment company LiveNation Entertainment, which was reported to be paying Defendant Cyrus Five Hundred

---

[23] "MTV to Premiere 'Miley: The Movement' Tonight at 10PM (Video)," *TVbytheNumbers*, October 2, 2013, retrieved October 7, 2013; "Miley: The Movement Sneak Peek: Singer Says Mom Tish Cyrus Is My Homie," *E!*, October 2, 2013, retrieved October 7, 2013, http://www.eonline.com/news/465684/miley-the-movement-sneak-peek-singer-says-mom-tish-cyrus-is-my-homie.

[24] Caulfield, Keith, "Miley Cyrus' 'Bangerz' Debuts At No. 1 On Billboard 200," *Billboard*, October 16, 2013.

[25] Associated Press, "MTV declares Miley Cyrus its artist of the year," *The San Diego Union-Tribune*, December 9, 2013.

[26] Lee, Ashley (February 6, 2014). "Miley Cyrus' Uncensored 'MTV Unplugged' Performance Released," *The Hollywood Reporter*, retrieved February 6, 2014.

[27] *Id.*

[28] Farber, Jim, "Bangerz Tour is Campy and Surreal," *New York Daily News*, April 4, 2014, retrieved July 31, 2014; Deen, Sarah, "Miley Cyrus Bangerz tour kicks off in Canada: 11 weird moments from the first show," *Metro Canada*, February 15, 2014.

[29] Oldenburg, Ann, "Miley will be less sexual at 40, 'maybe'," *USA Today*, October 7, 2013, retrieved October 9, 2013.

Thousand Dollars ($500,000.00) per presentation.[30] The first leg of the tour visited North America and was originally scheduled to include thirty-eight (38) shows.[31]

85.     That at all relevant times herein mentioned, and upon information and belief, the *Bangerz* Tour was the 16th highest-grossing tour of 2014, earning Sixty-Two Million Nine Hundred Thousand Dollars ($62.9 million).[32]   *See Exhibit C.*

86.     That at all relevant times herein mentioned, and upon information and belief, tickets for the highly lucrative tour became available for purchase on November 16, began at the Rogers Arena in Vancouver on February 14, 2014[33] and concluded on October 23 at the Perth Arena in Perth, Australia.[34] In addition, Defendants sold DVDs of the tour, which were officially released on or about March 23, 2015. *See Exhibit D.*

87.     That at all relevant times herein mentioned, and upon information and belief, in furtherance of Defendant Cyrus' expanding exposure, a two-hour television special titled: "Miley Cyrus: Bangerz Tour" was filmed during Defendant Cyrus' performances in Barcelona, Spain and Portugal, and was broadcast on July 6, 2014 on NBC in the United States.[35]

88.     That at all relevant times herein mentioned, and upon information and belief, Defendant Cyrus' album *Bangerz*, for which "*We Can't Stop*" is the lead single, has been certified 2x Double-Platinum by the RIAA with over two-million (2,000,000) certified units sold in the United States. Additionally, *Bangerz* has sold over four million five hundred thousand

---

[30] Jones, Rhian, "Live Nation and AEG in bidding war for Miley Cyrus' tour – report," *Music Week*, October 28, 2013.
[31] MileyCyrus.com, "Miley To Launch Bangerz Tour on Valentine's Day 2014," *MileyCyrus.com*, November 6, 2013, retrieved November 6, 2013.
[32] Statistic Brain, "Miley Cyrus Career Album Sale Statistics," *Statistic Brain*, October 28, 2013, https://www.statisticbrain.com/miley-cyrus-career-album-sale-statistics/.
[33] *Id.*
[34] Just Announced! European Dates of Miley's Bangerz Tour". MileyCyrus.com. December 9, 2013. Retrieved December 9, 2013.
[35] *Id.*

(4,500,000) units worldwide.[36] "*We Can't Stop*" has proven to be such a hitmaker and popular song for the Defendants that it is routinely performed by Defendant Cyrus, to present date, as part of her repertoire in live performances and promotional appearances.

89.     That upon information and belief, Defendant Cyrus has previously been accused of creative misappropriation. Defendant Cyrus and L.A. rock band Lustra had a feud after the band accused her hit song "Rockstar" was a copy of their song "Scotty Doesn't Know." Meanwhile, the teen sensation refuses to be held responsible for the band's accusation, stating that she's not the one who wrote the song. [37]

90.     That upon information and belief, Lustra offered a few promotional solutions, none of which were accepted. Lustra's guitarist Nick Cloutman also explained that they don't actually mind having any of their songs used by Defendant Cyrus as long as they would get a credit for it.[38] "We could share even more of our songs with Ms. Cyrus, just as long as we get credit for it, which is what we have wanted all along."[39] In her defense, Cyrus' spokesperson denied she wrote the song, "She doesn't write the songs – she sings them. We have referred this to Disney."[40]

91.     That at all relevant times herein mentioned, and upon information and belief, since the release of her breakout single, "*We Can't Stop*," Defendant Cyrus has continued her highly-lucrative nation-wide travel and tour circuit during which she performs the hit song.   For example, on October 10, 2017 Defendant Cyrus performed the song on The Late Show with James Corden "Carpool Karaoke"; on May 26, 2017 she performed the song on the Today Show;

---

[36] Lansky, Sam, "Miley Cyrus' "We Can't Stop": Hear Her Comeback Single Here," *Idolator. Spin Media*, June 3, 2013, retrieved April 20, 2014.
[37] Aceshowbiz, "Miley Cyrus to End Song Feud With Lustra," *Aceshowbiz.com*, May 28, 2008, https://www.aceshowbiz.com/news/view/00016122.html.
[38] *Id.*
[39] *Id.*
[40] *Id.*

on June 17, 2017 she performed the song during the Kiss 108 Concert in Mansfield, Massachusetts; on June 10, 2017 she performed the song at the iHeart Summer '17 Concert in Miami; on May 13, 2017 she perfumed the song at Kiss FM's Wango Tango Fest; December 5, 2015 she performed the song in concert in Philadelphia, Pennsylvania with "Her Dead Petz" presentation; December 25, 2015 she performed the song in concert in Vancouver; May 14, 2015 she performed the song in New York City at Adult Swim Upfront Concert. *See Exhibit E.*

### FIRST CLAIM FOR RELIEF
**(Copyright Infringement against All Defendants)**

92.     Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "91" with the same force and effect as if more fully set forth at length herein.

93.     That at all relevant times herein mentioned, Plaintiff's May's original, creative and unique composition *"We Run Things"* contains copyrightable subject matter under the copyright laws of the United States.

94.     That at all relevant times herein mentioned, Plaintiff May was/is the owner of the copyright to "We Run Things" which is the subject of a valid Certificate of Copyright Registration issued by the Register of Copyrights.

95.     That at all relevant times herein mentioned, Plaintiff May's original, creative and unique lyrical phrase "We run things. Things no run we" along with the sequence/cadence/inflection/rhythm of his words indicating a theme of being in control, as detailed above, is properly the subject of copyright protection.

96.     That at all relevant times herein mentioned, among the exclusive rights granted to each Plaintiff May under the Copyright Act are the exclusive rights to reproduce and distribute the copyrighted materials to the public and prepare derivative works.

97.     That at all relevant times herein mentioned, and upon information and belief, Defendants have continued to copy and publicly perform Plaintiff May's copyrighted material. Defendants have further authorized the making or distribution of singles, albums, records, CDs, and/or DVD performances and the like, substantially utilizing Plaintiff's copyrighted material in and as part of Defendants' "*We Can't Stop*" throughout the world.

98.     That at all relevant times herein mentioned, and upon information and belief, Defendants' exploitation of Plaintiff May's "*We Run Things*" was made without Plaintiff's knowledge or consent and constitutes a brazen violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

99.     That at all relevant times herein mentioned, and upon information and belief, Defendants' foregoing acts of infringement have been willful, intentional, in disregard for and indifferent to Plaintiff May's rights herein.

100.    That at all relevant times herein mentioned, and upon information and belief, Defendants have profited substantially from their infringing activities, have collected, and continue to collect fees and royalties from the sale of the infringing work and/or any derivatives thereof, and have retained a portion of those fees and royalties without submitting any amount to Plaintiff May. Defendants should be held jointly and severally liable for all profits derived as a result of their infringing activities, whether or not collected and retained by them, as practical partners.

101.    That at all relevant times herein mentioned, as a result of Defendants' willful infringement of Plaintiff May's copyrights and exclusive rights under copyright, Plaintiff May is entitled to maximum statutory damages pursuant to 17 U.S.C. § 504(c), and/or to recover their actual damages and profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), at

Plaintiff May's election, and such other relief as is provided by laws. Plaintiff May is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505.

102.     That at all relevant times herein mentioned, and upon information and belief, the conduct of Defendants is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff May great and irreparable injury that cannot fully be compensated or measured in money.   Plaintiff May has no adequate remedy at laws.

103.     That at all relevant times herein mentioned, pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff May is entitled to injunctive relief prohibiting Defendants from further infringing Plaintiff's copyrights and ordering Defendants to destroy all copies of the infringing work and/or other material made in violation of Plaintiff's exclusive rights.

## PLAINTIFF DEMANDS TRIAL BY JURY

104.     Plaintiff May respectfully demands and requests a trial by jury in the within action.

WHEREFORE, Plaintiff MICHAEL MAY prays for relief as follows:

1.     For a judicial determination that Plaintiff's copyright has been infringed upon by Defendants;

2.     For injunctive relief against Defendants, jointly and severally, enjoining Defendants from continuing to infringe on Plaintiff's copyright/protected content/lyrics including, but not limited to, enjoining Defendants from releasing, selling, distributing and/or performing "We Can't Stop" in any forum, fashion or manner;

3.     For damages against Defendants, jointly and severally, in such amount as may be found, or as otherwise permitted by laws;

4.     For attorney's fees and costs pursuant to 17 U.S.C. §505; and

27

5.     For any such other and further relief as the Court may deem just and proper.

Dated: March 13, 2018

Respectfully Submitted By:

Drummond & Squillace, PLLC


/s/ Stephen L. Drummond, Esq. (SLD 7359)
/s/  JoAnn Squillace, Esq. (JS 4217)
Drummond & Squillace, PLLC
Attorneys for Plaintiff
175-61 Hillside Avenue, Suite 205
Jamaica, New York 11432
(718) 298-5050
(718) 298-5554(fax)
sdrummond@dswinlaw.com
jsquillace@dswinlaw.com


Carol Green von Kaul, P.A.


/s/ Carol N. Green, Esq. (CG 1102)
Carol Green von Kaul, P.A.
Attorneys for Plaintiff
150 NW 70th Avenue, Suite 4
Plantation, Florida 33317
(954) 692-6026
cgreen@vonkaul.legal

## **ATTORNEY'S VERIFICATION**

STEPHEN L. DRUMMOND, an attorney duly admitted to practice before the Courts of the State of New York and before the Eastern and Southern Districts of New York of the United States District Court, affirms the following to be true under the penalties of perjury:

1.     I am an attorney at DRUMMOND & SQUILLACE, PLLC, attorneys of record for Plaintiff Michael May.   I have read the annexed **SUMMONS WITH NOTICE, COMPLAINT** and **JURY DEMAND** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.  My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files and discussions with Plaintiff.

2.     This verification is made by me because Plaintiff is not presently in the County wherein I maintain my offices.

DATED:     Jamaica, New York
           March 13, 2018


                         /s/  STEPHEN L. DRUMMOND

## ATTORNEY'S VERIFICATION

JOANN SQUILLACE, an attorney duly admitted to practice before the Courts of the State of New York and before the Eastern and Southern Districts of New York of the United States District Court, affirms the following to be true under the penalties of perjury:

1. I am an attorney at DRUMMOND & SQUILLACE, PLLC, attorneys of record for Plaintiff Michael May. I have read the annexed **SUMMONS WITH NOTICE, COMPLAINT** and **JURY DEMAND** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files and discussions with Plaintiff.

2. This verification is made by me because Plaintiff is not presently in the County wherein I maintain my offices.

DATED:      Jamaica, New York

               March 13, 2018

/s/ JOANN SQUILLACE

### ATTORNEY'S VERIFICATION

CAROL N. GREEN, an attorney duly admitted to practice before the Courts of the State of New York and before the Southern District of New York of the United States District Court, affirms the following to be true under the penalties of perjury:

1.    I am an attorney at CAROL GREEN VON KAUL, P.A., attorneys of record for Plaintiff Michael May.  I have read the annexed **SUMMONS WITH NOTICE, COMPLAINT** and **JURY DEMAND** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.  My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files and discussions with Plaintiff.

2.    This verification is made by me because Plaintiff is not presently in the County wherein I maintain my offices.

DATED:    Jamaica, New York
             March 13, 2018


/s/  CAROL N. GREEN

Docket No.:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------------------------------X
MICHAEL MAY a.k.a. FLOURGON, an individual,
                                        Plaintiff,

      -against-

DESTINY HOPE CYRUS a.k.a. MILEY RAY CYRUS, an individual, THERON THOMAS, an
individual, TIMOTHY THOMAS, an individual, SONY CORPORATION OF AMERICA, a
New York corporation, SONY MUSIC HOLDINGS, INC. f.k.a. SONY MUSIC
ENTERTAINMENT, a Delaware corporation, SONY MUSIC, a Delaware corporation, RCA
RECORDS, a Delaware corporation, MICHAEL LEN WILLIAMS II a.k.a. MIKE WILL
MADE IT/ MIKE WILL MADE-IT/MIKE WILL, an individual, and LARRY RUDOLPH, an
individual,
                                        Defendants.
-------------------------------------------------------------------------------------------------------------X

## SUMMONS IN A CIVIL ACTION AND COMPLAINT AND JURY DEMAND
## COMPLAINT FOR COPYRIGHT INFRINGEMENT

**DRUMMOND & SQUILLACE, PLLC**
*Attorneys for Plaintiff*
**175-61 Hillside Avenue, Suite 205**
**Jamaica, New York 11432**
**(718) 298-5050**
**(718) 298-5554(fax)**

**CAROL GREEN VON KAUL, P.A.**
*Attorneys for Plaintiff*
**150 NW 70th Avenue, Suite 4**
**Plantation, Florida 33317**
**(954) 692-6026**