Docket No.: 18 CV 2238 (LAK)(RWL)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------------------------------------------X

MICHAEL MAY a.k.a. FLOURGON, an individual,

                        Plaintiff,


     -against-

SONY MUSIC ENTERTAINMENT, a Delaware General Partnership, DESTINY HOPE CYRUS a.k.a. MILEY RAY CYRUS, an individual, SMILEY-MILEY, INC., a Tennessee corporation, THERON THOMAS, an individual, TIMOTHY THOMAS, an individual, MICHAEL LEN WILLIAMS II a.k.a. MIKE WILL MADE IT/ MIKE WILL MADE-IT/MIKE WILL, an individual, and LARRY RUDOLPH, an individual,

                        Defendants.

------------------------------------------------------------------------------------------------------------------X

## SECOND AMENDED COMPLAINT AND JURY DEMAND
## COMPLAINT FOR COPYRIGHT INFRINGEMENT

Plaintiff MICHAEL MAY a.k.a. FLOURGON (hereinafter "May"), through his undersigned attorneys, hereby alleges, upon information and belief, as follows:

### PARTIES

1.    That at all relevant times herein mentioned, Plaintiff MICHAEL MAY (hereinafter "May") is a songwriter and a resident of Jamaica, West Indies. That at all relevant times herein mentioned, Plaintiff May is the sole author/creator of the musical composition entitled *"We Run Things"* and is the legal and/or beneficial owner of a copyright interest in and to that musical composition.

1

2.      That at all relevant times herein mentioned, Plaintiff May created, authored and released his original, creative and unique musical composition/song/work entitled "We Run Things" in or about 1988 and/or earlier.

3.      That all relevant times herein mentioned, Plaintiff May is also known as, goes by the name of, creates under the name of, authors under the name of, sings under the name of and/or performs under/as the name, to wit: "Flourgon" including, but not limited to, Plaintiff May's 1988 original and creative musical work/composition/song entitled "We Run Things".

4.      That at all relevant times herein mentioned and upon information and belief, Defendant SONY MUSIC ENTERTAINMENT (hereinafter "SME") is an American record label/music industry conglomerate and a Delaware General Partnership, admitted and authorized to conduct business in the State of New York, and has offices/headquarters in the County of New York, State of New York.

5.      That at all relevant times herein mentioned and upon information and belief, Defendant SME is/was a subsidiary/subdivision of Sony Corporation of America.

6.      That at all relevant times herein mentioned and upon information and belief, Defendant SME is/was the parent company/subsidiary/subdivision of all relevant Sony subsidiaries, subdivisions and/or departments ultimately responsible for all contractual and fiscal elements involved in the management, production and distribution of music-sound recordation, music-video recordation, music-sound production, music-video production, live tour performances, live media performances and arrangements that were conducted/performed in connection with Defendants' *"We Can't Stop"*

7.      That at all relevant times herein mentioned and upon information and belief, Defendant SME controlled, governed and/or managed all contractual and financial aspects

involved in the management, production, creation, release, marketing, distribution, selling and promoting of Defendants' *"We Can't Stop."*

8.      That at all relevant times herein mentioned and upon information and belief, Defendant SME, prior to releasing, distributing, producing, marketing, placing into the stream of commerce and selling same *"We Can't Stop",* Defendant SME managed, oversaw, reviewed, cleared and approved the content, melody and lyrics contained in same *"We Can't Stop"* including, but not limited to: reviewing, clearing and approving for release and distribution, the infringing lyrics that Defendants unlawfully misappropriated and took from Plaintiff.

9.      That at all relevant times herein mentioned and upon information and belief, Defendant SME gave clearance and approval of the infringing work/song *"We Can't Stop"* for world-wide production, marketing, sales, promotion and distribution into the world-wide entertainment marketplace/stream of commerce.

10.     That at all relevant times herein mentioned, and upon information and belief, Defendant SME was/is contractually engaged in the production, manufacture and world-wide distribution of music works written and/or produced by Defendant Cyrus and her contracted third-party collaborators/songwriters/producers including, but not limited to, Defendants Theron, Timothy and Mike will herein, under and pursuant to her artist-label relationship with RCA and/or Defendant SME including, but not limited to, Defendants' *"We Can't Stop."*

11.     That at all relevant times herein mentioned and upon information and belief, Defendant SME directly presided over, managed, governed, operated and/or controlled any, part of and/or all creative, financial and contractual aspects and undertakings involved in the contractual creation, production and distribution of Defendants' *"We Can't Stop."*

3

12.     That at all relevant times herein mentioned and upon information and belief, Defendant SME is/was the parent company/subdivision/subsidiary to/of RCA Records (hereinafter "RCA"), which is the veteran music label to which Defendant Cyrus was/is contractually signed as a music artist at all times relevant to this action.

13.     That at all relevant times herein mentioned and upon information and belief, RCA is/was one of three flagship record labels, subsidiaries, subdivisions and/or departments of Defendant SME.

14.     That at all relevant times herein mentioned and upon information and belief, Defendant SME knew of and/or had reason to know of and/or cleared and approved, directly and/or by way of its RCA label/department/subdivision, the contractual retainers/agreements/contracts of all collaborating songwriters and collaborating producers engaged by Defendant Cyrus and/or Defendant Rudolph.

15.     That at all relevant times herein mentioned and upon information and belief, Defendant SME knew of and/or had reason to know of, and/or cleared and approved, directly and/or by way of RCA, the contractual retainers/agreements/contracts of the other named Defendants herein and/or other unnamed third-parties, to write, collaborate, create and/or produce "We Can't Stop," and/or assist in/participate in the writing, collaborating, creating and/or producing of same.

16.     That at all relevant times herein mentioned and upon information and belief, Defendant SME knew of and/or had reason to know of and/or cleared and approved, directly and/or by way of RCA, those contractual retainers/agreements/contracts with/for Defendant Mike Will Made It and/or Defendants Timothy and Theron Thomas in furtherance of Defendants' music-sound recordation, music-video recordation, music-sound production, music-

video production and the overall creation, production, distribution, marketing, promotion, selling and releasing of Defendants' *"We Can't Stop."*

17.     That at all relevant times herein mentioned and upon information and belief, Defendant DESTINY HOPE CYRUS a.k.a. MILEY RAY CYRUS (hereinafter "Cyrus"), is a singer and songwriter, who is a resident of the State of California and, at all material times, is and was doing business in the State of New York within this judicial district.

18.     That at all relevant times herein mentioned and upon information and belief, Defendant Cyrus co-wrote, performed and continues to perform the infringing musical composition "*We Can't Stop*."

19.     That at all relevant times herein mentioned and upon information and belief, Defendant Cyrus is a professional music entertainment singer, songwriter and performer who is contractually signed as a music entertainment artist to RCA and, by virtue of said contract with RCA, to Defendant SME.  That at all relevant times herein mentioned, and upon information and belief,

20.     That at all relevant times herein mentioned and upon information and belief, Defendant SME's label, subdivision, department and/or subsidiary RCA was/is the music label under which Defendant Cyrus and Defendants Mike Will, Timothy and Theron co-wrote and co-produced *"We Can't Stop"* and by which Defendant SME reviewed, cleared, approved, released, marketed, promoted, produced, sold and distributed Defendants' *"We Can't Stop"*.

21.     That at all relevant times herein mentioned and upon information and belief, Defendant SME, through its label/subdivision/department/subsidiary RCA, knew and/or had reasons to know of and/or managed, governed and/or controlled, the hiring of all third party music, lyric and production professionals engaged by Defendants for songwriting, music-audio

sound production and arrangement, video-music sound production and arrangement, and, songwriting production and arrangement for Defendants' *"We Can't Stop."*

22.     That at all relevant times herein mentioned and upon information and belief, Defendant SME, directly and/or by/through its label/subdivision/department/subsidiary RCA, maintained and continues to maintain and have/own a significant degree of contractual and/or financial interest in any and all underlying and/or resulting legal ownership rights including, but not limited to, those obtained by/through copyright protections initiated and/or held, individually or jointly, by Defendant Cyrus and/or Defendant SME and/or Defendant SMI, and/or by any third parties related thereto and/or any of the other named Defendants herein, in connection with the creating, producing, marketing, selling, releasing, performing and/or distributing of Defendants' *"We Can't Stop."*

23.     That at all relevant times herein mentioned and upon information and belief, Defendant SMILEY-MILEY, INC., (hereinafter "SMI") is a corporation organized and existing under the laws of the State of Tennessee, admitted and authorized to conduct business in the State of New York and, at all relevant times herein, is and was doing business in the State of New York within this judicial district.  At all relevant times herein mentioned, Defendant SMI was registered in 2006 and remains an active, for-profit corporation which owns several separately registered and active Trademarks for entities directly linked/connected to the professional entertainment industry including, and in particular, for Defendant Cyrus herein.

24.     That at all relevant times herein mentioned and upon information and belief, Defendant Cyrus owns, manages, controls and/or operates Defendant SMI as a corporate vehicle through which Defendant Cyrus enters into professional entertainment contracts, partnerships, businesses and/or agreements with third-party entities and which houses or processes any

revenue generated therefrom including, but not limited to, Defendants Cyrus and SMI's contract/agreement/business agreement/contractual relationship with Defendant SME and/or RCA for the creating, recording, selling, producing, marketing, performing and distributing of Defendants' *"We Can't Stop"*.

25.     That at all relevant times herein mentioned and upon information and belief, Defendant SMI additionally and/or alternatively houses various companies and copyright ownership interests owned and held by Defendant Cyrus that are related to her various music entertainment and other entrepreneurial ventures including, but not limited to, the creating, recording, selling, producing, marketing, performing and distributing of Defendants' *"We Can't Stop."*

26.     That at all relevant times herein mentioned and upon information and belief, Defendant SMI was established to receive, and presently receives, holds, processes, and/or distributes various forms and amounts of revenues, royalties, dividends and payments generated and received through transactions, partnerships, projects, and sales through and with various third party entities including, but not limited to, those generated and received through the creating, recording, selling, producing, marketing, performing and distributing of Defendants' *"We Can't Stop."*

27.     That at all relevant times herein mentioned and upon information and belief, Defendant SMI is a corporation created, owned, operated, managed, governed, controlled and/or established by Defendant Cyrus for the purposes of receiving, processing, holding and/or converting her contractual and/or non-contractual revenues and/or royalties earned and/or received by, gifted and/or otherwise granted to Defendant Cyrus in her capacity as a professional music entertainment artist including, but not limited to, such revenues generated and/or received

7

by Defendants Cyrus and/or SMI for/from the creating, recording, selling, producing, marketing, performing and distributing of Defendants' *"We Can't Stop."*

28.     That at all relevant times herein mentioned and upon information and belief, Defendant Cyrus established Defendant SMI for the purposes of receiving, processing, holding, and/or converting her contractual and/or non-contractual revenues and/or royalties earned, received by, gifted and/or otherwise granted to her in connection with any and all obligations, duties and/or endeavors executed or discharged under any contract she holds with Defendant SME, with Defendant SME's label RCA and/or with any of SME's subsidiaries/subdivisions/department and/or other third party entities, subsidiaries, labels, subdivisions, companies and/or individuals connected to her general entertainment and/or songwriting, production, live tour performance, live media performance and/or media-recorded performance undertakings and endeavors including, but not limited to, for the creating, recording, selling, producing, marketing, performing and distributing of Defendants' *"We Can't Stop."*

29.     That at all relevant times herein mentioned, upon information and belief, Defendant THERON THOMAS (hereinafter "Theron"), one half of the duo known as Rock City a.k.a. R. City, was born in St. Thomas, U.S. Virgin Islands. Upon information and belief and at all relevant times herein mentioned, Defendant Theron is a songwriter and music producer, is a resident of the State of Georgia and, at all relevant times herein, is and was doing business in the State of New York within this judicial district.

30.     That at all relevant times herein mentioned and upon information and belief, Defendant Theron co-wrote Defendants' song *"We Can't Stop"* -- the infringing musical composition herein.

8

31.     That at all relevant times herein mentioned and upon information and belief, Defendant TIMOTHY THOMAS (hereinafter "Timothy"), who was born in St. Thomas, U.S. Virgin Islands, is Defendant Theron's brother and is the other half of the Rock City duo. Upon information and belief and at all relevant times herein mentioned, Defendant Timothy is a songwriter and music producer, is a resident of the State of Georgia and, at all relevant times herein, is and was doing business in the State of New York and within this judicial district.

32.     That at all relevant times herein mentioned and upon information and belief, Defendant Timothy co-wrote Defendants' song "*We Can't Stop*" -- the infringing musical composition herein.

33.     That at all relevant times herein mentioned and upon information and belief, Defendant Theron, in his capacity as music producer and collaborating songwriter of Defendants' "*We Can't Stop*" individually, directly, purposefully, willfully, and cooperatively engaged in and participated in all aspects of the songwriting, musical production and/or arrangement, lyric arrangement, lyric composition, production, recording production and/or video-music production and arrangement of Defendants' "*We Can't Stop*."

34.     That at all relevant times herein mentioned and upon information and belief, Defendant Theron was personally and professionally aware of the existence of Plaintiff May, of Plaintiff May's contributions to the realm of professional music in particular, to the musical genre of reggae music and, specifically, of Plaintiff May's authoring, creating, writing and the production, performance and success of Plaintiff May's song "*We Run Things*" and of his unique, original and creative lyrics contained in same, to wit: "We run things. Things no run we".

35.     That at all relevant times herein mentioned and upon information and belief, Defendant Theron, in his capacity as music producer and collaborating songwriter of Defendants' *"We Can't Stop,"* individually and directly participated, collaborated and worked with Co-Defendants Timothy, Mike Will and Cyrus in identifying and implementing musical samplings, lyrics and interpolations involved in the songwriting and production of Defendants' *"We Can't Stop"* including, but not limited to, the use and implementation of Plaintiff May's unique, original and creative lyrics, to wit: "We run things. Things no run we" in/into Defendants' *"We Can't Stop."*

36.     That at all relevant times herein mentioned and upon information and belief, Defendant Theron, in his capacity as music producer and collaborating songwriter of Defendants' *"We Can't Stop,"* individually and directly participated with Defendant Cyrus in procuring, utilizing and/or applying certain music engineering tools and applications involved in the songwriting and production of Defendants' *"We Can't Stop."*

37.     That at all relevant times herein mentioned and upon information and belief, Defendant Timothy, in his capacity as music producer and collaborating songwriter of Defendants' *"We Can't Stop,"* individually, directly, purposefully, willfully, and cooperatively engaged in and participated in all aspects of the songwriting, musical production and/or arrangement, lyric arrangement, lyric composition, production, recording production and/or video-music production and arrangement of Defendants' *"We Can't Stop."*

38.     That at all relevant times herein mentioned and upon information and belief, Defendant Timothy, in his capacity as music producer and collaborating songwriter of Defendants' *"We Can't Stop,"* individually and directly participated with Defendant Cyrus in

procuring, utilizing and/or applying certain music engineering tools and applications involved in the songwriting and production of Defendants' *"We Can't Stop*."

39. That at all relevant times herein mentioned and upon information and belief, Defendant Timothy, in his capacity as music producer and collaborating songwriter of Defendants' *"We can't Stop,"* individually and directly participated with Co-Defendants Theron, Mike Will and Cyrus in identifying and implementing musical samplings, lyrics and interpolations involved in the songwriting and production of Defendants' *"We Can't Stop"* including, but not limited to, the use and implementation of Plaintiff May's unique, original and creative lyrics, to wit: "We run things. Things no run we" in/into Defendants' *"We Can't Stop"*.

40. That at all relevant times herein mentioned and upon information and belief, Defendant Timothy was personally and professionally aware of the existence of Plaintiff May, of Plaintiff May's contributions to the realm of professional music in particular, to the musical genre of reggae music and, specifically, of Plaintiff May's authoring, creating, writing and the production, performance and success, of Plaintiff May's song *"We Run Things"* and of his unique, original and creative lyrics contained in same, to wit: "We run things. Things no run we."

41. That at all relevant times herein mentioned and upon information and belief, Rock City is the American musical songwriting and music production duo formed in 2003, consisting of Defendants Theron and Timothy Thomas. Defendants Theron and Timothy use the stage names Uptown AP and A.I., respectively, and together constitute the songwriting and music production team for various popular music artists, including but not limited to, upon information and belief, for Defendant Cyrus herein and for Defendant's *"We Can't Stop"* herein.

11

42.     That at all relevant times herein mentioned and upon information and belief, Defendants Timothy and Theron freely acknowledge that their collective inspiration for the production of the arrangements contained, used and implemented in within Defendants' "*We Can't Stop*" was largely rooted in Caribbean musical influence.

43.     That at all relevant times herein mentioned and upon information and belief, Defendant MICHAEL LEN WILLIAMS II a.k.a. MIKE WILL MADE IT a.k.a MIKE WILL MADE-IT a.k.a MIKE WILL (hereinafter "Mike Will") is a songwriter and music producer, is a resident of the State of California and, at all relevant times herein, is and was doing business in the State of New York and within this judicial district.

44.     That at all relevant times herein mentioned and upon information and belief, Defendant Mike Will helped, participated in, assisted in, collaborated on, co-wrote and/or produced the Defendants' infringing musical composition herein, to wit: Defendants' "*We Can't Stop*."

45.     That at all relevant times herein mentioned and upon information and belief, Defendant Mike Will, in his capacity as music producer and/or collaborating songwriter of Defendants' "*We Can't Stop,*" individually, directly, purposefully, willfully, and cooperatively engaged in and participated in all aspects of the songwriting, musical production and/or arrangement, lyric arrangement, lyric composition, production, recording production and/or video-music production and arrangement of Defendants' "*We Can't Stop*".

46.     That at all relevant times herein mentioned and upon information and belief, Defendant Mike Will, in his capacity as music producer and/or collaborating songwriter of Defendants' "*We Can't Stop,*" individually and directly participated with Defendant Cyrus in

12

procuring, utilizing and/or applying certain music engineering tools and applications involved the songwriting and production of Defendants' "*We Can't Stop*."

47.     That at all relevant times herein mentioned and upon information and belief, Defendant Mike Will, in his capacity as music producer and/or collaborating songwriter of Defendants' "*We Can't Stop*," individually and directly participated with Co-Defendants Timothy, Theron and Cyrus in identifying and implementing musical samplings, lyrics and interpolations involved in the songwriting and production of Defendants' "*We Can't Stop*" including, but not limited to, the use and implementation of Plaintiff May's unique, original and creative lyrics, to wit: "We run things. Things no run we" in/into Defendants' "*We Can't Stop*".

48.     That at all relevant times herein mentioned and upon information and belief, Defendant LARRY RUDOLPH (hereinafter "Rudolf"), a former entertainment lawyer, is a talent manager of various artists, is a resident of the State of California and, at all relevant times herein, is and was doing business in the State of New York and within this judicial district.

49.     That at all relevant times herein mentioned and upon information and belief, Defendants SME, Cyrus and/or SMI hired, contracted with, collaborated with and/or worked with Defendant Rudolph in 2013 to be Defendant Cyrus' new entertainment talent and career manager.

50.     That at all relevant times herein mentioned and upon information and belief, Defendant Rudolph, as Defendant Cyrus' new entertainment talent and career manager, was responsible for revitalizing and revamping Defendant Cyrus' personal and career-based image to transition Defendant Cyrus from a child star into an "edgy" adult pop star.

51.     That at all relevant times herein mentioned and upon information and belief, Defendant Rudolph served as the entertainment talent and career manager for Defendant Cyrus

and thus managed, facilitated, presided over, directed, controlled and remained aware of all ideas of creative collaboration, artistry and music songwriting and/or production endeavored and/or undertaken by Defendant Cyrus in her capacity as collaborating songwriter and performer along with Defendants Timothy, Theron and Mike Will, in their respective capacities as collaborating songwriters and collaborating music producers, including for and of Defendants' *"We Can't Stop"* herein.

52.     That at all relevant times herein mentioned and upon information and belief, Defendant Rudolph was hired to, and did, craft, develop, tailor, re-invent, re-vamp and/or revitalize Defendant Cyrus' personal and career-based image and, in particular her personal and career-based image for her entertainment/music projects including, but not limited, to her image for the creation, writing, production, marketing, promoting, selling, releasing and distribution of Defendants' *"We Can't Stop"* herein.

53.     That at all relevant times herein mentioned and upon information and belief, Defendant Rudolph was responsible for and/or participated in the management, control, governance and supervision of any of, part of and/or all creative and contractual endeavors and undertakings related to Defendant Cyrus' performances of Defendants' *"We Can't Stop,"* including his curation of Defendant Cyrus' revamped entertainment image featuring an urban and island-inspired flair.

54.     That at all relevant times herein mentioned and upon information and belief, Defendant SME, directly and/or by/through RCA, knew and/or had reason to know that, Defendant Rudolph was hired as a talent and career manager for Defendants Cyrus to craft, develop, tailor, re-invent, re-vamp and/or revitalize her personal and career-based image and, in particular her personal and career-based image for her entertainment projects including, but not

limited, to that for the creation, writing, production, marketing, promoting, selling, releasing and distribution of Defendants' "*We Can't Stop*" herein.

55.     That at all relevant times herein mentioned, upon information and belief, Defendant SME , directly and/or by/through RCA, knew and/or had reason to know that Defendant Rudolph managed, controlled, governed and/or supervised any of, part of and/or all creative and contractual endeavors and undertakings related to Defendant Cyrus' performances of Defendants' "*We Can't Stop*," including his curation of Defendant Cyrus' revamped entertainment image featuring an urban and island-inspired flair.

56.     That at all relevant times herein mentioned and upon information and belief, Defendant Rudolph, in collaboration with representatives of Defendants SME, Cyrus and/or SMI managed, controlled, governed, oversaw, ran and/or supervised Defendants' hiring of third party contributors in the creation, development and performance of Defendants' "*We Can't Stop*," including, but not limited to, the hiring of, contracting with, collaborating with and/or working with Defendants Theron, Timothy and Mike Will herein for and in connection/furtherance of the creation, recording, selling, production, marketing, performance and distribution of Defendants' "*We Can't Stop.*"

57.     That at all relevant times herein mentioned and upon information and belief, Defendant Rudolph was responsible for, assisted with, engaged in, collaborated on and/or participated in the conceptualizing, developing and curating the new "edgy" image and identity of/for Defendant Cyrus including same for/in Defendants' "*We Can't Stop*".

58.     That at all relevant times herein mentioned, upon information and belief, Defendant Rudolph managed, controlled, governed, oversaw, ran and/or supervised Defendant

15

Cyrus' career and performances of Defendants' infringing musical composition *"We Can't Stop."*

59.     That at all relevant times herein mentioned and upon information and belief, Defendant SME knew and/or had reason to know of, and/or managed, facilitated, governed, recommended and/or controlled Defendant Cyrus' agreement, contract, retainer, collaboration and/or musical collaboration/engagement with Defendants Theron, Timothy and Mike Will in all music, lyric and video creation, writing, composing, recording, arrangement and production for/of the songwriting, arrangement and production of Defendants' *"We Can't Stop."*

60.     That at all relevant times herein mentioned and upon information and belief, Defendant SME knew and/or had reason to know, and was provided advance notice of all musical samplings, lyrics, compositions, lyrical compositions and/or interpolations written, created, arranged, selected, implemented and produced by Defendants Cyrus, Theron, Timothy and Mike Will in the songwriting, lyrical composition, arrangement and production of Defendants' "We Can't Stop."

## JURISDICTION

61.     This Court has subject matter jurisdiction herein pursuant to 28 U.S.C. §1388(a) because of this Court's exclusive jurisdiction over copyright cases.

62.     Venue is proper pursuant to 28 U.S.C. § 1400(a) because the Defendants reside or may be found within this district and personal jurisdiction may be properly obtained over the Defendants.

### GENERAL ALLEGATIONS
### Plaintiff and "We Run Things"

63.     Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "62" with the same force and effect as if more fully set forth at length herein.

64.     That at all relevant times herein mentioned, Plaintiff May is a Jamaican songwriter and recording artist who has released several hit reggae singles in the late 1980s and 1990s. He has recorded for various producers and collaborated with internationally-known reggae artists such as Freddie McGregor ("*Bless My Soul*"), Sanchez ("*Madly In Love*"), Ninjaman ("*Zip It Up*"), and ThrillerU ("*Girls Just Wanna Have Fun*").

65.     That in or about 1981 and continuing through to 1988, Plaintiff May performed as and was a disc jockey/DJ performing throughout Jamaica, West Indies for the sound system known as "Rambo Mango International" for which he performed and created sound system sets and created his own sound and authored/created his own lyrics.

66.     That in or about 1981, as part of Plaintiff May's sound system and performance as a disc jockey/DJ, Plaintiff May created, originated and authored lyrics to be used as a "hook" and/or "punch line" to/for his sound system performances/sets. That in or about 1981, Plaintiff May created, originated and authored the unique, original and creative lyrics/lyrical phrase, to wit: "We run things. Things no run we" and performed and/or sang same original, creative and unique lyrics/lyrical phrase during his sound system performances/sets as a disc jockey/DJ from in or about 1981 and continuing through to in or about 1988 when Plaintiff May then authored and created his original, unique and creative protected work/song entitled "We Run Things".

67.     That witnesses to Plaintiff May's authoring, originating and creating, in or about the year 1981, of the lyrical phrase "We run things. Things no run we", include Mr. Cleveland

Constantine Browne, Mr. Cyril Nelson, Mr. Junor Bryan and Mr. Nigel Lloyd.  As attested to by the sworn Affidavits of each of the aforementioned individuals, Plaintiff May in or about the year 1981, authored, created and originated the lyrical phrase "We run things. Things no run we" from when Plaintiff May was a disc jockey/DJ with the sound system "Rambo Mango International" and, that, prior to Plaintiff May creating, authoring and originating same lyrical phrase, each of them, individually and collectively, have never heard same phrase, lyrical phrase or saying in any conversations, communications, songs, vernacular or otherwise prior to Plaintiff May creating and authoring same. *See* **Composite Exhibit A.**

68.     In or about the year 1988 and/or earlier, Plaintiff May solely authored/created the song "*We Run Things*," which was musically arranged with the assistance of Cleveland Browne, Haldane Browne and Wycliffe Johnson. "We Run Things" was released to the public in 1988 and became a cultural hit garnering significant sales and popularity both domestically in the Caribbean region and internationally. Specifically, in December 1988, Plaintiff May's "We Run Things" became a No. 1 hit in Jamaica, West Indies as reported by the Jamaica Gleaner. *See* **Exhibit B.** The song was additionally met with great acclaim in the United Kingdom, Canada and the United States of America. Since its release, "*We Run Things*" remains a favorite for lovers of reggae music worldwide.

69.     Plaintiff May's original, creative and unique lyrical phrase "We run things. Things no run we" was featured prominently throughout his work as a disc jockey from in or about 1981 through to 1988, and is in his song "We Run Things."  This lyrical phrase is distinctly Plaintiff May's with its own unique phraseology, meaning and linguistic combinations using part of the Jamaican Patois dialect and uniquely and creatively mixing same with the English language.  Phonetically, in strict Jamaican Patois, Mr. May's lyrical phrase would be

spelled "Wi run tings. Tings nuh run wi." Though grammatically incorrect, the literal English translation is "We run things. Things don't run we." That incorrect grammar is a critical lyrical distinction. The grammatically correct version, that a native English language speaker such as Defendant Cyrus would be expected to use, is "We run things. Things don't run us." Yet Defendants' song instead _uses the grammatically incorrect version_ of the lyrical phrase – the exact, original, creative and unique lyrical phrase coined by Plaintiff May thirty-seven (37) years ago. The Defendants' infringement is linguistically and grammatically distinct and, as a result, unequivocal, particularly when the lyrical phrases are viewed side-by-side:

| Lyrical Phrase Comparison | | | | |
|---|---|---|---|---|
| **Michael May (Flourgon's) song, "We Run Things":** | | | **Miley Cyrus's/Defendants' song, "We Can't Stop":** | |
| We Run Things<br>Things no run we<br>Anything we do haffi done properly | | | We Run Things<br>Things don't run we<br>Don't take nothing from nobody | |
| **Amount of times repeated** | 9 | | 3 | |
| **Placement in song** | Title of Song and Hook of Repeated Chorus | | Hook of Repeated Chorus | |

70.     That at all relevant times herein mentioned, as solely created/authored/originated by Plaintiff May in or about 1981, and continuing through to 1988, Plaintiff May's unique, creative and original lyrical phrase "We run things. Things no run we" describes an attitude of personal freedom and situational control, where an individual need not be constrained by fear or reproach as he/she is not controlled or ruled by one's circumstances – a substantially similar theme/attitude also copied and misappropriated from Plaintiff May's protected work/song/musical composition/lyrical phrase by Defendants in Defendants' "We Can't Stop".

71. That at all relevant times herein mentioned, Plaintiff May's protected content was completely original, creative and unique from in or about 1981 and continuing through to 1988. Plaintiff May was the first to construct/create/author such a sequence using the phrase "We run things. Things no run we" and was the first musical artist to convey this unique, creative and original lyrical phrase/sequence into musical arrangement, from in or about 1981 as a disc jockey/DJ and continuing through to his 1988 release of "We Run Things", not only domestically in Jamaica, West Indies and the Caribbean region, but also internationally, with acclaim in the United Kingdom, Canada and the United States of America.

72. That at all relevant times herein mentioned, Plaintiff May's linguistic/lyrical phrase/sequence created by Plaintiff May in or about 1981 and continuing to 1988, is creative, original, unique and copyrightable.

73. That upon information and belief, in or about 1999, Plaintiff May's original, creative and unique lyrics/lyrical phrase "We run things. Things no run we" and his 1988 song "We Run Things" containing Plaintiff May's lyrics/lyrical phrase "We ring things. Things no run we" were used/sampled/featured in the 1999 film/soundtrack for the 1999 film entitled *"Third World Cop"*, a Jamaican action-crime film produced by Chris Blackwell of Island Jamaica films and directed by Chris Browne. That Plaintiff May gave permission to the filmmakers of *"Third World Cop"* to use/sample/feature his lyrical phrase/lyrics "We run things. Things no run we" and to use/sample/feature his 1988 song "We Run Things", containing said lyrics/lyrical phrase, in said film/film soundtrack for which Plaintiff May was given proper credit in the film for same.

74. In 2017, Plaintiff May sought from the United States Copyright Office formal ownership protections over this unique musical arrangement. In recognition of the uniqueness, originality and creativity embodied by Plaintiff May's bold musical integration of his unique,

original and creative lyrical phrase, Plaintiff May was granted formal copyright protection of all

musical arrangements contained within *"We Run Things."* ***See*** **Exhibit C.**

## DEFENDANTS' INFRINGEMENT

75.     Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every

allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "66"

with the same force and effect as if more fully set forth at length herein.

76.     That at all relevant times herein mentioned, Defendants have exploited and

continue to exploit and greatly profit from *"We Run Things"* in this jurisdiction, within the

balance of all U.S. jurisdictions, throughout the international entertainment market and the world

by reproducing, preparing derivative works, copying, distributing, selling, singing, licensing,

publicly performing, and/or otherwise exploiting Defendants' "We Can't Stop" and by further,

upon    information    and    belief,    marketing,    selling,    licensing    and/or    distributing

merchandise/merchandise    products    exploiting    Defendants'    "We    Can't    Stop    by    using,

misappropriating and infringing on Plaintiff May's unique, creative and original lyrical phrase.

77.     That at all relevant times herein mentioned, Defendants' infringement of Plaintiff

May's protected work/content/musical composition/song/lyrical phrase is continuing to present

date as Defendants' "We Can't Stop" continues to be sold, publicly performed, distributed and/or

licensed by Defendants herein, and, as Defendants, despite industry practice, never sought a

license or permission from Plaintiff May.  Defendants' infringement of Plaintiff May's work also

includes, upon information and belief, Defendants' registering "We run things. Things don't run

us" as search terms/ internet search engine terms and that Defendants have done so intentionally

to manipulate search engines and search engine terms to Defendants' direct benefit and/or profit.

That, upon information and belief, Defendants' registering Plaintiff May's lyrical phrase as

search engine terms continues as an infringement of Plaintiff May's protected work to present date.

78.     That at all relevant times herein mentioned, Defendants' infringing acts herein include, but are not limited to, unlawfully creating, recording, manufacturing, producing, selling, publicly performing, concert touring, licensing, marketing, and/or distributing the musical composition and sound recording of Defendants' "We Can't Stop" containing Plaintiff May's protected work/content/song/musical composition/lyrical phrase. Defendants, upon information and belief, further unlawfully infringed upon Plaintiff May's protected work and unique lyrical phrase by selling, marketing, licensing and/or distributing merchandise/merchandise products to exploit Defendants' "We Can't Stop by using Plaintiff May's lyrical phrase in/on same merchandise. Defendants' infringement is the unlawful appropriation of Plaintiff May's copyrighted material including Plaintiff May's original, creative and unique lyrical phrase "We run things. Things no run we." _**See**_ **Exhibit D.**

79.     That at all relevant times herein mentioned, without seeking to obtain any form of advance permission from Plaintiff May, upon information and belief, Defendants intentionally and unlawfully used Plaintiff May's original, creative and unique lyrical phraseology as the repeated chorus and hook in *"We Can't Stop."* With purposeful knowledge and intent, Defendants unlawfully misappropriated Plaintiff May's original, unique and creative lyrical phraseology in order to establish an overarching and pervasive theme for *"We Can't Stop."* As evidenced by its ongoing significant success, *"We Can't Stop"* features a theme of defiant audaciousness in the realm of self-discovery and self-governance. The entire theme of *"We Can't Stop"* would be hollow in sound and impact, and would fail to achieve stated success without the

22

unique thrust of authenticity and the substantially similar theme of /provided by Plaintiff May's original, protected content.

80.     That at all relevant times herein mentioned, upon information and belief, upon public debut, "*We Can't Stop*" was immediately received and recognized as a theme song and mantra of sorts for an entirely new musical audience for Defendant Cyrus; Defendants' song's meteoric success is squarely attributable to the fact that legions of newfound fans throughout the world download, direct-request and zealously respond to live performances of this song on a routine basis.

81.     That at all relevant times herein mentioned, upon information and belief, for this reason, Defendant Cyrus intentionally performs and continues to perform to present date "*We Can't Stop*" during nearly every single live

82.     That, upon information and belief, Defendant Cyrus began her musical career as Hannah Montana in 2006 mainly within the U.S. based television market. Hannah Montana was a television program created and produced by Disney in 2006. Hannah Montana was quite purposefully marketed as an "all-American," wholesome musical and television character, whose trademark sound was purely pop in nature. In 2007 Defendant Cyrus' music landed her on Billboard Chart's "Top 200."

83.     That, upon information and belief, in August 2012, Defendant Cyrus dramatically chopped off her flowing blond hair, trading it for a very avant garde, short, spiked and partly-shaven, platinum hairstyle. During that time, she commented very heavily within various media outlets about becoming "edgy" in her new approach to life and music.  In 2013, Defendant Cyrus signed with RCA and hired Defendant Rudolph as her new entertainment and talent and career manager including in furtherance of the altering, changing and reinventing of Defendant Cyrus's

personal and career image and musical sound into a new more urban image and sound and to transform her from a child star to an edgy adult pop star.

84.     That, upon information and belief, from the inception of her career, the focus of Defendant Cyrus' creative sound was exclusively oriented towards modern pop-music. Her music was bereft of any traces or hints of urban or Caribbean sound. However, in or about 2012 and 2013, Defendant Cyrus endeavored to revamp and overhaul her sound and personal image, seeking to reinvent her industry style and profile by urbanizing her musical sound.

85.     That, upon information and belief, in doing so, Defendant Cyrus exchanged her trademark "good girl" Disney profile for a gritty and hyper-sexualized image, quite often brazenly and defiantly invoking provocative and obscene statements, lyrics and gestures in her live and recorded performances. While doing so, Defendant Cyrus dramatically changed her style of dress and personal vocalizations to reflect the grittiness, aggression and sultriness associated with U.S.-based hip-hop, R&B, urban and Caribbean music. *See* **Exhibit E.**

86.     That, upon information and belief, within this process of self-reinvention, Defendant Cyrus sought production input and contribution from some of the most highly-celebrated musical legends of hip-hop R&B, rap and urban music. Defendant Cyrus similarly and contemporaneously sought parallel contributions from popular U.S. and Caribbean writing and production fixtures including, but not limited to, Defendants Timothy, Theron and Mike Will as she so collaborated/worked with for/on Defendants' "We Can't Stop". Defendant Cyrus sought this valuable writing production input in order to authenticate and add credibility by association to her aggressive new sound.

87.     That, upon information and belief, most recently, Defendant Cyrus has very publicly looked to American urban music and Caribbean music for inspiration in her evolving

career and Defendants' *"We Can't Stop"* has garnered a brand-new musical audience for Defendant Cyrus, especially given the industry-status and popularity of her new-found association with Co-Defendants Timothy, Theron and Mike Will within the realm of urban music.

88.    That, upon information and belief, the Caribbean, and in particular Jamaica, has long been a source of creative inspiration for generations of international artists of all races, creeds, colors and national origin. The Caribbean has been regarded for decades as a rich and attractive source of artistic inspiration, offering dynamic, engaging, trend-setting and enticing cultural enlightenment to artists and tourists alike, and, that for generations scores of American and international artists have based their musical productions on hallmark sounds hailing from various Caribbean communities and items.

89.    That, upon information and belief, throughout her highly-successful career, Defendant Cyrus and her team have successfully sampled various songs from a cross-section of musical artists for which Cyrus and her team have routinely gone through the proper industry channels of protocol in order to seek and obtain advanced clearance for use of the subject, protected musical content. This repeated adherence to decades-old industry protocol demonstrates that Defendant Cyrus and her team are well versed in the necessity of securing advance clearance and the associated repercussions in absence of the same.

90.    That, at all relevant times herein mentioned, and upon information and belief, in 2013, Defendants Cyrus, Theron, Timothy, and Mike Will co-authored and produced the musical composition entitled *"We Can't Stop."* The composition of Defendants' "We Can't Stop" was recorded and performed by Defendant Cyrus and was released to the general public on Cyrus' fourth album, *Bangerz,* on June 3, 2013.  Defendants re-released "We Can't Stop" in 2014,

continuing to re-release in 2015, continuing to re-release in 2016, continuing to re-release in 2017 and continuing to re-release same to present date for which same is released and continues to be release to present date to the public for sale.

91.     That at all relevant times herein mentioned, Defendants' "*We Can't Stop*" copies, misappropriates, takes, includes in its entirety, and/or is substantially similar to, Plaintiff May's unique, creative and original lyrical phrase "*We run things. Things no run we*," by Defendants featuring/containing the substantially similar lyrical phrase in Defendants' song, to wit: "We run things. Things don't run we" prominently throughout the repeated chorus of Defendants' "We Can't Stop" -- which is repeated at least three (3) times in the Defendants' infringing composition.

92.     That at all relevant times herein mentioned, upon information and belief, the overarching theme of defiance seen in Defendants' "*We Can't Stop*" is nearly exclusively based upon and authenticated by the brash and defiant nature/self rule/self-control embodied by Plaintiff May's original, creative and unique lyrical phrase "We run things. Things no run we".

93.     That at all relevant times herein mentioned, Defendants', including but not limited to Defendant Cyrus', use/taking/copying/misappropriating of Plaintiff May's original, unique and creative lyrical phrase within Defendants' "*We Can't Stop*" fully establishes the memorable context for which Defendants' song is popularly known. Particularly, Plaintiff May's original, unique and creative lyrical phrase is used by Defendants to form the repeated chorus or "hook" of Defendants' "*We Can't Stop*".

94.     That at all relevant times herein mentioned, and based upon the foregoing, in all, the infringed material belonging to Plaintiff May accounts for approximately **Fifty Percent (50%)** of the substantive content of Defendants' "*We Can't Stop*" and, as such, Defendants' "*We*

*Can't Stop*" owes the basis of its chart-topping popularity and its highly-lucrative success to Plaintiff May's protected, unique, creative and original content from Plaintiff May's original, unique and creative musical composition of/in his 1988 hit "We Run Things".

95.     That at all relevant times herein mentioned, and upon information and belief, the entire theme of Plaintiff May's 1988 and/or earlier song "*We Run Things*" is about being reminded that as individuals we should not operate in fear or reproach, but rather with liberty and personal freedom as he/she is in charge, i.e. in situational control. This is evidenced by the song's opening lyrics "All manner of things, hold tight. Shock out, for we rule," and later followed by "We run things. Things no run we.  Anything we do haffi done properly . . . We rule dollars. Dollars don't rule we. . . We rule girls. Girls no rule we."

96.     That at all relevant times herein mentioned, and upon information and belief, substantially similar to "*We Run Things*," is the theme of Defendants' "*We Can't Stop*" as same is centered around being in control of one's own actions, where an individual has license and personal freedom to do what he or she wants and not to be constrained by another person's dictates, as he/she is in charge.

97.     That at all relevant times herein mentioned, and upon information and belief, in Defendants' substantially similar lyrical and thematic version, Plaintiff May's original, creative and unique lyrical phrase is repeated by Defendants using the literal English translation, but substantially similar phraseology to Plaintiff May's, while wholly maintaining the unique Patois phraseology and the vocal/lyrical sequence/cadence/inflection/rhythm, in Defendants' "We run things, things don't run we...Don't take nothing from nobody... "

98.     That at all relevant times herein mentioned, and upon information and belief, Defendants' substantially similar version/copy describes a similar theme of personal liberty as

27

evidenced in Defendants' song, i.e. "Don't take nothing from nobody. Yeah, yeah. It's our party, we can do what we want. It's our party, we can say what we want. It's our party, we can love who we want. We can kiss who we want. We can see who we want."

99.    That at all relevant times herein mentioned, and upon information and belief, Defendants undoubtedly had access to "*We Run Things*" prior to writing and releasing "*We Can't Stop*" given its wide commercial success and given Defendants' knowing of, including but not limited to Defendants Theron and Timothy, Plaintiff May's 1988 and/or earlier hit "We Run Things".

100.    That at all relevant times herein mentioned, and upon information and belief, in particular, Defendants Timothy and Theron of Rock City are Caribbean born and contributed significantly to the writing of "*We Can't Stop*." In 2015, Defendant Theron of the Rock City duo admitted in an interview with Vibe Magazine that:"…we incorporate Caribbean culture because that's who we are and that's the base of our creativity."[1]  Specifically, he added: "You have to listen like 'We run tings, tings don't run we' and 'Hands inna di air like we don't care,'" as they incorporate "that bottom of who we are, that root into the music."[2]

101.    That at all relevant times herein mentioned, and upon information and belief, Defendant Timothy, the second half of the Rock City duo, similarly admits in the same Vibe interview that:  "We pull so many different melodies from Caribbean music because we like to believe Caribbean music has some of the best melodies in music."[3]

102.    That at all relevant times herein mentioned, and upon information and belief, Defendants Cyrus, Timothy, Theron, and Mike Will are seasoned music industry songwriters and

---

[1] Augustin, Camille, "Views From The Studio: Meet R. City, The Hardest Working Songwriters In Show Business" *Vibe E-Magazine,* July 17, 2015, https://www.vibe.com/2015/07/views-from-the-studio-r-city/.
[2] *Id.*
[3] *Id.*

industry professionals who are well-versed in the standard industry practices associated with the production of popular music. Defendants knew or should have known that the phrase "*We Run Things*" could not be used in a musical work by Defendants without a license and/or songwriting credit, as is customary standard practice in the music industry.

103.    That at all relevant times herein mentioned, and upon information and belief, Defendant Rudolph is a former entertainment attorney and therefore has actual and constructive knowledge of the standard industry practices.

104.    That at all relevant times herein mentioned, and upon information and belief, Defendants adhered to the established industry practice with this very same song regarding the interpolation of the song "*La Di Da Di*" being incorporated into Defendants' "We Can't Stop" as Defendants have duly provided writing credits to the songwriters of "*La Di Da Di*", to wit: Douglas E. Davis a.k.a. Doug. E Fresh and Richard Martin Lloyd Walters a.k.a. Slick Rick, for Defendants' use, copying, sampling and/or interpolation of "*La Di Da Di.*"

105.    That at all relevant times herein mentioned, and upon information and belief, Defendants knew and/or should have known that Plaintiff May's unique, original and creative lyrical phrase "We run things. Things no run we" was required to be cleared in a similar manner as Defendants did with Doug E. Fresh and Slick Rick's "*La Di Da Di*" for the very same Defendants' song of "We Can't Stop."

106.    That at all relevant times herein mentioned, and upon information and belief, Plaintiff May's unique, original and creative lyrical phrasing "We run things, Things no run we" is not syntactically correct, and is a conspicuous departure from proper English grammar with its improper sentence construction such that it is noticeably unique, creative and original thereby mandating further inquiry, which should have been conducted by Defendants herein.

107.    That at all relevant times herein mentioned, and upon information and belief, the failure of Defendants Cyrus, Timothy, Theron and Mike Will to deviate in any way from the syntactical uniqueness of Plaintiff May's original, creative and unique lyrical phrasing/protected content demonstrates Defendants' collective, willful and intentional efforts to unlawfully duplicate/copy/misappropriate/take Plaintiff May's protected content/unique, creative and original lyrical phrasing in his 1988 hit "We Run Things".

108.    That at all relevant times herein mentioned, and upon information and belief, had the Defendants performed a cursory search, they would have known that Plaintiff May's unique, creative and original 1988 and/or earlier hit "We Run Things", which was solely authored by Plaintiff May, preexisted Defendants' *We Can't Stop*."

109.    That at all relevant times herein mentioned, and upon information and belief, had Defendants performed a basic Google search for Defendants' intended lyrics of *We Can't Stop*" in 2013, Plaintiff May's protected 1988 and/or earlier *We Run Things*" would have appeared, further informing Defendants of Plaintiff May's copyrighted work.

110.    That at all relevant times herein mentioned, and upon information and belief, in addition to the unique, creative and original lyrics of Plaintiff May's "We Run Things", Defendants Cyrus, Timothy, Theron and Mike Will have substantially incorporated the vocal melody/cadence/inflection/vocal rhythm solely authored/created by Plaintiff May in his 1988 and/or earlier hit "We Run Things" into the vocal melody/rhythm/cadence/inflection of the repeated chorus of Defendants' *We Can't Stop*" including, but not limited to, Defendants' use/copying/recording/singing/producing   the   substantially   similar   hook   that   they took/misappropriated from Plaintiff May, to wit: "We run things. Things don't run we", as well

as taking the substantially similar vocal/lyrical sequence/cadence/inflection/rhythm of Plaintiff May's lyrical phrase "We run things. Things no run we. Anything we do haffi done properly".

111.     That at all relevant times herein mentioned, and upon information and belief, Defendants Timothy and Theron have already admitted to taking the melodies of Caribbean songs and incorporating them into their songwriting.   The combination of the substantial similarities of both lyrics and accompanying vocal melody/cadence/inflection/rhythm of and between Plaintiff May's "*We Run Things*" and Defendants' "*We Can't Stop*" goes beyond substantial and is liable to engender immediate recognition of copying by an observer that is familiar with both songs.

112.     That at all relevant times herein mentioned, and upon information and belief, musical misappropriations are considered so egregious in nature that even the industry's leading talents are not immune from becoming ensnared in content ownership feuds. For example, popular songstress Beyoncé has been involved in circumstances regarding alleged content theft, where such theft was taken seriously and, in some cases, resulted in presumably significant settlements in favor of the artist allegedly deprived of production credit or production compensation. This especially holds true when the subject material is covered by copyright protections.

113.     That at all relevant times herein mentioned, and upon information and belief, song writer Ricky Allen sued Beyoncé in Federal Court on December 10, 2009 for musical misappropriation in connection with theft of his copyrighted song "*Cater 2 U.*"[4] According to relevant documentation, Allen registered the copyright for "*Cater 2 U*" with the Copyright

---

[4] The Judiciary Report, "Beyonce Steals Song again", *The Judiciary Report*, Nov. 10, 2009, http://www.judiciaryreport.com/beyonce_steals_song_again.htm.

Office/Library of Congress in Washington, D.C., in 2000.[5] In 2004, Beyoncé's ladies-group, Destiny's Child, released a song entitled "*Cater 2 U*" featuring the same exact music, lyrics and song title, as the preexisting, copyrighted song Allen registered with the Library of Congress.[6] The wildly successful musical trio reportedly settled the claim with Allen out of court for an undisclosed figure.[7]

114.    That at all relevant times herein mentioned, and upon information and belief, another example is Beyoncé's song "*Hold Up*" which features lyrics from two previous copyrighted works – the Yeah Yeah Yeahs' "*Maps*"[8] and Soulja Boy's "*Turn My Swag On*." [9] The chorus in "*Maps*" includes the lyrics: "Wait, they don't love you like a love you."[10] "*Hold Up*" riffs off of these lyrics with the chorus: "Hold up, they don't love you like I love you / Slow down, they don't love you like I love you / Back up, they don't love you like I love you / Step down, they don't love you like I love you."[11]

115.    That at all relevant times herein mentioned, and upon information and belief, Soulja Boy's "*Turn My Swag On*" includes the lyrics: "Hopped up out the bed turn my swag on / Took a look in the mirror said what's up" while "*Hold Up*" interpolates this lyric with: "I hop up out the bed and get my swag on / I look in the mirror, say, 'What's up?'"[12] Similar to how

---

[5] *Id.*
[6] Sam, "Beyonce Accused Of Song-Stealing; Due In Court Next Month?" ThatGrapeJuice.com, November 9, 2009, http://thatgrapejuice.net/2009/11/beyonce-accused-songstealing-due-court-month/.
[7] Essence, "Destiny's Child Settles 'Cater 2 U' Lawsuit," *Essence.com*, December 4, 2009, https://www.essence.com/2009/12/04/destinys-child-settles-cater-2-u-lawsuit.
[8] Payne, Chris, "Here's How Ezra Koenig Squeezed the Yeah Yeah Yeahs' 'Maps' Into Beyonce's 'Lemonade'," *Billboard*, April 4, 2016, https://www.billboard.com/articles/columns/rock/7348295/beyonce-lemonade-credit-hold-up-ezra-koenig-yeah-yeah-yeahs-vampire-weekend.
[9] Feature, "Soulja Boy Responds To Beyoncé's 'Turn My Swag On' Homage," *Genius*, June 9, 2016, https://genius.com/a/soulja-boy-responds-to-beyonces-turn-my-swag-on-homage.
[10] *Supra*, n. 8.
[11] *Id.*
[12] *Supra*, n. 9.

"*Shake if Off*" repeats the words "play," "hate," "break," and "fake" at the end of the phrase, the lyrics in "*Hold Up*" repeat the phrase "What's Up" three times at the end of the phrase.[13]

116.    That at all relevant times herein mentioned, and upon information and belief, even though "*Hold Up*" did not use the lyrics from "*Turn My Swag On*" or "*Maps*" verbatim, the use of the lyrics from both of these songs was still cleared in advance with the copyright owners. This demonstrates the industry standard practice to clear such lyrical similarities.

117.    That at all relevant times herein mentioned, and upon information and belief, despite this industry standard practice, Defendants never sought or contemplated to secure a license or other permission from Plaintiff May herein.

118.    That at all relevant times herein mentioned, Defendants' infringing acts include, but are not limited to, unlawfully creating, recording, performing, manufacturing, producing, selling, licensing marketing and/or distributing the musical composition and sound recording of "*We Can't Stop.*" Defendants' infringement amounts to the unlawful appropriation of Plaintiff May's copyrighted material including his original, unique and creative lyrical phrase "We run things. Things no run we" by containing in Defendants' "We Can't Stop", the repeated hook of the repeated chorus: "We run things. Things don't run we".

119.    That at all relevant times herein mentioned, Defendants' infringement includes the unlawful appropriation of Plaintiff May's vocal melody/cadence/rhythm/inflection contained in Plaintiff May's "We Run Things".

120.    That at all relevant times herein mentioned, and upon information and belief, Defendants continue to exploit, "*We Can't Stop*" to their significant financial enrichment and to the complete detriment and exclusion of Plaintiff May. Since the release of "*We Can't Stop,*"

---

[13] *Id.*

Defendants have continued to profit greatly from their reproduction, preparation, distribution, licensing and ongoing public performance of *"We Can't Stop."*

121.    That at all relevant times herein mentioned, and upon information and belief, Defendant Cyrus' popularity and earnings have dramatically increased by virtue of the popularization of *"We Can't Stop."* The wildly-popular song has opened new doors of economic opportunity and has generated new streams of income and wealth for her through a variety of entertainment and media channels.

122.    That at all relevant times herein mentioned, and upon information and belief, *"We Can't Stop"* was released by Defendants including, but not limited to, Defendant Cyrus on June 3, 2013.[14] Defendants re-released "We Can't Stop" in 2014, in 2015, in 2016, in 2017 and into present date as "We Can't Stop" is still presently released to the public for sale. This song was Defendant Cyrus' 'comeback' single, as it went on to become a worldwide commercial success, topping the charts in territories such as the United Kingdom.[15] Internationally, it enjoyed significant success across Europe, and peaked at number one in New Zealand.[16] *"We Can't Stop"* peaked at number 2 on the U.S. Billboard Hot 100, tying it with *"Party in the U.S.A."* as Defendant Cyrus' highest-peaking single in the country at the time.[17]

123.    That at all relevant times herein mentioned, and upon information and belief, the song's music video set the VEVO record for most views within twenty-four hours of release, and became the first to reach one-hundred million (100,000,000) views on the site.[18]    The accompanying music video was released on June 19, 2013, with ten-million seven hundred

---

[14] "Miley Cyrus' 'We Can't Stop' Single Due June 3," *Billboard*, May 19, 2013, retrieved September 10, 2013.

[15] Hung, Steffen. "Miley Cyrus – We Can't Stop," *charts.org.nz*, retrieved September 10, 2013; "Miley Cyrus earns first UK number one single with 'We Can't Stop' – Music News," *Digital Spy*, August 11, 2013, retrieved September 10, 2013.

[16] "Miley Cyrus – We Can't Stop," *Ultratop*, Hung Medien, retrieved August 25, 2013.

[17] "Miley Cyrus – Chart history," *Billboard*, retrieved August 25, 2013.

[18] "Miley Cyrus' 'We Can't Stop' Video Breaks VEVO Record," *Billboard*, July 29, 2013, retrieved September 10, 2013.

thousand (10,700,000) views in its first day.[19]  It was also the fastest video to reach one-hundred million (100,000,000) views, having done so in thirty-seven (37) days.[20]

124.    That at all relevant times herein mentioned, and upon information and belief, upon release, "*We Can't Stop*" debuted at number 11 on Billboard's Hot 100 chart with first-week sales of two-hundred fourteen thousand (214,000) downloads. By August 2013, the song hit No. 2 on Billboard's Hot 100 chart and the song went on to become a massive worldwide hit for Defendant Cyrus, staying on the Billboard's Hot 100 for twenty-six (26) weeks. "*We Can't Stop*" has subsequently been certified 5x Platinum by the RIAA with over five million (5,000,000) copies sold.[21]

125.    That at all relevant times herein mentioned, and upon information and belief, the music video for "*We Can't Stop*" debuted on June 19, 2013 and has, to date, gained eight-hundred one million, one hundred and thirty-one-thousand, four hundred and forty-five (801,131,445) views on YouTube.[22]

126.    That at all relevant times herein mentioned, and upon information and belief, on October 2, 2013, MTV aired the documentary *Miley: The Movement*, which chronicled the recording of her fourth studio album Bangerz, which was released on October 4, 2013.[23] The documentary was a commercial success, debuting at number one on the Billboard 200 with first week sales of two-hundred and seventy thousand (270,000) copies.[24]

---

[19] *Id.*

[20] Lipshutz, Jason, "Miley Cyrus' 'We Can't Stop' Video Breaks VEVO Record," *Billboard*, July 29, 2013, retrieved August 25, 2013.

[21] *Id.*

[22] *Id.*

[23] "MTV to Premiere 'Miley: The Movement' Tonight at 10PM (Video)," *TVbytheNumbers*, October 2, 2013, retrieved October 7, 2013; "Miley: The Movement Sneak Peek: Singer Says Mom Tish Cyrus Is My Homie," *E!*, October 2, 2013, retrieved October 7, 2013, http://www.eonline.com/news/465684/miley-the-movement-sneak-peek-singer-says-mom-tish-cyrus-is-my-homie.

[24] Caulfield, Keith, "Miley Cyrus' 'Bangerz' Debuts At No. 1 On Billboard 200," *Billboard*, October 16, 2013.

127.     That at all relevant times herein mentioned, and upon information and belief, in late 2013, Defendant Cyrus was declared Artist of the Year by MTV.[25] On January 29, 2014, she played an acoustic concert show on MTV Unplugged, performing songs from *Bangerz* featuring a guest appearance by Madonna.[26] It became the highest rated MTV Unplugged in the past decade with over one million seven-hundred thousand (1,700,000) streams.[27] Defendant Cyrus launched her controversial *Bangerz* Tour in the same year of 2014 which received a generally positive reception.[28]

128.     That at all relevant times herein mentioned, and upon information and belief, during her appearance on the *Today* show on October 7, 2014, Defendant Cyrus first mentioned her intentions to tour in 2014.[29] The tour was promoted by the American entertainment company LiveNation Entertainment, which was reported to be paying Defendant Cyrus Five Hundred Thousand Dollars ($500,000.00) per presentation.[30] The first leg of the tour visited North America and was originally scheduled to include thirty-eight (38) shows.[31]

129.     That at all relevant times herein mentioned, and upon information and belief, the *Bangerz* Tour was the 16th highest-grossing tour of 2014, earning Sixty-Two Million Nine Hundred Thousand Dollars ($62.9 million).[32]   ***See* Exhibit F.**

---

[25] Associated Press, "MTV declares Miley Cyrus its artist of the year," *The San Diego Union-Tribune*, December 9, 2013.

[26] Lee, Ashley (February 6, 2014). "Miley Cyrus' Uncensored 'MTV Unplugged' Performance Released," *The Hollywood Reporter*, retrieved February 6, 2014.

[27] *Id.*

[28] Farber, Jim, "Bangerz Tour is Campy and Surreal," *New York Daily News*, April 4, 2014, retrieved July 31, 2014; Deen, Sarah, "Miley Cyrus Bangerz tour kicks off in Canada: 11 weird moments from the first show," *Metro Canada*, February 15, 2014.

[29] Oldenburg, Ann, "Miley will be less sexual at 40, 'maybe'," *USA Today*, October 7, 2013, retrieved October 9, 2013.

[30] Jones, Rhian, "Live Nation and AEG in bidding war for Miley Cyrus' tour – report," *Music Week*, October 28, 2013.

[31] MileyCyrus.com, "Miley To Launch Bangerz Tour on Valentine's Day 2014," *MileyCyrus.com*, November 6, 2013, retrieved November 6, 2013.

[32] Statistic Brain, "Miley Cyrus Career Album Sale Statistics," *Statistic Brain*, October 28, 2013, https://www.statisticbrain.com/miley-cyrus-career-album-sale-statistics/.

130.    That at all relevant times herein mentioned, and upon information and belief, tickets for the highly lucrative tour became available for purchase on November 16, began at the Rogers Arena in Vancouver on February 14, 2014[33] and concluded on October 23 at the Perth Arena in Perth, Australia.[34] In addition, Defendants sold DVDs of the tour, which were officially released on or about March 23, 2015. **_See_ _id._**

131.    That at all relevant times herein mentioned, and upon information and belief, in furtherance of Defendant Cyrus' expanding exposure, a two-hour television special titled: "Miley Cyrus: Bangerz Tour" was filmed during Defendant Cyrus' performances in Barcelona, Spain and Portugal, and was broadcast on July 6, 2014 on NBC in the United States.[35]

132.    That at all relevant times herein mentioned, and upon information and belief, Defendant Cyrus' album _Bangerz_, for which "_We Can't Stop_" is the lead single, has been certified 2x Double-Platinum by the RIAA with over two-million (2,000,000) certified units sold in the United States. Additionally, _Bangerz_ has sold over four million five hundred thousand (4,500,000) units worldwide.[36] "_We Can't Stop_" has proven to be such a hitmaker and popular song for the Defendants that it is routinely performed by Defendant Cyrus, to present date, as part of her repertoire in live performances and promotional appearances.

133.    That upon information and belief, Defendant Cyrus has previously been accused of creative misappropriation. Defendant Cyrus and L.A. rock band Lustra had a feud after the band accused her hit song "Rockstar" was a copy of their song "Scotty Doesn't Know."

---

[33] _Id._

[34] Just Announced! European Dates of Miley's Bangerz Tour". MileyCyrus.com. December 9, 2013. Retrieved December 9, 2013.

[35] _Id._

[36] Lansky, Sam, "Miley Cyrus' "We Can't Stop": Hear Her Comeback Single Here," _Idolator. Spin Media_, June 3, 2013, retrieved April 20, 2014.

Meanwhile, the teen sensation refuses to be held responsible for the band's accusation, stating that she's not the one who wrote the song. [37]

134.    That upon information and belief, Lustra offered a few promotional solutions, none of which were accepted. Lustra's guitarist Nick Cloutman also explained that they don't actually mind having any of their songs used by Defendant Cyrus as long as they would get a credit for it.[38] "We could share even more of our songs with Ms. Cyrus, just as long as we get credit for it, which is what we have wanted all along."[39] In her defense, Cyrus' spokesperson denied she wrote the song, "She doesn't write the songs – she sings them. We have referred this to Disney."[40]

135.    That at all relevant times herein mentioned, and upon information and belief, since the release of her breakout single, "*We Can't Stop*," Defendant Cyrus has continued her highly-lucrative nation-wide travel and tour circuit during which she performs the hit song. For example, on October 10, 2017 Defendant Cyrus performed the song on The Late Show with James Corden "Carpool Karaoke"; on May 26, 2017 she performed the song on the Today Show; on June 17, 2017 she performed the song during the Kiss 108 Concert in Mansfield, Massachusetts; on June 10, 2017 she performed the song at the iHeart Summer '17 Concert in Miami; on May 13, 2017 she perfumed the song at Kiss FM's Wango Tango Fest; December 5, 2015 she performed the song in concert in Philadelphia, Pennsylvania with "Her Dead Petz" presentation; December 25, 2015 she performed the song in concert in Vancouver; May 14, 2015 she performed the song in New York City at Adult Swim Upfront Concert.

---

[37] Aceshowbiz, "Miley Cyrus to End Song Feud With Lustra," *Aceshowbiz.com*, May 28, 2008, https://www.aceshowbiz.com/news/view/00016122.html.
[38] *Id.*
[39] *Id.*
[40] *Id.*

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement against All Defendants)

136.    Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "135" with the same force and effect as if more fully set forth at length herein.

137.    That at all relevant times herein mentioned, Plaintiff's May's original, creative and unique composition *"We Run Things"* contains copyrightable subject matter under the copyright laws of the United States.

138.    That at all relevant times herein mentioned, Plaintiff May was/is the owner of the copyright to "We Run Things" which is the subject of a valid Certificate of Copyright Registration issued by the Register of Copyrights.

139.    That at all relevant times herein mentioned, Plaintiff May's original, creative and unique lyrical phrase "We run things. Things no run we. Anything we do haffi done properly", along with the vocal/lyrical sequence/cadence/inflection/rhythm of his words indicating a theme of being in control, as detailed above, is properly the subject of copyright protection.

140.    That at all relevant times herein mentioned, among the exclusive rights granted to each Plaintiff May under the Copyright Act are the exclusive rights to reproduce and distribute the copyrighted materials to the public and prepare derivative works.

141.    That at all relevant times herein mentioned, and upon information and belief, Defendants have continued to copy and publicly perform Plaintiff May's copyrighted material. Defendants have further authorized the making or distribution of singles, albums, records, CDs, and/or DVD performances and the like, substantially utilizing Plaintiff's copyrighted material in and as part of Defendants' *"We Can't Stop"* throughout the world.

142.    That at all relevant times herein mentioned, and upon information and belief, Defendants' exploitation of Plaintiff May's "*We Run Things*" was made without Plaintiff's knowledge or consent and constitutes a brazen violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

143.    That at all relevant times herein mentioned, and upon information and belief, Defendants' foregoing acts of infringement have been willful, intentional, in disregard for and indifferent to Plaintiff May's rights herein.

144.    That at all relevant times herein mentioned, and upon information and belief, Defendants have profited substantially from their infringing activities, have collected, and continue to collect fees and royalties from the sale of the infringing work and/or any derivatives thereof, and have retained a portion of those fees and royalties without submitting any amount to Plaintiff May. Defendants should be held jointly and severally liable for all profits derived as a result of their infringing activities, whether or not collected and retained by them, as practical partners.

145.    That at all relevant times herein mentioned, and upon information and belief, Defendant SME was/is contractually engaged in the production, manufacture and world-wide distribution of music works written and/or produced by Defendant Cyrus and her contracted third-party collaborators/songwriters/producers including, but not limited to, Defendants Theron, Timothy and Mike will herein, under and pursuant to her artist-label relationship with RCA and/or Defendant SME including, but not limited to, Defendants' "*We Can't Stop.*"

146.    That at all relevant times herein mentioned, and upon information and belief, Plaintiff May's work was misappropriated by Defendants without the opportunity for Plaintiff May to agree to confer the benefit of consent to Defendants to copy, use, take, implement and/or

create derivative songs/lyrics/works from Plaintiff May's unique, original and creative copyrighted work "*We Run Things*."

147.    That at all relevant times herein mentioned, and upon information and belief, Defendants SME, SMI and/or Rudolph knew or should have known of Defendant Cyrus' collaboration with Defendants Mike Will, Timothy and Theron, in the writing, creation and production of Defendants' "*We Can't Stop*", and that it contained, took, used and implemented Plaintiff May's original, unique and creative protected lyrics/music/content without Plaintiff May's knowledge, consent, permission and authority, and, without due and lawful credit and compensation to Plaintiff May for same.

148.    That at all relevant times herein mentioned, and upon information and belief, as a direct result of the writing, creation, production, release, marketing, promoting, sales, performances and distribution of Defendants' "*We Can't Stop*", the Defendants herein received and accepted, and continue to receive and accept to present date, financial enrichment, financial gains, financial profits, monies, income and/or revenues from the writing, production, sale and world-wide distribution of Defendants' "We Can't Stop", and, further receive and continue to receive same unjustly and to the financial detriment and expense of Plaintiff May as set forth herein.

149.    That at all relevant times herein mentioned, and upon information and belief, Defendant SME was/is contractually, professionally and financially enriched by the musical works written, conceptualized, produced and/or performed by Defendants.

150.    That at all relevant times herein mentioned, and upon information and belief, the Defendants knew and/or should have known of the substantial similarities with the lyrics and accompanying vocal melody/cadence/inflection/rhythm of and between Plaintiff May's "*We Run*

*Things. Things No Run We" and* Defendants' "We run things. Things don't run we" that is contained in, used in, taken and implemented by Defendants in Defendants' *"We Can't Stop."*

151.     That at all relevant times herein mentioned, and upon information and belief, the Defendants wrote, created, produced, composed, cleared, approved, released, promoted, marketed, distributed, manufactured and sold "We Can't Stop" to the complete contractual, professional and financial exclusion, detriment and expense of Plaintiff May as set forth herein.

152.     That at all relevant times herein mentioned, and upon information and belief, the Defendants wrote, created, produced, composed, cleared, approved, released, promoted, marketed, distributed, manufactured, sold and/or performed Defendants' *"We Can't Stop"* in a total exclusionary fashion and at his expense and to the Defendants' unjust enrichment, and, contrary to Plaintiff May's exclusive rights to reproduce and distribute the copyrighted materials to the public and to authorize derivative works under copyright law to/for Plaintiff's own benefit/financial benefit.

153.     That at all relevant times herein mentioned, and upon information and belief, the Defendants have continued to release, promote, market, distribute, manufacture, sell and/or perform *"We Can't Stop,"* while unjustly receiving, and continuing to receive to present date, perpetual financial unjust enrichment from Plaintiff May's unique, creative, original and copyrighted material at Plaintiff May's expense and to his financial detriment.

154.     That at all relevant times herein mentioned, and upon information and belief, the Defendants have continued to further authorize and execute the manufacturing of and world-wide distribution of all medium formats of Defendants' *"We Can't Stop"* including, but not limited to, -singles, albums, records, CDs, and/or DVD performances and the like, substantially

42

utilizing, taking and misappropriating Plaintiff's unique, original, creative and copyrighted material in and as part of Defendants' "*We Can't Stop*" throughout the world to present date.

155.    That at all relevant times herein mentioned, and upon information and belief, Plaintiff May's work was misappropriated by Defendants without the opportunity for Plaintiff May to agree to confer the benefit of consent to Defendants to copy, use, take, implement and/or create derivative songs/lyrics/works from Plaintiff May's unique, original and creative copyrighted work "*We Run Things.*"

156.    That at all relevant times herein mentioned, and upon information and belief, Defendants SME, SMI and/or Rudolph knew or should have known of Defendant Cyrus' collaboration with Defendants Mike Will, Timothy and Theron, in the writing, creation and production of Defendants' "*We Can't Stop*", and that it contained, took, used and implemented Plaintiff May's original, unique and creative protected lyrics/music/content without Plaintiff May's knowledge, consent, permission and authority, and, without due and lawful credit and compensation to Plaintiff May for same.

157.    That at all relevant times herein mentioned, and upon information and belief, as a direct result of the writing, creation, production, release, marketing, promoting, sales, performances and distribution of Defendants' "*We Can't Stop*", the Defendants herein received and accepted, and continue to receive and accept to present date, financial enrichment, financial gains, financial profits, monies, income and/or revenues from the writing, production, sale and world-wide distribution of Defendants' "We Can't Stop", and, further receive and continue to receive same unjustly and to the financial detriment and expense of Plaintiff May as set forth herein.

158.    That at all relevant times herein mentioned, and upon information and belief, Defendant SME was/is contractually, professionally and financially enriched by the musical works written, conceptualized, produced and/or performed by Defendants.

159.    That at all relevant times herein mentioned, and upon information and belief, the Defendants knew and/or should have known of the substantial similarities with the lyrics and accompanying vocal melody/cadence/inflection/rhythm of and between Plaintiff May's *"We Run Things. Things No Run We" and* Defendants' "We run things. Things don't run we" that is contained in, used in, taken and implemented by Defendants in Defendants' *"We Can't Stop."*

160.    That at all relevant times herein mentioned, and upon information and belief, the Defendants knew of Plaintiff May, knew of Plaintiff May's original, unique and creative lyrics, to wit: "We run things. Things no run we", and, knew of Plaintiff May's 1988 song entitled "We Run Things" containing the foregoing infringed upon lyrics/lyrical content, when the Defendants took, used, implemented, misappropriated same and intentionally placed same in the repeated chorus of Defendants' *"We Can't Stop"* and when they wrote, created, composed, produced, cleared, approved, released, marketed, promoted, manufactured, distributed, sold and performed Defendants' *"We Can't Stop"*.

161.    That at all relevant times herein mentioned, and upon information and belief, the Defendants wrote, created, produced, composed, cleared, approved, released, promoted, marketed, distributed, manufactured and sold "We Can't Stop" to the complete contractual, professional and financial exclusion, detriment and expense of Plaintiff May as set forth herein.

162.    That at all relevant times herein mentioned, and upon information and belief, the Defendants wrote, created, produced, composed, cleared, approved, released, promoted, marketed, distributed, manufactured, sold and/or performed Defendants' *"We Can't Stop"* in a

total exclusionary fashion and at his expense and to the Defendants' unjust enrichment, and, contrary to Plaintiff May's exclusive rights to reproduce and distribute the copyrighted materials to the public and to authorize derivative works under copyright law to/for Plaintiff's own benefit/financial benefit.

163.    That at all relevant times herein mentioned, and upon information and belief, the Defendants have continued to release, promote, market, distribute, manufacture, sell and/or perform *"We Can't Stop,"* while unjustly receiving, and continuing to receive to present date, perpetual financial unjust enrichment from Plaintiff May's unique, creative, original and copyrighted material at Plaintiff May's expense and to his financial detriment.

164.    That at all relevant times herein mentioned, and upon information and belief, the Defendants have continued to further authorize and execute the manufacturing of and world-wide distribution of all medium formats of Defendants' *"We Can't Stop"* including, but not limited to: singles, albums, records, CDs, and/or DVD performances and the like, substantially utilizing, taking and misappropriating Plaintiff's unique, original, creative and copyrighted material in and as part of Defendants' *"We Can't Stop"* throughout the world to present date.

165.    That at all relevant times herein mentioned, and upon information and belief, Defendants have willfully and intentionally continued to receive unjust financial enrichment from its perpetual exploitation of Plaintiff May's *"We Run Things"* without Plaintiff's knowledge or consent, at his expense and to his financial detriment which constitutes a violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

166.    That at all relevant times herein mentioned, and upon information and belief, Defendants' foregoing acts of infringement have been willful and intentional and in deliberate disregard for Plaintiff May's rights granted under copyright law.

167.     That at all relevant times herein mentioned, and upon information and belief, Defendants have been and continue to be unjustly enriched with millions of dollars in revenues and royalties garnered in the world-wide production and world-wide distribution of Defendants' "We Can't Stop" at Plaintiff's expense, to his financial detriment and in violation of his rights under copyright law.

168.     That at all relevant times herein mentioned, and upon information and belief, it is against equity and good conscience to permit the Defendants herein to retain the ill-obtained financial unjust enrichments gained and received by Defendants and sought by Plaintiff May for recovery under this action herein.

169.     That at all relevant times herein mentioned, as a result of Defendants' willful infringement of Plaintiff May's copyrights and exclusive rights under copyright, Plaintiff May is entitled to maximum statutory damages pursuant to 17 U.S.C. § 504(c), and/or to recover their actual damages and profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), at Plaintiff May's election, and such other relief as is provided by laws. Plaintiff May is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505.

170.     That at all relevant times herein mentioned, and upon information and belief, the conduct of Defendants is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff May great and irreparable injury that cannot fully be compensated or measured in money.  Plaintiff May has no adequate remedy at laws.

171.     That at all relevant times herein mentioned, pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff May is entitled to injunctive relief prohibiting Defendants from further infringing Plaintiff's copyrights and ordering Defendants to destroy all copies of the infringing work and/or other material made in violation of Plaintiff's exclusive rights.

172.    That at all relevant times herein mentioned, Plaintiff May is entitled to damages including, but not limited to, the disgorgement of profits received from the creation of, production of, marketing of, promoting of, releasing of, selling of, manufacture of, world-wide sale of, world-wide distribution of and world-wide performance by Defendants of *"We Can't Stop"* which unlawfully uses, takes and misappropriates Plaintiff May's original, creative and unique copyrighted lyrics.

## PLAINTIFF DEMANDS TRIAL BY JURY

173.    Plaintiff May respectfully demands and requests a trial by jury in the within action.

**WHEREFORE,** Plaintiff MICHAEL MAY prays for relief as follows:

1.    For a judicial determination that Plaintiff's copyright has been infringed upon by Defendants;

2.    For injunctive relief against Defendants, jointly and severally, enjoining Defendants from continuing to infringe on Plaintiff's copyright/protected content/lyrics including, but not limited to, enjoining Defendants from releasing, selling, distributing and/or performing "We Can't Stop" in any forum, fashion or manner;

3.    For damages against Defendants, jointly and severally, in such amount as may be found, or as otherwise permitted by laws;

4.    For attorney's fees and costs pursuant to 17 U.S.C. §505; and

5.    For any such other and further relief as the Court may deem just and proper.

Dated: May 25, 2018

Respectfully Submitted By:

Gary, Williams, Parenti, Watson & Gary, PLLC

/s/ Willie E. Gary, Esq.
/s/ Loreal McDonald, Esq.
/s/ Larry A. Strauss, Esq.
/s/ Victor Gregory Swift, Esq.
Attorneys for Plaintiff MICHAEL MAY
*Pro Hac Vice*
221 S. Osceola Street
Stuart, Florida 34994-2213
(772) 283-8260
WEG@williegary.com

Drummond & Squillace, PLLC

/s/ Stephen L. Drummond, Esq. (SLD 7359)
/s/ JoAnn Squillace, Esq. (JS 4217)
Drummond & Squillace, PLLC
Attorneys for Plaintiff MICHAEL MAY
175-61 Hillside Avenue, Suite 205
Jamaica, New York 11432
(718) 298-5050
(718) 298-5554(fax)
sdrummond@dswinlaw.com
jsquillace@dswinlaw.com

Carol Green von Kaul, P.A.

/s/ Carol N. Green, Esq. (CG 1102)
Carol Green von Kaul, P.A.
Attorneys for Plaintiff MICHAEL MAY
150 NW 70th Avenue, Suite 4
Plantation, Florida 33317
(954) 692-6026
cgreen@vonkaul.legal

Garth Alexander Clarke, Esq.

/s/ Garth A. Clarke, Esq.
Attorneys for Plaintiff MICHAEL MAY
*Pro Hac Vice*
145 Canal Street
Shelton, Connecticut 06484
(202) 286-6829; garthclarke@yahoo.com

## ATTORNEY'S VERIFICATION

WILLIE E. GARY, ESQ., an attorney duly admitted to practice *Pro hac Vice* before this Honorable Court of this Honorable District, the Southern District of New York of the United States District Court, affirms the following to be true under the penalties of perjury:

1.     I am an attorney at GARY, WILLIAMS, PARENTI, WATSON & GARY, PLLC, attorneys of record for Plaintiff Michael May and I am admitted as counsel herein for Plaintiff *Pro Hac Vice*. I have read the annexed **SECOND AMENDED COMPLAINT** and **JURY DEMAND** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files and discussions with Plaintiff.

2.     This verification is made by me because Plaintiff is not presently in the County wherein I maintain my offices.

DATED:     Stuart, Florida

May 25, 2018

/s/  WILLIE E. GARY, ESQ.

49

Docket No.: 18 CV 2238 (LAK)(RWL)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------------------------------------X

MICHAEL MAY a.k.a. FLOURGON, an individual,

                              Plaintiff,

      -against-

SONY MUSIC ENTERTAINMENT, a Delaware General Partnership, DESTINY HOPE CYRUS a.k.a. MILEY RAY CYRUS, an individual, SMILEY-MILEY, INC., a Tennessee corporation, THERON THOMAS, an individual, TIMOTHY THOMAS, an individual, MICHAEL LEN WILLIAMS II a.k.a. MIKE WILL MADE IT/ MIKE WILL MADE-IT/MIKE WILL, an individual, and LARRY RUDOLPH, an individual,

                          Defendants.

-------------------------------------------------------------------------------------------------------------X

## SECOND AMENDED COMPLAINT AND JURY DEMAND

## COMPLAINT FOR COPYRIGHT INFRINGEMENT

**GARY, WILLIAMS, PARENTI, WATSON & GARY, PLLC**

**DRUMMOND & SQUILLACE, PLLC**

**CAROL GREEN VON KAUL, P.A.**

**GARTH ALEXANDER CLARKE, ESQ.**

*Attorneys for Plaintiff MICHAEL MAY a/k/a FLOURGON*