j182mayA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MICHAEL MAY,

 4                    Plaintiff,            New York, N.Y.

 5            v.                            18 Civ. 2238(LAK)(RWL)

 6   DESTINY HOPE CYRUS, et al.,

 7                    Defendants.

 8   ------------------------------x        Argument

 9                                          January 8, 2019
                                            2:05 p.m.
10   Before:

11                    HON. ROBERT W. LEHRBURGER,

12                                          Magistrate Judge

13

14                         APPEARANCES

15

16   DRUMMOND & SQUILLACE, PLLC
          Attorneys for Plaintiff
17   BY:  JoANN SQUILACCE
          STEPHEN L. DRUMMOND
18

19   GARY WILLIAMS PARENTI WATSON & GARY, PLLC
          Attorneys for Plaintiff
20   BY:  WILLIE E. GARY

21

     DAVIS WRIGHT TREMAINE LLP
22        Attorneys for Defendants
     BY:  MARCIA B. PAUL
23        JAMES ROSENFELD
          MEREDITH I. SANTANA
24

25
```

j182mayA

1           (Case called)

2           THE DEPUTY CLERK:  Attorneys, please state your name

3    for the record.

4           MS. SQUILLACE:  Good afternoon, your Honor, and Happy

5    New Year.  JoAnn Squillace, from the law office of Drummond &

6    Squillace, for the plaintiff Michael May.  Good afternoon

7    again, your Honor.

8           THE COURT:  Good afternoon.

9           MR. GARY:  Good afternoon, your Honor.  From Florida,

10   Willie Gary, for the plaintiff.  Happy New Year.

11          THE COURT:  Okay.  Good afternoon.

12          MS. PAUL:  Good afternoon, Judge.  Marcia Paul, here

13   together with Jim Rosenfeld and Meredith Santana, from Davis

14   Wright Tremaine, for the defendants in the action.

15          THE COURT:  Okay.  Good afternoon.

16          We are here on a motion to dismiss in this copyright

17   case.  I want the parties to know that I have thoroughly

18   reviewed the briefs and the papers, and I really actually want

19   to go through an agenda of questions that I have.  You are

20   certainly free to add other things in along the way that you

21   think I should know, but I think there are some important

22   questions to be asked here.

23          I would actually like to start with the plaintiff,

24   even though it is the defendant's motion.

25          My first question, and a very important issue, I

j182mayA

1    think, is exactly what you are alleging.  I am referring

2    specifically to paragraph 69 of the second amended complaint.

3    What I am trying to understand -- and I think defendants have

4    given their own gloss on this as to their understanding -- what

5    exactly is it that Mr. May originated or created?  And what I

6    mean more specifically is, did the phrase "Wi run tings" --

7    where "we" is spelled w-i -- "tings nuh" -- N-U-H -- "run wi,"

8    W-I.  Did that phrase exist before Mr. May created his phrase?

9    In other words, did he adapt it by sort of English-izing it, if

10   you will, or is it your contention and does the second amended

11   complaint contend, allege that Mr. May actually originated the

12   phrase, in full Jamaican patois, "Wi run tings, tings nuh run

13   wi"?

14              MS. SQUILLACE:  Thank you, Judge.

15              It is plaintiff's contention that he, in 1981, as a

16   disc jockey with Rango Mango International and that sound

17   system where he performed musical sets, he originated and

18   created the lyrical phrase which is protected by copyright law

19   "we run things, things no run we."

20              Now, those specific words mixed together, the English

21   words mixed together with the intentionally grammatically

22   incorrect sequence of the words, which comes from patois, he is

23   not using patois words.  He is using English words mixed with

24   the intentionally grammatically incorrect sequence that the

25   Jamaican patois language lends itself to, to originate this

j182mayA

creative, unique, and original phrase, "We run things, things

no run we."

THE COURT: But do you concede that the Jamaican

patois phrase "Wi run tings, tings nuh run wi" existed prior to

Mr. May originating his phrase?

MS. SQUILLACE: Absolutely not, Judge.  We are not.

And, in fact, when you look at the defendants' moving and reply

papers, nowhere do they assert, allege, or provide any proof in

admissible form that in fact that phrase, either the way

Mr. May originated it or in strict Jamaican patois language,

was existing before 1981 nor that anybody else other than

Mr. May originated it or created it before 1981 or since.  All

of the citations that defendants cite to are post 1981 and post

1988, publications, such as an article and a book, and nowhere

in their papers do they allege that the author of that article

created the phrase or that the author of that book created the

phrase.  And the law is clear, just because something may be in

the public domain after it is created doesn't mean that an

infringement did not occur.  And so we absolutely do not

concede that that phrase, even in the strict Jamaican patois,

existed prior to Mr. May.

The other thing, Judge, which is crucial to this

12(b)(6) motion, is that on the pleadings 12(b)(6) motion to

dismiss, the issue of originality, creation, and authorship

cannot be decided, most respectfully, by this court.  The only

j182mayA

1    issue that can be decided by this court on this motion is the

2    issue of fair use.

3         THE COURT:  Well, protectability is also an issue that

4    can be determined by this court.  Indeed, there are cases that

5    have -- other cases that have granted motions to dismiss as

6    opposed to, say, summary judgment on claims where a phrase is

7    alleged to have been the infringing element.

8         MS. SQUILLACE:  The only cases in all of the cases

9    cited by the defendants are all summary judgment and trial

10   cases, Judge.  None of them are 12(b)(6) pleadings.  That is

11   why the only issue that, on the 12(b)(6) motion to dismiss, can

12   be decided by this honorable court as a matter of law is

13   whether the use of defendants taking plaintiff's lyrics is a

14   fair use and thus protected and thus not an infringement or

15   not.  That's the only issue.  Everything else is for a jury to

16   decide.

17        And even with that, Judge, at most and at best, all

18   defendants' papers have done, if you even give it that weight,

19   is show that there are genuine issues of material fact in

20   dispute that, again, warrants a denial for any holding to be

21   held as a matter of law on the 12(b)(6) motion to dismiss.

22        All plaintiff has to do, as required by the Federal

23   Rules of Civil Procedure, is plead with specific detail, which

24   plaintiff does, facial plausible facts, which plaintiff does,

25   and we have to give defendants fair notice of what his claims

j182mayA

1    are, and plaintiff does more than enough of that.

2             The other issue with originality and the authorship of

3    the phrase, Judge, is that we have submitted proof in

4    admissible evidentiary form, both as an exhibit to the summons

5    and complaint as well as attached to our memorandum of law and

6    opposition, the sworn affidavits of Mr. Cleveland Browne, Nigel

7    Lloyd, Junor Bryan, and Cyril Nelson that all attest, under

8    penalties of perjury, that in 1981 he created this phrase.

9    Again, defendants, in their moving papers and reply papers, do

10   nothing to rebut that, dispute that, contradict that, or show

11   an authorship by anybody else at any time prior to 1981.  And

12   based on those reasons, their motion to dismiss should be

13   denied.

14            THE COURT:  Do you agree that some of those

15   attachments, which I agree are articles or otherwise or sources

16   such as Jamaican proverbs and such, would it -- well, you tell

17   me, do you agree that some of those do indicate that the phrase

18   is actually an old Jamaican proverb?  Is that something, again,

19   you dispute or you agree with or --

20            MS. SQUILLACE:  No, Judge.  We dispute that

21   wholeheartedly.

22            THE COURT:  Let me ask you this, then.  One of the

23   documents, that I -- I think among those attachments there is a

24   document that you and your client refer to in your own papers,

25   and that's the Gleaner publication, where there is a discussion

j182mayA

1    of Flourgon -- that's Mr. May's performance name -- and in it

2    there is an interview of counsel for Mr. May from Drummond &

3    Squillace, which is your firm, right?

4              MS. SQUILLACE:  Yes.

5              THE COURT:  And the article says that the phrase "We

6    run things, things no run we" became commonly used in Jamaica.

7    Is that a statement that you made and agree with?

8              MS. SQUILLACE:  No, we didn't, Judge.  And I may

9    suggest that that is actually an exhibit that I believe the

10   defendants attached to their moving papers --

11             THE COURT:  Okay.

12             MS. SQUILLACE:  -- and obviously we can't control how

13   journalists paraphrase or piecemeal comments that are made in

14   an interview such as that.  But, no, we did not say that it

15   became common afterwards.  What we said was that even if it

16   became a common phrase after Mr. May created it, that did not

17   mean that the defendants' infringement did not occur and that

18   the defendants' infringement was not unlawful.  And in fact, as

19   we cited to in our memorandum on page 21, the Supreme Court has

20   held in the case of *Feist Publications, Inc. v. Rural*

21   *Television Services, Co.,* 499 U.S. 345, "even if a copyrighted

22   work independently created by a party" -- which here would be

23   Mr. May -- "is copied by another party" -- any other third

24   party including the defendants -- "the motion should be denied

25   because there is an infringement of the copyright regardless of

j182mayA

1    whether other independent and legitimate uses of the same

2    material exist."  And that is even if you believe defendants'

3    argument that after he created it it is out there in the public

4    domain an infringement still occurred and the infringement is

5    still unlawful and actionable.

6           THE COURT:  Let me go into that a little more because

7    that picks up on some of my other questions.

8           So let's use 1988 as a demarcation because that is

9    when your client or the complaint alleges that he created the

10   song, *We Run Things,* is that correct?

11          MS. SQUILLACE:  That's when he created the song *We Run*

12   *Things*, but not the lyrics specific, Judge.

13          THE COURT:  What I want to ask is, would you agree

14   that prior to 1988 the phrase "we run things, things no run

15   we," standing alone, just standing alone, that phrase itself

16   was not protectable under copyright law.

17          MS. SQUILLACE:  No, Judge.  We wholeheartedly

18   disagree.

19          THE COURT:  So even the phrase by itself, even

20   standing alone from any song, just that phrase by itself you

21   are contending is copyrightable.

22          MS. SQUILLACE:  Absolutely, Judge, because the case

23   law is clear that short phrases, in fact, just like "we run

24   things, things no run we" are protected by copyright law when

25   such short phrases are unique, original, and creative.

j182mayA

1          THE COURT:  Can you give me an example of any

2     phrase -- any copyright that's been issued for a phrase unto

3     itself, not part of a song, just unto itself.

4          MS. SQUILLACE:  I absolutely can.

5          THE COURT:  Okay.

6          MS. SQUILLACE:  In fact, it was used in defendant's

7     song.  Defendant used another copyrighted phrase that was

8     created and copyrighted by Slick Rick and Doug E. Fresh, and

9     the phrase is "LaDiDaDi."  It is not a full sentence.  It is

10    not even really a phrase.  It is a mishmosh of sounds and

11    pronouns that are meshed together to create the LaDiDaDi.  And

12    in that, defendants used that in their song, gave them due

13    compensation and due credit.

14          We submit, Judge, at that it unfortunately becomes a

15    business practice, because Mr. May is not as famous or as

16    popular or as known here, we submit that companies such as the

17    defendants' take the risk, the business risk, we will take this

18    language, we will take their lyrics, and if down the line they

19    found out about it, then we will deal with it then.  They know

20    they could never not give due compensation and credit to Slick

21    Rick and Doug E. Fresh.  That could never happen because they

22    are known, they are famous, and they are more popular and they

23    are more pronounced here in the United States.  But that very

24    phrase, Judge, "LaDiDaDi," that is protected

25          THE COURT:  But was that LaDiDaDi phrase from a song?

j182mayA

1          MS. SQUILLACE:  Yes.  In fact, the song is entitled

2    *LaDiDaDi*.

3          THE COURT:  Okay.  So what I am asking is, did a

4    copyright issue for the phrase or did it issue for the song?

5          MS. SQUILLACE:  Judge, I'm not sure whether the

6    copyright was for the entire song, but when you have a

7    copyright that is for the entire compilation of a song, it is

8    for all the lyrics in the song, just as we have here with

9    Mr. --

10          THE COURT:  I don't disagree with that.  I want to

11    understand how far your position goes.

12          Do you contend that a phrase unto itself, such as "we

13    run things, things no run we," independent of any songs, if

14    there had been no song, but just the phrase, the phrase itself

15    was not copyrightable under the copyright law of the United

16    States?

17          MS. SQUILLACE:  Judge, he copyrighted it when he

18    copyrighted it here in the United States.

19          THE COURT:  He copyrighted the song.  I understand it

20    is part of the song.

21          MS. SQUILLACE:  Correct.

22          THE COURT:  Let's assume there is no song.

23          MS. SQUILLACE:  Correct.

24          THE COURT:  Just the phrase.

25          MS. SQUILLACE:  Yes.

j182mayA

```
 1              THE COURT:  He comes up with the phrase and he hasn't
 2    created any song yet.  Is the phrase itself protectable under
 3    U.S. copyright law?
 4              MS. SQUILLACE:  It absolutely is, Judge.
 5              THE COURT:  So someone can take that phrase, even if
 6    there is no song, and apply for a copyright on that phrase?
 7              MS. SQUILLACE:  Absolutely, Judge.
 8              THE COURT:  Can you give me an example where that's
 9    been done, where there has been no song -- I'm not talking
10    about where it has been part of a song -- someone has come up
11    with a phrase.  You can get a trademark on a phrase because it
12    is a slogan, but what about a copyright?
13              MS. SQUILLACE:  Yes, Judge.  Judge, I want to also
14    just point out that copyright protection doesn't just attach
15    when there is an actual copyright registration.
16              THE COURT:  I understand that.
17              MS. SQUILLACE:  Copyright law -- as soon as he made
18    and originated this unique, original, creative phrase in 1981
19    and he put it in tangible form and published it to the world
20    as --
21              THE COURT:  As part of a song.
22              MS. SQUILLACE:  No.  He used it, Judge, by itself in
23    1981 as a hook, a segue, in the middle of his sets --
24              THE COURT:  So --
25              MS. SQUILLACE:  -- as a deejay.
```

j182mayA

1          THE COURT:  -- do you contend that those words by

2     itself, the phrase unto itself, is what gives it protection?

3          MS. SQUILLACE:  Absolutely, Judge.

4          THE COURT:  All right.  Let me ask this.  Can a

5     portion of a copyrighted work fall into the public domain?

6          MS. SQUILLACE:  Well, the public domain is so vast, a

7     portion of it, of course, could wind up in the public domain in

8     some form, Judge.

9          THE COURT:  And if it enters the public domain, can --

10     once that happens, isn't someone free to then incorporate it in

11     whatever they want to, because it has entered the public

12     domain?

13          MS. SQUILLACE:  No, Judge, for two reasons.  First, we

14     don't know -- we have to know how it entered the public domain

15     to begin with; and, second, as I just cited, the Supreme Court

16     case of *Feist Publications*, even if it enters the public domain

17     and exists in other areas and other even legitimate ways, for

18     example, if someone makes a commentary about it in an article,

19     that is a fair use of it because they are making commentary.

20     They are not taking it and putting the hook of Mr. May's song,

21     which is the mantra and theme of his song, and using it,

22     intentionally placing it as the hook and theme of the repeated

23     chorus in their song.

24          THE COURT:  So when I say "public domain," I am using

25     that in the sense that it is free to use, that once something

j182mayA

```
1    enters -- once something is in the public domain, it is free

2    for the public to use, not just the public sees it, but they

3    are free to use it.  Again, my question is, are there

4    situations where a portion of a copyrighted work, that portion

5    falls into the public domain and can be used freely?

6         MS. SQUILLACE:  I believe there are situations where

7    they could fall into the public domain.  Whether they can be

8    used freely, Judge, is, I think, the question.  As your

9    colleague Judge Stanton just ruled in the Ed Sheeran case,

10   there are material facts in dispute as to whether in fact in

11   that case Mr. Gaye's music was so in the public domain and so

12   commonly known that the defendants and Mr. Sheeran in that case

13   were free to use it and their use was fair use.  That exact

14   issue was decided, your Honor, by this very same court,

15   Judge Stanton, in the Ed Sheeran case, The Estate of Marvin

16   Gaye v. Ed Sheeran, the very issue we have here.  And

17   because --

18        THE COURT:  I'm not sure that it's very issue.  That

19   case is more like the Gaye case that was brought in California

20   involving Blurred Lines.  Isn't that true?

21        MS. SQUILLACE:  It involved more of an

22   instrumentality, yes, Judge.  It is not lyric-specific.

23   However, the issue is in fact the same.  There is not enough --

24   and we have no discovery yet, Judge.  This is just on the

25   pleadings.  We have no discovery.  And when you take a look in
```

j182mayA

1    that very same paragraph of 69 and 70 and you do it and you see

2    in the black-and-white comparison plaintiff's lyrics "we run

3    things, things no run we" and defendant's lyrics "we run

4    things, things don't run we," "no" and "don't," that's the

5    change the word.  Defendants' change plaintiff's "no" to

6    "don't."  The case law is clear, as we cited to, that is even

7    more than a trivial variation.  "We shall overcome" --

8            THE COURT:  I don't think this case is going to rise

9    or fall on that variation.

10           MS. SQUILLACE:  Right, but when you see them side by

11   side, Judge, you see the taking is nearly verbatim.  The

12   changing of the word "no" to "don't" is not enough to make it

13   fair use or a fair derivative use.

14           Not only that, Judge, what's important to note -- and

15   defendants do not address this at all -- it is not just that

16   they took the words "we run things, things," they change it to

17   "don't," "don't run we," they intentionally also took Mr. May's

18   use and creativity of the intentionally grammatically incorrect

19   sequence of the words.  And when you look at the four factors

20   under fair use, sequence and arrangement of words is one of the

21   things you look to.  They could have taken the words and

22   rearranged them in a whole new way to give a new meaning or a

23   new context.  They did not do that.  They took the exact same

24   words, changing "no" to "don't," which is really no change at

25   all because the meanings are the same, and they took the very

j182mayA

same intentionally grammatically incorrect sequence of the
words to give rise to the same meaning, no difference, no
variation, no transformation to the meaning.

     And one other thing, Judge, while theme is not
protected under copyright law, theme is looked at when you look
at the four factors of fair use and the purpose and character
of the use by the defendants.  It is not a coincidence --

     THE COURT:  We are going to get to theme in a minute.

     MS. SQUILLACE:  Very good, Judge.

     THE COURT:  Going back to the public domain issue, on
page 22 of your brief in opposition, I quote the brief as
saying, "Plaintiff's original lyrics/lyrical phrase preexisted
defendants' unlawful use of same and was in the public domain,
as any Google or Internet search would reveal decades, before
the defendants' unlawfully took, copied, and used same in their
'*We Can't Stop*.'"

     You have taken the position or asserted that the
phrase was in the public domain decades before the defendants
wrote their song.  Why isn't that case dispositive here?  Why
doesn't that just sort of resolve the whole matter?

     MS. SQUILLACE:  Because that doesn't mean that the way
they used it is lawful, Judge.  His song existed when he
published that song in 1988 and it existed in the public
domain.  This goes to access, Judge.

     THE COURT:  But a public domain has a meaning in

j182mayA

copyright law, and it means that it has entered the free use by the public.  It's not just that it is out there to be seen. That's publication.  But public domain is I am free to use it because it has entered public domain and is not protectable.

MS. SQUILLACE:  Respectfully, no, your Honor, because that would mean that every song that has ever been released in the history of this entire world would be free for the taking to be used --

THE COURT:  No.  It means it would be published, but it doesn't mean that all those songs or all parts of them have entered the public domain.  And the words here are very specific in your brief.  It says they have entered the public domain.

All right.  It seems to me that you are giving a gloss on public domain that's different from the way it is used in copyright law perhaps, but I'm not -- maybe I'm wrong.

So I believe among the tests that one could apply in copyright infringement, you allude to -- I think you allude to fragmented literal similarity.  Is that the test that you contend applies here or is it some other test?

MS. SQUILLACE:  Judge, that's one of what we look at. When you have a short lyrical phrase and it's a fragmented part of a song, you don't have to have the two entire songs be same or similar, not all.  So when you look at the songs as a whole under the four-factor test for fair use, not all of the lyrics

j182mayA

1    have to be same or similar in order for there to be --

2              THE COURT:  Put aside fair use.  What about for

3    infringement purposes?  Is fragmented literal similarity a test

4    unto itself?

5              MS. SQUILLACE:  Yes, it is, Judge.

6              THE COURT:  Okay.

7              MS. SQUILLACE:  It is one of the things that you look

8    to, then you look to the substantial similarity.  That's why we

9    do the side-by-side, Judge, and that's why the case law is

10   clear.  Where the copying is exact or nearly exact, there is an

11   actionable infringement.  And, again, that goes back to

12   changing the "no" to the "don't" is not enough of a variation

13   for the defendants' use to be protected.

14             THE COURT:  Okay.

15             On page 11 of your brief, you say, "The two works are

16   so nearly alike that the only reasonable explanation is that

17   the defendants copied Mr. May's work."

18             What are the two works you are referring to there?  I

19   assume they are the entire song, is that correct?

20             MS. SQUILLACE:  No, Judge, we are talking about the

21   phrases, and this, again, goes to --

22             THE COURT:  But the copyright -- but the work that is

23   the subject of the copyright is the song, not the phrase.

24             MS. SQUILLACE:  Judge, and part of that -- it is not

25   just that the entire song has to be the same.  A copyright

j182mayA

protection to the song protects all of the lyrics in the song
and all of the notes and instrumentalities and melodies of the
song, and thus everything that is a part of the song is
protected.

You need not have, as your Honor correctly noted in
our premotion conference, you need not have a *Blurred Lines*
case for there to be an infringement.  He obtained his
copyright protection back in 1981 when he created the phrase
and used just the phrase, and he obtained additional copyright
protection when he published and created the song using the
phrase.

THE COURT:  Right, but when you refer to "work" in
your brief -- and, again, this is a copyright convention that
is pretty much accepted, I would assume, but, again, you can
tell me if I am wrong -- "the work" refers to the song.  That
is the subject the copyright.  Isn't that the case?

MS. SQUILLACE:  And the lyrics, Judge.

THE COURT:  Well, I understand the lyrics are part of
the song, but the work is the song as a whole.

MS. SQUILLACE:  The overall song is a work as a whole,
yes, Judge.  But you can't piecemeal.  The words are protected
and the melodies are protected.

THE COURT:  Okay, but you say in here that "the two
works are so nearly alike in both syntactical structure and
lyrical content that the only reasonable, logical explanation

j182mayA

1    for such a great degree of similarity is the defendants copied

2    from plaintiff."  Isn't it just as likely or more likely that

3    the reason that they used that phrase is because it was already

4    existing in the public domain --

5               MS. SQUILLACE:  No, Judge.

6               THE COURT:  -- for decades.

7               MS. SQUILLACE:  No, Judge.  The reason why they used

8    that phrase -- and I'm glad you asked that question -- and,

9    again, it goes back to while theme is not protected, theme is

10   critical for this court to look at.  Defendants try to assert

11   that these are two completely different songs.  They are

12   actually not.

13              THE COURT:  Wait a minute.  But this isn't about

14   theme, though.  This is just about what's the explanation for

15   why it appears in their song.

16              MS. SQUILLACE:  Yes, Judge.

17              THE COURT:  And I was just getting back to the issue

18   of public domain.  But I think we have a disagreement there

19   about what the public domain is.

20              Let me ask, relatedly, you mentioned this earlier, you

21   mentioned a hook and that the phrase appears -- well, is the

22   phrase the hook or is it part of the hook?  What do you mean

23   when you say it is in the hook or the hook.

24              MS. SQUILLACE:  The hook is really what the theme of

25   the song or the theme of chorus would be.  As I was saying

j182mayA

1    earlier, Judge, and we discussed this also at the premotion

2    conference, it is not a coincidence that the theme of

3    plaintiff's song, which is about being in control of your own

4    life, your own destiny, your own situation, he may in his song

5    give different examples about how to be in control of your own

6    life versus the examples defendants give, but defendants' theme

7    of their song is about being in control of her own life and as

8    girls being --

9             THE COURT:  Right, so --

10            MS. SQUILLACE:  -- in control of their own life.

11            THE COURT:  -- there is -- there are two different

12   glosses put on the theme of the song by the parties.  You

13   contend that there is an overall theme of control of one's life

14   and independence; whereas, the defendants contend that, as used

15   by Mr. May, it is very much in the realm of male domination of

16   women and in a context of Ms. Cyrus's song, it is about female

17   independence, so sort of a subset maybe of the theme.

18            But here is my question about it.  You, in your brief,

19   say that "the court" -- this is on page 13 -- "can take

20   judicial notice of the themes of the songs."  The parties

21   disagree about what those themes are, so can I still make a

22   determination as to what the theme is?  Can I independently

23   make that determination?

24            MS. SQUILLACE:  Not on the 12(b)(6), Judge.

25            THE COURT:  But you say I can take judicial notice.

j182mayA

1          MS. SQUILLACE:  You can.  If you were to find, if you

2     were to be able to find that there is not fair use or there is

3     fair use, theme is what must be looked at as part of the four

4     factors.

5          THE COURT:  But putting aside whether it is fair use,

6     infringement, whatever, you have -- let me just go, to make

7     sure I have the wording right, let's see, I'm reading from page

8     13 of your brief.  "This honorable court is allowed to take

9     judicial notice of the defendants' theme of their song, of

10    plaintiff's theme of his song, and of defendants taking and

11    copying plaintiff's theme."

12         So you have told me you I can take judicial notice,

13    but what if I determined that the theme is something other than

14    what you are contending it is?

15         MS. SQUILLACE:  Judge, you can take judicial notice of

16    it as it applies to what you can rule on on this 12(b)(6), and

17    that is fair use and fair use only.  We raise that in our

18    section of the motion as to substantial similarity.  The reason

19    why they intentionally take Mr. May's song is because it

20    epitomizes the mantra of her song, and that is why they

21    intentionally place it in the repeated chorus of their song, as

22    does Mr. May.

23         We all know that the repeated chorus is what we all

24    learn the words to first as a listener because it is repeated

25    more than the verses are and the verses, while they have other

j182mayA

words, reflect back to the chorus, because the chorus contains

the mantra or the theme of the song.  Just like Mr. May's, so

does Ms. Cyrus's.

THE COURT:  I'm looking at the lyrics for Ms. Cyrus's

song *We Can't Stop*, and the phrase "we run things, things don't

run we" appears in three places, right?

MS. SQUILLACE:  Yes.

THE COURT:  And it appears in what is apparently the

chorus of the song, is that correct?

MS. SQUILLACE:  Yes.

THE COURT:  But there are a lot of other things in

this chorus of the song.  In fact, most of the chorus precedes

the statement, and there is reference to "this is our house,

this is our rules," and "we can't stop, we won't stop; can't

you see it's we who own the night, can't you see it we who bout

that life, and we can't stop," then it gets to "we run things,

things don't run we."

How in that context is "we run things, things don't

run we" the hook?

MS. SQUILLACE:  Because, Judge, it exudes the exact

mantra:  Be in control of your life.  This goes back to, while

they give different examples of how to be in control of one's

life, the lyrics of Mr. May's song that talks about being

dominant to your women and women being subservient -- which is

a Jamaican cultural thing, by the way -- is only one portion of

j182mayA

1    that song.  This is not an antiwoman song.

2             THE COURT:  It is more than one portion.  It is.

3             MS. SQUILLACE:  Judge, but it is not the mantra of the

4    song, it is not the theme of the song to be dominant over the

5    women.  The theme is being in self-control.  He gives that

6    example.  The defendants give the example about if you want to

7    do drugs, do drugs, do mollie; if you want to have sex with

8    whomever you want, whenever you want, wherever you want, you

9    are a woman, it is your body, do what you want to do;

10   self-control; don't let society, life, life situations, or

11   other people dictate what you want to do, when you want to do

12   it, where you want to do it, and with whom you want to do it.

13   They are the exact same theme, Judge --

14            THE COURT:  Okay.

15            MS. SQUILLACE:  -- and that's what we --

16            THE COURT:  Let me just turn briefly to the damages

17   issues.

18            MS. SQUILLACE:  Yes.

19            THE COURT:  Do you agree or disagree that the damages

20   available only go back three years before the filing of the

21   complaint?

22            MS. SQUILLACE:  We conceded that, Judge.

23            THE COURT:  Okay.

24            MS. SQUILLACE:  Yes.

25            THE COURT:  And with respect to the issue of

j182mayA

1    attorney's fees and statutory damages and when registration

2    occurred versus when infringement case was brought, etc., I

3    think you bring up the continuing infringement theory in your

4    brief, is that right?

5              MS. SQUILLACE:  We allege that the infringement

6    continued past, continuing to present, that it has continued.

7    However, I am glad that your Honor brought up this question

8    because of two things, Judge.  First, the issue of whether

9    statutory damages and attorney's fees are applicable is not

10   ripe for this court to --

11             THE COURT:  That may be but, I am just trying to

12   understand, the Second Circuit has rejected the continuing

13   infringement --

14             MS. SQUILLACE:  Yes, Judge.

15             THE COURT:  Okay.

16             MS. SQUILLACE:  That is exactly why we have to

17   determine -- because we had no discovery yet, Judge, and this

18   is why the *Steele* case that they cite is not applicable, in the

19   *Steele* case plaintiff obtained default judgment against

20   defendants and was at an inquest trial for damages.  We are not

21   anywhere near that stage.

22             THE COURT:  All right.

23             MS. SQUILLACE:  Secondly, in that case, why it is not

24   applicable here, in that case plaintiff conceded that her work

25   was unpublished.  We have a published work here.  It's been

j182mayA

published decades before Ms. Cyrus was even born and before the

defendants use it.

          And third, we must have discovery to see each and

every infringing act, whether it was the sale of an album,

the -- a performance, because it is not just the fact that

their album remains publicly on sale since it has been

released.  That doesn't get the defendants out of liability.

She has performed this song continuously as part of her

repertoire, including promoting her new album with the hit

single *Malibu*.  She performed it on *The Today Show*, and that is

a completely different genre and theme of music than the

song --

          THE COURT:  Well, it is an interesting --

          MS. SQUILLACE:  -- *We Can't Stop*.

          THE COURT:  -- question, right?  The question is what

is a new infringement, right?

          MS. SQUILLACE:  Correct, Judge.

          THE COURT:  And if it is -- let's take a situation

where the record continues to be sold.  The cases pretty much

say that is one infringement.  You don't get to look at it

again just because a record was sold again a couple of years

later.  What happens if it appears on a different album?  Well,

that's another degree.  What happens if it is performed live on

stage versus in a record?  What happens if it's used in a

movie?

j182mayA

1          What authority are you aware of that addresses whether

2     uses in different media in that way does or does not constitute

3     a new infringement?

4          MS. SQUILLACE:  Judge, well, this is the very reason

5     why it can't be decided on this motion, because what we have to

6     look at is because in the *Steele* case she never published it

7     before copyright registration occurred, the issue of when she

8     registered it and when the post-registration infringing acts

9     occurred became crux to her damages issue for statutory

10    damages.

11         Here, because Mr. May's work has been published

12    before, while we do look at the certificate of registration and

13    see now what acts occurred after that, we must look at the

14    timing in order to determine whether those acts are part of a

15    continuing preregistration infringement or are they separate,

16    new, actionable infringing acts?  And we don't have any

17    discovery as to that.  It is not ripe.  It cannot be decided at

18    this stage.  At best and at most, they may be able to make a

19    motion after full discovery is complete for them to assert

20    these were all continuing acts of a preregistration

21    infringement.  But we know no information yet and they don't

22    provide any, so this cannot be decided, most respectfully,

23    Judge, by your Honor on this motion.

24         THE COURT:  Okay.  Thank you.

25         MS. SQUILLACE:  Thank you so much, Judge.

j182mayA

1          THE COURT:  Thank you, and I will come back to you if

2    you want to respond to whatever the defendants have to say.

3          MS. SQUILLACE:  Thank you, Judge.

4          THE COURT:  And the defendants don't get off the hook

5    here.  I have questions for you, too.  And, frankly, I think

6    the case would be easier if the plaintiffs had conceded that

7    the phrase "wi run tings," in the full Jamaican patois, had

8    existed beforehand and all that Mr. May had done was add

9    English elements to it, and I believe that in your brief that

10   was sort of an assumption you made in your brief.  So (a) tell

11   me is that an assumption that (a) you did make; and (b) if that

12   assumption is incorrect, that is the reading of paragraph 69 of

13   the second amended complaint, does that change the outcome?

14         MS. PAUL:  I will answer the second question first, as

15   you might expect and, no, it does not change the outcome one

16   way or another.

17         If I might, Judge, we frankly did not understand, even

18   given their second amended complaint, even given their response

19   to the premotion letter, even given their opposition brief,

20   what it is they are claiming he created and what he did not.

21   All we can go on -- I'm still not sure I understand, although I

22   heard the various denials that Ms. Squillace offered to your

23   questions, I'm still not sure I understand what he created and

24   what he didn't.

25         However, several things are true:

j182mayA

1          First, it is clear and she stated that he claims to

2    have created it in 1981.  It is equally clear that he did not

3    affix it until 1988, if then.  Therefore, 1988, as I think your

4    Honor alluded to, is the critical time for purposes of

5    determining whether the phrase is in the public domain and

6    whether the phrase had been used by others previously.

7          The second thing that is clear is there is proof in

8    the record, both pre-1981 and certainly pre-1988, as their

9    brief concedes, the page you cited, that numerous others used

10   the phrase both in songs -- the *Nitty Gritty* song and in the

11   Johnny Osbourne song -- and, in addition, there are numerous

12   trademark uses of the phrase for various classes of goods and

13   services.

14         THE COURT:  But the only -- isn't it the case the only

15   proof I have of that or only indicia of that are the

16   attachments and exhibits that you provided from various

17   publications, and therefore aren't those essentially hearsay

18   and items that I can't take into account on a motion to

19   dismiss?

20         MS. PAUL:  Respectfully, Judge, they are judicially

21   noticeable.  However, I would like to go to your last point,

22   which is where I began, which is, it does not make a difference

23   here whether or not he originated/created the phrase.  It does

24   not make a difference for several reasons.

25         First of all, you said that you had taken the time to

j182mayA

1   review our respective sets of papers and the exhibits.  I

2   certainly hope the court has also had the opportunity to listen

3   to the two songs.

4             THE COURT:  Well, I have heard -- I have listened to

5   the two songs.  I have also read, I think, all of the cases

6   that were cited to as cases about phrases.

7             MS. PAUL:  Okay.  Listening to the two songs --

8             THE COURT:  They sound nothing alike.  There is no

9   question.  But that's not what determines whether it is

10  infringement with respect to the phrase.

11            MS. PAUL:  Respectfully, I disagree.

12            THE COURT:  Well, they are not alleging that one song

13  infringes the other song as a whole.  And I think, again, even

14  in the Gleaner article that counsel is distancing themselves

15  from at least they were quoted as saying even if they want to

16  distance themselves from it, maybe this wasn't said, but the

17  two songs sound nothing alike.

18            MS. PAUL:  But, Judge, they have a copyright

19  registration, as you pointed out, for a song.  They are suing

20  based on that registration.

21            THE COURT:  Right.  And if you have a copyright on a

22  work, it can be the case that there can be infringement for

23  copying a selected snippet of that work.  And the best example,

24  I would think, are the sampling cases, where someone is taking

25  the actual sound recording of what may be, I don't know,

j182mayA

1      anywhere from two to eight beats, I don't know what the common

2      use is in terms of length, and in those cases, there can be an

3      infringement.  Let me start there.  Is that right?

4                  MS. PAUL:  No.

5                  THE COURT:  No?  Sampling --

6                  MS. PAUL:  First of all, I believe your Honor is

7      referring principally to the *Bridgeport* case out of, I believe,

8      the Sixth Circuit.

9                  THE COURT:  That's one case.

10                 MS. PAUL:  Pardon?

11                 THE COURT:  That's one of the cases.

12                 MS. PAUL:  And that case was based on the conclusion

13     of that circuit that, because of section 114 of the Copyright

14     Act, any taking of a digital sound recording is, by definition,

15     an infringement, because 114 gives the copyright owner of the

16     digital sound recording the right to remix, alter, or otherwise

17     change a work.

18                 The Ninth Circuit expressly rejected that concept in a

19     Madonna case.  I think it is SalSoul v. Ciccone and said it was

20     absurd -- Ninth Circuit's word -- to conclude that a provision

21     of the Copyright Act which was intended to be a limitation on

22     the rights otherwise accorded copyright owners in the case of a

23     digital sound recording and convert it into a greater right

24     than others would have to sample, to use other copyrighted

25     works.

j182mayA

1          So the Second Circuit has not ruled on this question,

2     but I --

3          THE COURT:  To be clear, you are saying the Second

4     Circuit has not ruled on the question of whether sampling is a

5     violation?

6          MS. PAUL:  *Per se*, as opposed to the Ninth Circuit

7     ruling that the use of I think it was 40 times looped through

8     the first six seconds of the song or something like that was a

9     *de minimis* use in the Madonna case, the *SalSoul v. Ciccone.*

10          But what I am saying is that I agree that it is

11     possible that in some sampling cases, sampling by definition

12     being the taking of both the musical composition and the sound

13     recording, that the use of a relatively small snippet may

14     constitute substantial similarity, putting aside the issue of

15     whether, assuming substantial similarity, it might be fair use.

16          However, I am aware of no case in this circuit or

17     elsewhere that has held that the taking of a very small snippet

18     of a musical -- of the lyrics of a musical composition standing

19     alone can constitute or does constitute copyright infringement.

20          THE COURT:  Putting aside -- you put that gloss

21     "standing alone."  This goes to a question I have, which is,

22     what would justify a different outcome legally for a sampling,

23     as defined or exemplified by the taking of the actual sound

24     recording, in addition to the composition, versus just taking a

25     sample of the lyrics?  And what rationale is there as to why

j182mayA

1    there should be a different outcome?

2         MS. PAUL:  Well, the very simple answer to that is

3    that, by definition, sampling is taking -- well, it is taking

4    three things.  It is taking the musical composition, it is

5    taking the sound recording, and it is also taking the

6    particular performance of that sound recording.  Using lyrics

7    is less of a use by a substantial measure; and, more

8    importantly, since a copyright registration for a song and the

9    registration on which they are suing here covers both the

10   musical composition -- well, covers the musical composition

11   which includes both the lyrics and the arrangement, the taking

12   is a lesser taking than it is in a sampling case.  Now,

13   "lesser" doesn't mean home free, but "lesser" is "lesser," and

14   for that reason I don't think that reliance on the sampling

15   cases, even to the extent that there is a loose analogy there,

16   is appropriate.

17        What we are talking about here is the taking of a

18   phrase.  Let's assume that he created the phrase.  Let's assume

19   that, notwithstanding the fact that it is a short word or

20   phrase consisting of seven words, three of which are repeated

21   two times, somehow or other that short phrase is protectable

22   under copyright law.  Even so, you still have to compare the

23   two works to see whether they exhibit the same aesthetic

24   choices.  You still have to compare the two works holistically

25   in order to determine whether there is substantial similarity

j182mayA

1    of protectable expression.

2              THE COURT:  Is that true even under what is referred

3    to in some of the cases as a fragmented --

4              MS. PAUL:  Yes.

5              THE COURT:  -- similarity analysis?

6              MS. PAUL:  Yes, it is.

7              THE COURT:  So help me with that.  Explain why that

8    is --

9              MS. PAUL:  Because it is only one part.

10             THE COURT:  Go ahead.

11             MS. PAUL:  It is only the first stage of the analysis,

12   whether you are doing comprehensive nonliteral similarity,

13   which is overall structure without taking of specifics, or you

14   are doing fragmented literal, and I am not aware of a single

15   case where there has been a finding of infringement based on

16   one fragment, as opposed to multiple fragments, for fragmented

17   literal similarity.

18             But putting that aside, look at *Tufenkian*, look at

19   *Boisson*, look at numerous of the Second Circuit cases, not to

20   speak of the application of those precedents in music cases and

21   elsewhere.  After you do the dissection, even under fragmented

22   literal similarity, you then turn to the holistic comparison.

23   Judge Nathan cited the *Peter Gaito* case, *McDonald v. Kanye*

24   *West*.  Numerous, numerous cases both on the district court

25   level and in the circuit say that you don't stop at fragmented

j182mayA

literal similarity when you hit upon a similarity that exists

in two works.  You then have to do the holistic comparison,

look at the songs as a whole, and look at the relationship of

the choices made by the respective artists/creators as to how

to put those choices together in a song, and case after case

does this, Judge.

           So I am saying that let's assume that it was created

by him and let's assume that it wasn't in the public domain and

let's assume that it is protectable, all of which are

assumptions that I am making for purposes of this argument,

nonetheless, the song aren't substantially similar.  It doesn't

matter whether you look at the ordinary observer test to see

whether your average listener would, unless they set out to

identify the disparities, would see the overall aesthetic of

the songs as the same.  It doesn't matter if you look at the

more discerning observer test which filters out all of the

elements except those that are protectable and then proceeds to

do the total concept in view of holistic comparison.  It

doesn't matter whether it is comprehensive nonliteral or

fragmented literal.  At the end of the day -- well, it's not

quite the end because there is still fair use, but for purposes

of determining whether there is substantial similarity, you

cannot get away from comparing the two songs as a whole.

           THE COURT:  So let me ask you about that.  So in the

other cases involving phrases or allegations that a use of a

j182mayA

1    phrase from one song in another song or some other work is an

2    infringing use, it did seem to me that many, maybe all, of

3    those cases that resulted in a dismissal was on summary

4    judgment.  I'm going to have you correct me if I am wrong on

5    that.  Because if you what you are saying is true for all

6    cases, then you would expect in every situation where someone's

7    claim of infringement is based on the use of a phrase from some

8    other work, that those would all be dismissed at the motion to

9    dismiss stage.

10              MS. PAUL:  You could have a song that consists of

11    repetition of the same phrase for the entirety of the song.

12              THE COURT:  Yes, but none of the cases have that.

13              MS. PAUL:  Well, I am not saying that simply because

14    the phrase is the same means that they can't be substantially

15    similar.  I'm saying that where, as here, the only similarity

16    alleged or that could be alleged based on the two songs is the

17    use of a common phrase --

18              THE COURT:  But in several of the cases, and I don't

19    have the names handy, summary judgment was granted, perhaps

20    even denied, I can't remember, but even where it was granted it

21    was in cases similar to that situation where the only

22    commonality was the phrase, and those cases still made it to

23    summary judgment.  My question is why?

24              MS. PAUL:  I'm not aware of a case, frankly, in this

25    district that's made it past summary judgment that was based

j182mayA

1    solely on a phrase.  If I might, Judge, *Bell v. Blaze*, *Hip-hop*

2    *Behind the Walls*, 12(b)(6); *Boyle v. Stephens*, LifePath for

3    mutual funds, 12(b)(6); the *McDonald v. Kanye West* case that I

4    mentioned before, 12(b)(6).  There are several others, but

5    these are the ones I happen to have notes on in front of me.

6            So I don't think that you need to go as far as you are

7    positing going in the questions either to me or Ms. Squillace

8    in order to reach the conclusion that, as a matter of law --

9    and there are many cases in this circuit and elsewhere reaching

10   the conclusion on an up-front 12(b)(6) motion -- that there is

11   not substantial similarity as a matter of law.

12           And I don't care if he created this phrase.  I

13   actually think it is a very interesting question of Jamaican

14   law that I don't know the answer to as yet as to whether he can

15   have a copyright if he publicly performed either the song or

16   the phrase from '81 on, putting aside the question of whether

17   he entered the public domain.  Under United States copyright

18   law, if he publicly used the phrase as a hook and/or as part of

19   a song for seven years before he tried to register it, it would

20   be in the public domain.  But that ownership question is a

21   question of Jamaican law which is not before the court on this

22   motion.

23           We are simply saying that what matters is the status

24   pre-'88.  Even if pre-'88 it was not in the public domain, it

25   is not protectable as a short word or phrase.  And, by the way,

j182mayA

Ms. Cyrus, defendants in this case did not use the exact same

phrase.  And, in addition, defendants' use is for a very

different purpose that borders on fair use, which your Honor

said you were not addressing at this point.

THE COURT:  I'm happy to have it addressed.  I just

wanted to distinguish this being where we were in the issues.

MS. PAUL:  To go back to your first question, there is

no substantial similarity here.  Whether he --

THE COURT:  There isn't in the songs, but I am still

having trouble with the cases that have -- I don't recall the

cases going down that path and saying that there is no

infringement in use of a phrase because there is no substantial

similarity in the overall work.  Maybe one or two of the cases

have, but I don't remember that being the basis on which

overall the phrase cases have been decided.

MS. PAUL:  Look at the *McDonald v. Kanye West* case

and --

THE COURT:  That may be one.

MS. PAUL:  -- look at the *Oyewole v. Rita Ora* case.

Both of those are Judge Nathan opinions.  There are several

others which are cited in our briefs.  And if you go through

the proper analysis, you first look at the similarity, you

identify the similarity -- actually take a step back.  I will

take a step back, if I may.

The proper analysis begins with probative similarity,

j182mayA

1    and you have to have probative similarity before you even get

2    up to substantial similarity; "probative similarity" being

3    copying enough similarities to show copying, whether the

4    copying is illegal or not; "substantial similarity" being --

5    "substantial similarity of protectable expression" being the

6    illegal taking, subject to the fair use defense.

7            So I do not believe, based upon listening to the

8    songs, reading their papers, looking at the lyrics of these

9    songs, that there is even probative similarity here, not to

10   speak of moving to the next level of the analysis, which is the

11   substantial similarity analysis which I have outlined.

12           And I am happy to address any other questions the

13   court has, but you cannot divorce the phrase from the song in

14   the way that plaintiff is attempting to do it in this case to

15   ground a copyright infringement action.  This is not a

16   trademark infringement case.  Yes, as your Honor pointed out,

17   you can have protection subject to the various fair use

18   defenses in trademark law for a phrase, a short phrase, a

19   slogan.  But this is copyright, and you can only sue for what

20   is registered, and what is registered here is a song.

21           THE COURT:  Okay.  All right.  Thank you.

22           Let me hear some rebuttal from the plaintiff on this,

23   because what the defendants have presented to me, at least as I

24   perceive it, is a very big statement, in a way, that this case

25   can easily be decided because of the lack of substantial

j182mayA

similarity or even probative similarity between the songs as a
whole.

MS. SQUILLACE:  If I may, most respectfully,
unfortunately counsel is incorrect.  You can absolutely
fragment the phrase out.

I would turn to, first, Exhibit C to the summons and
complaint, which is attached as an exhibit.  It is a copy of
the copyright registration for Mr. May of the 1988 song *We Run
Things* in which the phrase "we run things, things no run we,"
is included and --

THE COURT:  All right.  We know that.

MS. SQUILLACE:  -- repeated in the song.  Copyrighted
and protected under the registration on the first page,
paragraph 1, subsection b, "Description of the work protected,"
the second box is checked, "musical work including any
accompanying words."  That gives the protection to the phrase
we are talking about here, Judge.

And you absolutely can isolate a phrase, which is why
the defendants knew that they had to give due compensation and
credit to Slick Rick and Doug E. Fresh for LaDiDaDi, because it
is a segmented, fragmented -- even more fragmented than
plaintiff's protected work here.  It is not even a sentence.
It is not even really a phrase.  It is a convoluted one word of
multiple pronouns and words mixed together to create a sound,
"LaDiDaDi."  They know that they had to give them credit

j182mayA

1    because fragmented and short phrases that are unique and

2    creative are protected by copyright.

3            I want to turn to counsel with regards to her argument

4    that the taking is *de minimis*, and I am glad that she brought

5    that argument back because here, again, the *We Shall Overcome*

6    case, which is a case they cite, it's a summary judgment motion

7    case, Judge, but the holding is critical to this case because

8    in that case the defendants change the plaintiff's word from a

9    phrase, not the entire song of all of the lyrics, from a part

10   of the song, the defendants in that case change plaintiff's

11   word of "will" to "shall" and change plaintiff's word of "down"

12   to "deep."  And the Supreme Court was clear that this taking

13   was not enough of a variation to give the defendants

14   protection.  It was not transformative.  It was not a protected

15   derivative work.

16           THE COURT:  But wasn't the overall song more similar

17   than in the case here?

18           MS. SQUILLACE:  The overall songs themselves, Judge?

19           THE COURT:  Yes.

20           MS. SQUILLACE:  Not by much, Judge.  This is, again,

21   it goes to the issue of whether these lyrics can be taken from

22   the particular song.  If that were the case, then no lyrics

23   would ever be protected and you would have to have different

24   registrations and different copyrights for every single word of

25   a song and for every single note of a song separately, and we

j182mayA

don't have that.

          THE COURT:  In *We Shall Overcome*, weren't they just
two different versions of *We Shall Overcome* essentially?

          MS. SQUILLACE:  That dealt more also with musicality,
Judge, which is different than here.  We don't have that.  But
when we go to what the holding of the case is and why they cite
it, the *de minimis* taking, it comes down to what transformation
did they make in their taking.  As is here, it is such a
trivial change that it doesn't change the meaning.  So that's
why --

          THE COURT:  I'm not worried about the change part, but
it could still be a *de minimis* taking, couldn't it?

          MS. SQUILLACE:  No, Judge, it is not *de minimis*.
That's why I give those examples from that case.  Here we
change "no" to "don't."  "No" and "don't" mean the same thing.
They are interchangeable.

          THE COURT:  It can be *de minimis* in terms of the
quantitative or is that only considered in the context of fair
use?

          MS. SQUILLACE:  That's in the context of fair use,
Judge.

          THE COURT:  Okay.

          MS. SQUILLACE:  Now, with regard to the cases that
counsel cited that were 12(b)(6) motions, those 12(b)(6)
motions, while they were 12(b)(6) motions, like the Kanye West

j182mayA

1    case, the only issue decided on those 12(b)(6) was fair use,

2    not originality, not creation, not access, not whether it was

3    in the public domain, none of that, because it can't be

4    decided, Judge.

5          Briefly, to just go back, and this may clear up any

6    confusion if I confused the court, Judge, when we allege public

7    domain, when he published and recorded and put into the public,

8    publication, the song in 1988, that's what we mean when we

9    allege that any search by the defendants would have realized

10   who the author of that song and creator of the song was, that

11   they would then, just like they went to Slick Rick and Doug E.

12   Fresh, go search out Flourgon, find where he is, find who

13   represents him, if any recording company represents him, and

14   get his permission to use the song.

15         Because, Judge, we are at the 12(b)(6) stage and we

16   have no discovery, discovery will reveal -- and, again, this

17   goes back to the *Feist Publications* case, where there are other

18   legitimate uses of the protected or the work in dispute, here

19   the lyrics, discovery is going to show that the *Nitty Gritty*

20   song and the other song had permission, they had permission

21   from Flourgon to use this phrase.  And, again, that's why *Feist*

22   *Publications*, the Supreme Court held --

23         THE COURT:  Oh, actually I had a question about that,

24   which is, there is reference in your papers to a license

25   previously given by Flourgon, is that correct?

j182mayA

1            MS. SQUILLACE:  Correct, Judge.

2            THE COURT:  And was the license for the song or for

3    only the phrase?

4            MS. SQUILLACE:  It was for the phrase to use how they

5    want and any of the other lyrics in the song.

6            THE COURT:  Was the license to the song as a whole?

7    In other words, they were licensed rights to use the song?

8            MS. SQUILLACE:  To use the lyrics, Judge, to the

9    lyrics.

10           THE COURT:  To the lyrics as a whole, though, all of

11   the lyrics.  In other words, does the license specifically call

12   out and say:  You may use the phrase, "We run things, things no

13   run we"?

14           MS. SQUILLACE:  Yes, Judge.  Yes, Judge.

15           THE COURT:  Okay.

16           MS. SQUILLACE:  Yes.

17           And, again, because we are at 12(b)(6), we don't have

18   any discovery, just like we don't have the discovery to show

19   the post-registration infringing acts and when they occurred to

20   now compare to the date of the registration.

21           But I also want to again go back to when a person

22   creates a work and puts it in tangible form and publishes it,

23   that person has copyright protection no matter what country

24   they come from for life plus 75 years, and that covers the time

25   frame the defendants infringed on the plaintiff's work.

j182mayA

1          Going to the aesthetics that counsel raised and the

2     taking, when you look at the works as a whole, again, not all

3     of the lyrics have to be same or similar, not all the

4     instrumental notes have to be same or similar.  And that is

5     why, as is here, the arrangement of the words, did they use the

6     same arrangement, did they use the same sequence, and here with

7     these lyrics of "we run things, things no run we" that they

8     changed to "we run things, things don't run we," they use the

9     same words, the same meaning, the same incorrect sequence and

10    arrangement of the words, and they also use the same rhyming

11    rhythm as the plaintiff.  In the side-by-side comparison in the

12    complaint, the reason why we include the third line of the

13    chorus on plaintiff's side is "we run things, things no run we,

14    anything we do haffi done properly."  He rhymes the third line

15    to the second line, not the first line.  They do the same thing

16    on theirs.  They could have rhymed the third line to the first

17    line or to the fourth or fifth line.  So they are taking the

18    sequence, the arrangements of the words, the inflection, the

19    cadence, the theme, and the words without any derivative or

20    transformative change that would allow them any protection,

21    Judge.

22          And just if you give me one second to just look over

23    my notes.

24          (Pause)

25          MS. SQUILLACE:  That's all, your Honor.

j182mayA

1        THE COURT:  Okay.

2        MS. SQUILLACE:  Thank you.

3        THE COURT:  Ms. Paul, one things I would like you to

4    address is the LaDiDaDi issue and if what you are saying is the

5    case with respect to what the law is and should be applied to

6    phrases, why was it necessary to obtain a license for that

7    phrase?

8        MS. PAUL:  Well, you are assuming, Judge, that it was

9    necessary to obtain --

10        THE COURT:  Well, I realize it may be to avoid

11    litigation because you don't think it is necessary, but

12    nonetheless.

13        MS. PAUL:  Look at the Supreme Court in the

14    *Campbell v. Acuff-Rose* case.  It specifically says, even if you

15    sought a license and it was denied -- what am I doing wrong?

16        THE COURT:  Let the record reflect that what she did

17    wrong was that she did not have the microphone closer to her.

18    Nothing else.

19        MS. PAUL:  The *Campbell v. Acuff-Rose* case says there

20    are lots of reasons why people take licenses, and it is totally

21    irrelevant to the question of whether or not it is a fair use.

22    The truth is that, in the music industry, people label, take

23    licenses for all kinds of things that if they picked up the

24    phone and called me that I would say, you don't need that,

25    that's so clearly a fair use.  The truth is that there are

j182mayA

 1    customs that are sometimes followed, protocols that are

 2    sometimes followed.  It has nothing to do with what the

 3    applicable law is.  The LaDiDaDi business is totally irrelevant

 4    to any issue that is or could be before this court.

 5         THE COURT:  What bothers me is that if the law were so

 6    clear that a phrase -- you have to look at the overall song,

 7    compare the overall songs, then a phrase or a sample, whatever

 8    it is, it would just never be -- it would be a clear matter of

 9    law that that can't be copyright infringement.  The cases don't

10    go that far.

11         MS. PAUL:  They don't go that far because -- I'm not

12    sure that they don't go that far.  But, as a general

13    proposition, I am not aware of a single case where there was

14    use of one phrase with no other similarity, whether in musical

15    arrangement or in lyrics, that's not a digital sampling case,

16    where a court or a jury found that that was insufficient to

17    constitute substantial similarity.  There are cases on the

18    specific facts of those cases where the court said there is a

19    jury question as to whether given the qualitative and

20    quantitative importance of the phrase to the plaintiff's song

21    and given other overall similarities, such as similarities in

22    sequencing -- I must say, Ms. Squillace keeps quoting the *Feist*

23    case.  *Feist* stands for the proposition that you can have

24    protection for something that isn't otherwise copyrightable if

25    there is something original about the selection, order, and

j182mayA

1    arrangement --

2              THE COURT:  It's a compilation case.

3              MS. PAUL:  It is a compilation case.  Even then,

4    protection is so thin as to be, some cases say, anorexic.  So I

5    don't get what *Feist* has to do with any of this.

6              My colleagues point out that in the LaDiDaDi examples,

7    and I don't really think this makes a difference because I

8    don't think it is relevant, there was also a taking of the

9    melody, and there is no taking of a melody here.  But again,

10   people take licenses for lots of reasons.  It doesn't mean that

11   something is or is not a --

12             THE COURT:  I understand.  I understand.

13             MS. PAUL:  Just a couple of things I wanted to briefly

14   address.

15             Ms. Squillace said, among other things, that *de*

16   *minimis* is only relevant to fair use.  I just think we need to

17   clear that up.  I assume although the court may well be aware

18   of it, as Judge Newman pointed out in the *Reingold* case, there

19   are two very separate analyses.  One is assuming substantial

20   similarity is the use *de minimis* separately from that, even if

21   it isn't *de minimis*, is it a fair use?

22             THE COURT:  Or is it *de minimis* apart from fair use?

23   Do we look at the importance of what was taken to the original

24   work, that is, the work from which it was taken, or are we

25   looking at it in terms of quantitative or qualitative

j182mayA

1    contribution to the alleged infringing work?

2              MS. PAUL:  The latter, as opposed to on the fragmented

3    literal similarity where the focus is on the importance to

4    plaintiff's song.  But if you are talking about a *de minimis*

5    use, then you are looking mostly in the cases quantitatively

6    rather than qualitatively, but I can imagine there could be a

7    case where qualitative was also the issue.  Look at the *Sea of*

8    *Love* case, with the use of the pictures on the wall in the Al

9    Pacino movie and the court said -- I think that was a

10   Judge Stein decision, the court said it was a *de minimis* use.

11             THE COURT:  But in the *Reingold* case it was the

12   opposite, right?  Picture on the wall, *Cosby Show*.

13             MS. PAUL:  Picture on the wall, up there throughout a

14   good part of the movie.  They clipped off the copyright

15   registration in the lower right-hand corner.  It was really

16   important to see --

17             THE COURT:  Right.  So why aren't these all

18   fact-specific issues, though, as to what is actually *de*

19   *minimis*?

20             MS. PAUL:  Can there be fact-specific issues in a

21   given case?  Yes.  Are there fact-specific issues in this case?

22   I respectfully submit there are not.  We didn't put a lot of

23   emphasis -- I do think the use is probably *de minimis*, but I

24   don't think you have to go that far because it is so clearly a

25   fair use in this case.

j182mayA

1          THE COURT:  Let me stop you there, because we didn't

2     directly address fair use.  I don't want to take up too much

3     more time, but I want to ask counsel, to the extent you have

4     something to say about fair use that's not among what we have

5     already discussed, I want to give you an opportunity to address

6     that.  But you don't need to give me the full run down on fair

7     use, because I am aware of the factors, I am aware you have

8     what you said in the briefs, and I am aware of some of the

9     issues that are common to what we have been talking about.  But

10    there may be something particular that sets it apart or that we

11    haven't addressed that I would just like to hear about.

12         MS. PAUL:  There is something that we touched on in

13    our brief, but it's come up so many times today in plaintiff's

14    argument that I would like to say it again.  You have to focus

15    on when does the phrase matter and when does the song matter

16    for purposes of the analysis.  And plaintiff takes the position

17    that all you look at for purposes of deciding whether there is

18    a transformative use or not is the phrase; that the songs are

19    totally irrelevant, their brief says.  How could that be?  How

20    can you possibly determine whether it is being used for a

21    transformative purpose, whether it supplants the demand for the

22    original, whether it adds something new with new meaning, new

23    aesthetics, all of the language that we have got from

24    Judge Laval on down with regard to transformative analysis, how

25    can you possibly decide that without looking at the entirety of

j182mayA

1    the song?

2              THE COURT:  Well, you do because if I recall --

3    correct me if I am wrong -- the quantitative part of that, that

4    is, the amount taken, is done in relation to the original song

5    as a whole.

6              MS. PAUL:  That's the third factor.  I'm talking about

7    the first factor.

8              THE COURT:  Oh, okay.  I'm sorry.

9              MS. PAUL:  I'm saying for purposes of deciding whether

10   something is transformative or not, you can't just look at the

11   phrase to determine whether we transform the phrase.  You have

12   to look at the way the phrase is used in each of the two songs.

13             THE COURT:  Right.  Hence their argument about theme,

14   but nonetheless.

15             MS. PAUL:  Right.  Putting that aside, I'm not going

16   to repeat what we have said about theme.

17             Second factor, the nature of the copyrighted work.

18   What's the work here?  The work is their song, including the

19   musical arrangement of the song as well as the lyrics of the

20   song.  You don't just focus on how unique the phrase is.  I

21   think the song, their song, is quite unique -- well, unique not

22   being a copyright word, but creative.  It also is published and

23   it's also, by their own admission, been out there without being

24   affixed from '81 to '87 and used by many others, they claim,

25   subsequent to '88.

j182mayA

1          Third factor, the court just pointed out, amount and

2    substantiality of the taking.  You have to look not just at the

3    taking of the phrase, but how much of the lyrics has been

4    taken, how much of the musical composition.  No other lyrics

5    taken, no allegation of taking of musical composition in any

6    sense that has ever been protected by any court under copyright

7    law.

8          Fourth factor, it is not the impact on the market for

9    the phrase, it is the impact on the market for the work, the

10   actual or potential market for the work and, under some of the

11   cases, or derivatives thereof.  *Cariou* sort of dismisses the

12   idea of an impact on the derivative market.  But, again, it

13   doesn't make a difference here.

14         So I think, unless the court has questions, I'm

15   perfectly prepared to rest on what we have said about fair use.

16   I think fair use, just like substantial similarity, is an issue

17   that is decidable on 12(b)(6), presents no issues of fact, no

18   amount of discovery is going to change those things, so I am

19   prepared to rest on the arguments, but I thought it was

20   important to point out the distinction of focus on the phrase

21   as opposed to focus on the song.

22         THE COURT:  Thank you.

23         MS. PAUL:  And if I might do one more thing, no amount

24   of discovery is going to change the fact that this is, in the

25   words of Justice Ginsberg in the *Petrella* case, continuing harm

j182mayA

<table>
<tr><td>1</td><td>from the same wrong.  What is the wrong that is alleged?  The</td></tr>
</table>

1    from the same wrong.  What is the wrong that is alleged?  The

2    wrong that is alleged is the reproduction, distribution,

3    performance of the song.

4              THE COURT:  In all cases that are alleged as to an

5    infringement, it is the song just happens to appear in

6    different places in different ways, either in through either

7    performance or some other --

8              MS. PAUL:  Correct.

9              THE COURT:  -- use.

10             MS. PAUL:  And that's, under the rolling approach that

11    the Second Circuit endorses instead of the continuing wrong

12    approach, that's all subject to the bright-line rule on

13    statutory damages.

14             THE COURT:  I'm forgetting which case it was, but one

15    of the cases that addresses that at the -- I think at the end

16    of that analysis, cabined the holding to saying in this

17    situation, where it is the same medium, then it is just one

18    infringement which tacitly suggests, perhaps, that in a case

19    where the same use is made in different media that you might

20    have multiple infringements.

21             MS. PAUL:  I think the case law does not support that.

22    There are cases -- I have been involved in cases, different

23    field, but involving lines of clothing and you come up with a

24    T-shirt and then you come up with a sweatshirt and then you

25    come up with a baseball cap and are those new fringing acts for

j182mayA

purposes of triggering a new availability of statutory damages,

and the vast majority of the cases say no.  But it is not

consistent and there are cases, some of which we have cited,

saying that continuing to perform the same song, rerelease the

same record, all of that is continuing harm.

THE COURT:  Right.

MS. PAUL:  And Justice Ginsberg's opinion in *Petrella*,

granted it is *dicta* because that case was about *laches*, but

it's clearly controlling here and fully consistent even with

the discovery rule under the Second Circuit precedence.

THE COURT:  All right.  Thank you.

So let me just give plaintiff's counsel a chance to

just address the fair use point I made before, not a full

rendition of everything, just highlight anything you think you

either need to respond to what was said or that hasn't been

said already.

MS. SQUILLACE:  Sure, Judge.  And, again, not to

belabor points that we have already made in prior argument and

going back, when you look at the first factor, purpose and

character of the use, again, plaintiff's song has the phrase

nine times in his song.  It is the theme of his song.  It is

the mantra of his song.  It epitomizes the overall theme of the

song.  This is why, when determining fair use, which is the

only thing this court can decide on the 12(b)(6), theme is

important for that reason only.  We are not claiming that theme

1    is protectable, but you must look at the overall theme of the

2    song as you look to the both songs as a whole.  You cannot

3    ignore theme, as defendants would like to do.  They purposely

4    and intentionally placed it in the very same place in their

5    song -- the repeated chorus, the mantra of the song the theme

6    of the song, the epitome of her song and her theme, both themes

7    being being in control of your own life, your own destiny, your

8    own situation and don't let others, society, or life itself

9    dictate your own life and how you live your life.

10             THE COURT:  I understand that argument.  I have to

11   say, when I listened to the songs, and it may just be the

12   recording that I have, the phrase was probably the least

13   emphasized part of the chorus.  There were other parts that

14   were much stronger and called out that theme.  And the only

15   reason I really heard or understood what was being said in

16   regard to the phrase is because I was looking for it.  But

17   nonetheless, I'm not going to make a judgment at this point

18   about what the recording quality is or isn't.

19             MS. SQUILLACE:  Okay, Judge.

20             So obviously in the factor one and it is important to

21   point out, as the court is well aware and the case law is

22   clear, that no individual or coupling of the factors is

23   dispositive.  You must look at all four factors together.

24   There is not one single factor or grouping of factors -- one

25   and three or four and two -- that is dispositive.  You must

j182mayA

1    look at everything.

2         So in furtherance of factor number one, important to

3    note is this being used for a commercial nature or profit

4    nature or not profit nature?  Obviously the use is being used

5    for a commercial profit-generating nature.

6         When you look, too, at the nature of the copyrighted

7    work, not, again, to belabor the point, but from when he

8    created it in tangible form, the phrase "we run things, things

9    no run we" in 1981, he obtained copyright protection.

10        THE COURT:  Well, wait.  He created the song in 1981

11   or the phrase?

12        MS. SQUILLACE:  The phrase, Judge.

13        THE COURT:  Okay.  But the song wasn't created until

14   1988, right?

15        MS. SQUILLACE:  Correct.

16        THE COURT:  I don't think -- look, we talked about

17   this a little bit.  It is my understanding -- and maybe I am

18   wrong, but I will take a look -- that he had no copyright

19   protection in the phrase itself unless and until it was part of

20   the lyrics, in which case it is part of the overall lyrics.

21   But between 1981 and '88, he had nothing.

22        MS. SQUILLACE:  Judge, we respectfully disagree,

23   because what is tangible form?  If I create a lyric and I

24   produce it and I publish it by singing it, that is tangible

25   form, and I have obtained copyright protection.

j182mayA

1          THE COURT:  The copyright is on the song, not the

2    phrase by itself.  I cannot get copyright protection for that

3    phrase.  If I go to the copyright office and I have this unique

4    phrase that I came up with that's really cool and original and

5    it is ten words long and I say to the copyright office, I want

6    a copyright on this, they are not going to give that.  They

7    might give me a trademark if I applied for a trademark.

8          MS. SQUILLACE:  Correct, Judge, but that's why it is

9    important to note Mr. May's copyright registration.  Defendants

10   focus on the musical original --

11         THE COURT:  I understand, but many registrations say

12   that and of course everyone claims that their entire work is

13   protected, all the lyrics therein.

14         MS. SQUILLACE:  Correct.  So we can't ignore that,

15   Judge, which is important to note.  It says "any of the words

16   accompanying the musical work in the arrangement."  So that

17   clearly covers the lyrics in question here.

18         As to the amount and substantiality of the portion

19   used in relation to the copyrighted work, again, as the court

20   is well aware, this looks to plaintiff's work.  How much of it

21   was taken from plaintiff's work?  He uses it nine times in the

22   song.  It is a lot.  Even though they use it three times, that

23   is not dispositive of that factor.  It is how many times and

24   how substantial is it in his work?  So we have that and we have

25   pled that with specificity.

j182mayA

1            And then the fourth factor, which is the effect of the

2    use upon the potential market, at best and at most, Judge,

3    defendants' papers may have raised a general issue of material

4    fact in dispute as a potential market, but clearly plaintiff's

5    music is dancehall dance music and defendants' music is

6    dancehall dance music, and discovery is needed to see the

7    effect of --

8            THE COURT:  They are both dancehall dance music, but

9    is anyone really going to say that the market for the song *We*

10   *Run Things* by Mr. May is displaced in any way or faces any

11   threat of dislocation because of Ms. Cyrus's song?

12           MS. SQUILLACE:  Yes, Judge.  And in fact, this goes

13   back to when we talk about it being published.  If you were to

14   Google "we run things, things no run we now," Ms. Cyrus comes

15   up for about 30 pages on the Internet before Flourgon.  So the

16   effect on Flourgon and his market and his fans absolutely is

17   there.  But, again, at best, all they raise is a triable issue

18   of genuine fact in dispute which, again, means their motion has

19   to be denied.  And, again, this one-fourth factor in and of

20   itself by itself is not dispositive.

21           And when you look, again, the *Campbell v. Acuff-Rose*

22   case, as defendants also cite, you can't have one factor

23   dispositive and when looking at side by side, when you talk

24   about transformative use, you look at what the defendants took

25   from plaintiff, this is what you must look at when you talk

j182mayA

1    about determining whether it is fair use.  In order to be fair

2    use, it must transform the meaning in the defendants' work from

3    the meaning that it has in plaintiff's work and, again, it does

4    not.  "We run things, things no run we" means the same thing as

5    "we run things, things don't run we," in and of itself and as

6    it is used as the repeated mantra of the theme of the song in

7    the repeated chorus.  It does not change the meaning of being

8    in control of one's life, which is the theme of defendants'

9    song, and it is the same use of it in plaintiff's song.  That

10   is what must be looked at when looked to see whether it is fair

11   use.  Does the defendants' change of the word "no" to "don't,"

12   is that enough of a variation to transform the meaning of the

13   phrase and the meaning of the phrase within the meaning of the

14   song, and it absolutely does not.  Which by the way, Judge, we

15   believe is why really plaintiff would be entitled to judgment

16   as a matter of law, determining fair use.  But, again, at best

17   and at most, the defendants raise general issues of material

18   fact in dispute which would warrant a denial of granting their

19   motion at the 12(b)(6) stage, your Honor.

20               THE COURT:  All right.

21               MS. SQUILLACE:  Thank you.

22               THE COURT:  All right.  The court is going to reserve

23   decision and give it due consideration and issue an opinion in

24   due course.

25               Anything else?

j182mayA

1                MS. SQUILLACE:  No, your Honor.

2                MS. PAUL:  No, your Honor.  Thank you very much for

3     your time.

4                MS. SQUILLACE:  Thank you, your Honor.

5                THE COURT:  Of course.  Thank you.  We are adjourned.

6                MS. SQUILLACE:  And Happy New Year.

7                              oOo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25