USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/13/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MICHAEL MAY a.k.a. FLOURGON,                          :
                                                      :
                                   Plaintiff,         :          18-CV-2238 (LAK) (RWL)
                                                      :
            - against -                               :          **REPORT AND**
                                                      :          **RECOMMENDATION**
SONY MUSIC ENTERTAINMENT; DESTINY HOPE :                         **ON MOTION TO DISMISS**
CYRUS a.k.a. MILEY RAY CYRUS; SMILEY MILEY, :
INC.; THERON THOMAS; TIMOTHY TOMAS;                   :
MICHAEL LEN WILLIAMS II a.k.a. MIKE WILL              :
MADE IT / MIKE WILL; and LARRY RUDOLPH,               :
                                                      :
                                   Defendants.        :
------------------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

**TO THE HONORABLE LEWIS A. KAPLAN, United States District Judge:**

This case is about whether the phrase "We Run Things, Things Don't Run We"

used in the chart-topping 2013 song "We Can't Stop" co-written and performed by Miley

Cyrus infringes Michael May's copyright in his hit 1988 song "We Run Things."  Cyrus

and her co-defendants have moved to dismiss May's complaint for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6).  Alternatively, Defendants seek a

ruling that even if May has a viable claim, he cannot recover statutory damages or

attorneys' fees, and his damages are limited by the applicable three-year statute of

limitations.  For the reasons set forth below, I recommend that Defendants' motion to

dismiss be DENIED with respect to infringement, fair use, statutory damages and

attorney's fees and GRANTED with respect to limiting pre-suit damages to a three-year

period.

<u>Factual Background</u>[1]

A.    <u>May and "We Run Things"</u>

May, also known as Flourgon, is a Jamaican songwriter and recording artist who released hit reggae singles in the late 1980s and 1990s.[2]  In the 1980s, May performed as a disc jockey and created his own sound system sets and authored his own lyrics.[3]  At the start of that period, in or about 1981, May created, originated and authored "We run things. Things no run we" as a lyrical phrase included in his performances (the "Phrase").[4]

---

[1] The facts are drawn from the Second Amended Complaint (hereinafter, "SAC") (ECF No. 32), including materials incorporated or referenced therein, such as the song recordings and their lyrics.  The parties agree this is proper.  Memorandum Of Law In Support Of Motion To Dismiss Plaintiff's Second Amended Complaint (ECF No. 52) (hereinafter, "Pl. Mem.") at 5; Memorandum Of Law In Opposition To Defendants' Motion To Dismiss Plaintiff's Second Amended Complaint Pursuant To FRCP 12(b)(6) (ECF No.57) (hereinafter, "Def. Mem.") at 9; *see, e.g., Halebian v. Berv,* 644 F.3d 122, 131 n.7 (2d Cir. 2011) ("it is well established that on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court may also rely upon documents attached to the complaint as exhibits[ ] and documents incorporated by reference in the complaint.") (internal quotation omitted).  As must be done on a motion to dismiss, the Court accepts Plaintiff's factual allegations as true, and draws reasonable inferences and resolves ambiguities in his favor.  *See Lotes Co. v. Hon Hai Precision Indus. Co.,* 753 F.3d 395, 403 (2d Cir. 2014).

[2] SAC ¶ 64.

[3] SAC ¶ 65.  A "sound system" has a specialized meaning in Jamaican culture.  The term refers to a collection of disc jockeys, engineers and other performers playing reggae and ska music. *See*, Tracy L. Reilly, *Debunking the Top Three Myths of Digital Sampling*, 31 COLUM. J.L. & ARTS 355, 358 (2008).

[4] SAC ¶ 66.

Several former sound system colleagues or associates of May assert that May originated the Phrase and that none of them were aware of the Phrase being previously used.[5]

The Phrase is a combination of English language and Jamaican Patois dialect. Phonetically, in strict Patois, the Phrase would be "Wi run tings. Tings nuh run wi."[6]  The SAC is ambiguous as to whether May merely adapted the Phrase "We run things. Things no run we" from the Jamaican Patios saying "Wi run tings. Tings nuh run wi," or whether May originated the Phrase from whole cloth.[7]  At oral argument, however, May's counsel expressly rejected conceding the notion that May adapted the Phrase from a pre-existing strict Patois version of the same phrasing.[8]

In 1988, May incorporated the Phrase into a song entitled *We Run Things*.[9]  The Phrase appears nine times in the song, particularly in the repeated chorus.[10]  May's song was publicly released in 1988, became a No. 1 hit in Jamaica, and garnered "great acclaim" outside Jamaica, including in the United States.[11]  In 1999, May "permitted" *We*

---

[5] SAC ¶ 67 and Ex. A.  Exhibit A is a collection of affidavits from individuals attesting to the originality of the Phrase.  The Court may consider these on this motion as attachments referenced in the SAC.

[6] SAC ¶ 69.  *Wallace v. Glover*, No. Civ. 09-4494 ES, 2013 WL 1352250, at *2 (D.N.J. Apr. 2, 2013) ("'Jamaican Patois,' formally known as 'Jamaican Creole,' presents a mix of English and African terms") (citing Lars Hinrichs, *Codeswitching on the Web: English and Jamaican Creole in E–Mail Communication* (2006)).

[7] *See* SAC ¶ 69.

[8] Transcript of Oral Argument, January 8, 2019 (ECF No. 61) (hereinafter, "Argument Transcript"), at 4.

[9] SAC ¶ 68.

[10] SAC ¶ 69.

[11] SAC ¶ 68.

*Run Things* to be used in the soundtrack of a Jamaican action-crime film.[12]   May registered *We Run Things* with the United States Copyright Office in 2017, shortly before filing this lawsuit.[13]

May alleges that the theme of the Phrase and *We Run Things* is "an attitude of personal freedom and situational control, where an individual need not be constrained by fear or reproach as he/she is not controlled or ruled by one's circumstances."[14]   The lyrics of *We Run Things*, attached at the end of this opinion, celebrate personal freedom and control, mostly over money, other men and particularly women. Two such examples are:

> *We rule girl, girl no rule we*
> *That's a fi girl, dem haffi respect we*
>
> *But if a girl love me, that's a different fashion*
> *Jahman she would haffi know she mi a di man*
> *We come first and she come second*

The phrase "We rule girl, girl no rule we" is repeated three times throughout *We Run Things.*

B.    <u>Cyrus and "We Can't Stop"</u>

Miley Cyrus is a popular and successful American singer and songwriter.[15]   Cyrus co-wrote the song *We Can't Stop*, which was released in 2013 and achieved "meteoric

---

[12] SAC ¶ 73.

[13] SAC ¶ 74.

[14] SAC ¶ 70.

[15] SAC ¶ 17, 127, and Ex. F.

success."[16]   *We Can't Stop* was re-released each year thereafter to the present.[17]
Cyrus's song celebrates female empowerment and includes lyrics such as "This is our
house; this is our rules"; "Can't you see it's we who own the night"; "It's our party we can
do what we want;" "It's our party we can say what we want; It's our party we can love who
we want"; "We can kiss who we want."[18]   The lyric "We run things, things don't run we"
appears three times in the song, each time in the chorus.

Cyrus has looked to multiple genres of music, including Caribbean music, to inspire
her own work.[19]   In a 2015 interview, Defendants Theron and Timothy Thomas,
songwriters and producers, and co-authors of *We Can't Stop*, explained that they
incorporate Caribbean culture and melodies into their songs; and, in regard to *We Can't*
*Stop*, mentioned "We run tings, tings don't run we" and "Hands inna di air like we don't
care" as examples.[20]

Cyrus and the other defendants are music industry professionals who are familiar
with established industry practice, including licensing of song rights.[21]   According to the
SAC, the Defendants knew or should have known that they needed to clear the rights to

---

[16] SAC ¶ 80 and 90.

[17] SAC ¶ 90.

[18] The lyrics for *We Can't Stop* are appended to this opinion following those of May's
song.

[19] SAC ¶ 87.

[20] Augustin, Camille, "Views From The Studio: Meet R. City, The Hardest Working
Songwriters In Show Business" *Vibe E*-Magazine, July 17, 2015,
http://www.vibe.com/2015/07/views-from-the -studio-r-city, quoted in SAC ¶ 100-01.

[21] SAC ¶ 102-105.

use the Phrase just as they cleared rights to use another song's phrase – "La Di Da Di" – for *We Can't Stop.*[22]

       *We Can't* Stop has been a "worldwide commercial success."[23]   The song was Cyrus's "comeback" single with over five million copies sold.[24]   The song's music video release set record-breaking numbers in viewing, and Cyrus continues to perform the song in her concerts and promotional appearances.[25]

## C.   May's Copyright Infringement Claim

       May's SAC asserts a single count of copyright infringement.   The SAC repeatedly bases that claim on *We Can't Stop*'s incorporation of the Phrase,[26] and specifically compares the extent and nature of use of the Phrase in *We Run Things* and *We Can't Stop.*[27]   May's "Lyrical Phrase Comparison" chart asserts that the Phrase is used nine times in May's song and also in the title of the song and in the hook of the repeated chorus, while Cyrus's song uses the Phrase three times in the hook of its repeated

---

[22]   SAC ¶ 104-105, 116.   Defendants provided writing credits to the songwriters of "La Di Da Di"; namely, Douglas E. Davis, a.k.a Doug E. Fresh, and Richard Martin Lloyd Walters, a.k.a. Slick Rick.   SAC ¶ 104.

[23] SAC ¶ 122.

[24] SAC ¶ 122, 124.   Ironically, *We Can't Stop* apparently peaked at second place on the *Billboard Hot 100*, surpassed by the song *Blurred Lines*, which recently fell victim to copyright infringement allegations of its own.   *See*, Wikipedia, *We Can't Stop*, https://en.wikipedia.org/wiki/We_Can%27t_Stop (as of February 11, 2019); *Williams v. Gaye,* 895 F.3d 1106 (9th Cir. 2018).

[25] SAC ¶ 123, 132, 135.

[26] SAC ¶ 76-79, 91-92, 118.

[27] SAC ¶ 69.

chorus.[28]  *We Can't Stop* repeatedly uses "substantially similar phraseology" by using the literal English translation of the Phrase "while wholly maintaining the unique Patois phraseology."[29]  The SAC also alleges that *We Can't Stop* employs the Phrase to convey the same theme as *We Run Things*,[30] and also uses substantially the same "vocal melody/cadence/rhythm/inflection."[31]  The SAC does not, however, allege that *We Can't Stop* as a whole work infringes *We Run Things* as a whole work.  May seeks injunctive relief, damages, attorney's fees and costs pursuant to the Copyright Act.

D.    History Of The Phrase Apart From The Parties' Songs[32]

Various articles and literature indicate that the Phrase, or some variation of it, has a lengthy history and is well-recognized in Jamaican culture.  For instance, "Wi run tings, tings nuh run we" is included in an online source of "Wise Jamaican Proverbs."[33]  Similarly, a 2003 publication refers to "'we run tings, tings nuh run we" as an "old Jamaican proverb."[34]  "Wi run tings, tings nuh run wi" also is defined in an online dictionary of

---

[28] SAC ¶ 69.  While the numerical counts are correct, the characterizations are not entirely accurate.  Only half the Phrase is used for May's song title, and, while the Phrase appears in the chorus of Cyrus' song, it is quite a stretch to call it the "hook," particularly in comparison to other parts of the chorus, both as written and as recorded.

[29] SAC ¶ 97.

[30] SAC ¶ 79, 92, 95-96.

[31] SAC ¶ 119.

[32] The materials discussed in this section are not part of the SAC.  Rather, Defendants have submitted them.  The extent to which the Court may consider these materials on this motion is discussed later in this opinion.

[33] Declaration of Lacy H. Koonce in Support of Motion to Dismiss (ECF No. 53) (hereinafter, "Koonce Decl."), Ex. G.

[34] Koonce Decl., Ex. M.

Jamaican Patois.[35]  And an article from a Jamaican news publication suggests that even May's attorneys recognize that the Phrase, at some point, became "commonly used" and "a part of Jamaican culture."[36]  It is not clear how far back use of the Phrase or its variations go, but there is no dispute that the Phrase was widely accessible from multiple sources prior to the release of *We Can't Stop* in 2013.

E.      Defendants' Motion To Dismiss

Defendants advance three primary arguments in support of their motion to dismiss on the merits.  First, although the song *We Run Things* is copyrighted, the Phrase alone is not subject to copyright protection.  Second, even if the Phrase were protectable, that protection is minimal, and there is no substantial similarity between the works.  Third, Defendants use of the Phrase in *We Can't Stop* is a permissible fair use under the Copyright Act.

In addition to addressing the merits issues, Defendants also move to dismiss certain aspects of damages sought by May.  Specifically, Defendants argue that May is not entitled to damages for any time prior to the three-year statute of limitations period preceding filing of this action.  Defendants further contend that May is not entitled to statutory damages or attorneys' fees because he did not register *We Run Things* until 2017, several years after *We Can't Stop* was first released in 2013.

As explained below, the standards governing a motion to dismiss, which require that reasonable inferences be drawn in favor of the non-moving party, compel denial of

---

[35] Koonce Decl., Ex. F.

[36] Koonce Decl., Ex. E.

Defendants' motion.   Defendants' arguments to a large extent are predicated on an incorrect assumption that the Phrase merely is a trivial adaptation of a well-known, pre-existing Jamaican saying.   While that ultimately may prove to be true, the Court cannot make that determination on this motion.    Further, the Court cannot conclude without a more developed record that Defendants' use of the Phrase is a fair use, although that too may well turn out to be so.   As to damages, the Court, and the parties, agree that May, if successful, cannot recover damages for any time prior to the three-year statutory period preceding filing of his complaint.   Whether May could recover statutory damages and attorney's fees, however, is premature to answer at this stage of the case.

## Procedural History

May filed his initial complaint on March 13, 2018.   He filed the operative Second Amended Complaint on June 5, 2018.   The SAC alleges a single cause of action for copyright infringement and seeks injunctive relief as well as damages, attorneys' fees and costs.   The Defendants filed the motion to dismiss on August 22, 2018.   Following full briefing, this Court heard argument on January 8, 2019.

## Legal Principles

A. Motion To Dismiss Standards

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   "Where a complaint pleads facts that are

'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks omitted). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quotation marks omitted). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purposes of considering a motion to dismiss pursuant to 12(b)(6), a court generally is confined to the facts alleged in the complaint. *Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

In that regard, "[i]f a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept

10

the allegations in the complaint as true." *Poindexter v. EMI Record Grp. Inc.*, No. 11 Civ. 559(LTS), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) (citing *593 *Barnum v. Millbrook Care LP*, 850 F.Supp. 1227, 1232–33 (S.D.N.Y.1994)). "In copyright infringement actions, 'the works themselves supersede and control contrary descriptions of them,' including 'any contrary allegations, conclusions or descriptions of the works contained in the pleadings.' " *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir.2010) (internal citation omitted) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir.1986), and 3–12 Melville B. Nimmer and David Nimmer, *Nimmer On Copyright* § 14–01[B] (2012) (hereinafter, "Nimmer") § 12.10)).

## B. Copyright Infringement Principles

Establishing copyright infringement requires proof of: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). For purposes of this motion, Defendants accept as true the allegation that May owns a valid copyright in the song *We Run Things*. (Def. Mem. at 2 n.1.)  Accordingly, ownership and validity are not at issue on this motion.  Rather, the arguments focus on the second requirement: improper copying.  *See Jorgenson v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (infringement entails copying that "amounts to an improper or unlawful appropriation"). Proving improper copying in turn requires establishing two elements: "(1) the defendant has actually copied the plaintiff's work;[37] and (2) the copying is illegal because a

---

[37] For purposes of this motion, Defendants do not expressly accept May's allegations of actual copying.  However, neither Defendants' opening brief nor their reply address the issue of actual copying.  At oral argument, defense counsel alluded to probative similarity, which is a factor in the copying analysis, but did not develop the argument.  Accordingly, the Court need not address it on this motion, and the only infringement issue to be

substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito Architecture*, 602 F.3d at 63 (internal quotation marks omitted).

Multiple tests exist to determine substantial similarity, including, as relevant here, the "ordinary observer test" and the "fragmented literal similarity test." *Estate of Smith v. Cash Money Records, Inc.*, 253 F.Supp.3d 737, 746 (S.D.N.Y. 2017) (citing *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 140 (2d Cir. 1998). "The ordinary observer test is the "'standard test for substantial similarity.'" *Estate of Smith,* 253 F. Suppl.3d at 746 (quoting *Peter F. Gaito*, 602 F.3d at 66). This test asks "whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Peter F. Gaito*, 602 F.3d at 66 (internal quotation marks and alterations omitted). The Court looks to "the contested [work]'s total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense." *Id.* (citation omitted); *see Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1977 (2014) (quoting with approval the standard set forth in *Peter F. Gaito*).

By contrast, "fragmented literal similarity exists where the defendant copies a portion of the plaintiff's work exactly or nearly exactly, without appropriating the work's overall essence or structure." *TufAmerica, Inc. v. Diamond*, 968 F.Supp.2d 588, 597

---

discussed is substantial similarity. *See Board of Managers of Mason Fisk Condominiums v. 72 Berry St., LLC,* 801 F.Supp.2d 30, 39 (E.D.N.Y. 2011) ("[a]rguments raised for the first time at oral argument are generally deemed waived") (citing *Tamar v. Mind C.T.I., Ltd.,* 723 F.Supp.2d 546, 555 (S.D.N.Y. 2010); *Nobel Ins. Co. v. City of New York,* No. 00 Civ. 1328, 2006 WL 2848121, at *16 (S.D.N.Y. Sept. 29, 2006) ("Normally, [the Court] will not consider arguments raised for the first time in a reply brief, let alone [at or] after oral argument" (alterations in original) (quoting *United States v. Barnes,* 158 F.3d 662, 672 (2d Cir. 1998)).

(S.D.N.Y. 2013) (*citing Newton v. Diamond*, 388 F.3d 1189, 1194 (9th Cir. 2004) (citing 4 *Nimmer* § 130.03[A][2], at 13-45); *see also Castle Rock*, 150 F.3d at 140 (fragmented similarity test "focuses upon copying of direct quotations or close paraphrasing"); *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75 n.3 (2d Cir. 1997) (noting that the Second Circuit has "endorsed th[e] taxonomy" distinguishing between "fragmented literal similarity" and "comprehensive nonliteral similarity"). Under the fragmented literal similarity test, "the question of substantial similarity is determined by an analysis of 'whether the copying goes to trivial or substantial elements' of the original work." *TufAmerica*, 968 F.Supp.2d at 598 (citing *Newton*, 388 F.3d at 1195, and *Williams v. Broadus*, No. 99 Civ. 10957, 2001 WL 984714, at *3 (S.D.N.Y. August. 27, 2001))*; see also* 4-13 Nimmer  (2017) § 13.03 ("The question ... is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work – not whether such material constitutes a substantial portion of defendant's work.").

"Both tests ask 'whether 'the copying is quantitatively and qualitatively sufficient' to support a finding of infringement.'" *Estate of Smith*, 253 F. Supp.3d at 748 (quoting *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999)). "It is only where the points of dissimilarity exceed those that are similar and those similar are – when compared to the original work – of small import quantitatively or qualitatively that a finding of no infringement is appropriate." *Gal v. Viacom International, Inc.,* 403 F.Supp.2d 294, 305 (S.D.N.Y. 2005) (*quoting Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992)). But "[b]ecause they involve literal copying, in cases of 'fragmented literal similarity,' more so than under the 'ordinary observer test,' the copying of even a 'relatively small' quantitative 'portion of the pre-existing work may be substantial if it is of

13

great qualitative importance to the [pre-existing] work as a whole.'" *Estate of Smith*, 253 F. Supp.3d at 747 (*quoting TufAmerica*, 968 F.Supp.2d at 597).

"Under either test, only the protectable portions of the copyrighted works are compared for substantial similarity." *Estate of Smith*, 253 F. Supp.3d at 747.  "To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* (quoting *Feist*, 499 U.S. at 345); *see also N.Y. Mercantile Exchange., Inc. v. Intercontinental Exchange, Inc.,* 497 F.3d 109, 113 (2d Cir. 2007) ("The sine qua non of copyright is originality").  "Where works 'have both protectible and unprotectible elements [the] analysis must be more discerning and ... [courts] must attempt to extract the unprotectible elements from ... consideration and ask whether the protectible elements, standing alone, are substantially similar.'" *Estate of Smith*, 253 F. Supp.3d at 747 (quoting *Peter F. Gaito*, 602 F.3d at 66) (elipses in original).

The Court may evaluate substantial similarity at the motion to dismiss stage. *McDonald v. West*, 138 F. Supp.3d 448, 454 (S.D.N.Y. 2015) (citing *Peter F. Gaito*, 602 F.3d at 64).  "When evaluating substantial similarity on a motion to dismiss, 'no discovery or fact-finding is typically necessary, because what is required is only a visual [aural] comparison of the works.'"  *Id.* (citing *Peter F. Gaito*, 602 F.3d at 64).  If a district court determines that the two works are not substantially similar as a matter of law, then the court "can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not plausibly give rise to an entitlement to relief."  *Peter F. Gaito*, 602 F.3d at 64 (citation and internal quotations omitted); *see also Bell v. Blaze Magazine,*

No. 99 Civ. 12342, 2001 WL 262718, at *3 (S.D.N.Y. March 16, 2001) (If court determines no reasonable jury could find works substantially similar, or concludes the similarities pertain only to unprotected elements of the work, "it is appropriate for the court to dismiss the action because, as a matter of law, there is no copyright infringement.").

Discussion

I.   <u>May States A Claim For Copyright Infringement</u>

Defendants' argument for dismissal of May's copyright claim can be broken down to three points.  First, Defendants argue that the Phrase is not sufficiently original to be protected by copyright.  Second, Defendants contend that there is no substantial similarity between the two songs to establish infringement.   Last, Defendants argue that even if infringement were established, their use of the Phrase in *We Can't Stop* is a permitted fair use.  Defendants ultimately may be correct with respect to all three arguments.  But whether that is so may be properly determined at summary judgment, not on this motion to dismiss where reasonable inferences are to be made, and ambiguities resolved, in favor of May, the non-moving party.

A.   <u>Whether The Phrase Is Original And Protectable</u>

Defendants first argue that the Phrase is not subject to copyright protection and cannot be the basis for an infringement claim because (1) the Phrase is not original to May, and (2) the Phrase is not protected by copyright as a matter of law.  The first leg of this argument fails based on a mistaken assumption about May's allegations.  The second leg fails because although some phrases cannot be separately protected as a matter of law, copying a phrase from one copyrighted work into another work may have the potential to infringe.

15

1.  <u>Whether The Phrase Is Original To May</u>

Much of Defendants' motion to dismiss is predicated on the premise that May created the Phrase merely by adapting and partly Anglicizing a well-known, pre-existing Jamaican saying "Wi run tings. Tings nuh run wi." (Def. Mem. at 1-2, 9-13; Def. Reply at 1-3.)  According to Defendants, May's adaptation of the Jamaican saying is trivial, does not arise to the level of originality required for copyright protection, and renders any appropriation of the Phrase merely *de minimis* and thus non-actionable.

The problem with this argument is that Defendants' premise is incorrect. Defendants draw their conclusion from Paragraph 69 of the SAC.  That paragraph alleges that the Phrase "is distinctly May's with its own unique phraseology, meaning and linguistic combinations using part of the Jamaican Patois dialect and uniquely and creatively mixing same with the English language.  Phonetically, in strict Jamaican Patois, Mr. May's lyrical phrase would be spelled "Wi run tings. Tings nuh run wi." (SAC ¶ 69.) While Defendants' interpretation may be reasonable, another reasonable interpretation is that May blended Jamaican Patois and English from scratch.  Alleging what the Phrase *would* read as in Jamaican Patois suggests a hypothetical, not that the strict Jamaican Patios version preceded May's adaptation.  The Court must resolve ambiguities in favor of May and therefore cannot conclude on this motion that May merely altered a pre-existing saying.  And to lay the matter to rest for purposes of this motion, May confirmed at oral argument that he did not intend his allegations to be construed in the manner that Defendants do.  (Argument Transcript at 4.)

Regardless of how May's allegations are construed, Defendants submit several items obtained from websites to show indisputably that the Phrase, in either May's version

or strict Jamaican Patois, was well-known before May incorporated it into his song in 1988. (*See* Koonce Decl. Exs. E-N.) These materials may well confirm Defendants' contention. But that is a matter to be explored in discovery and ultimately considered on summary judgment. *TufAmerica*, 968 F.Supp.2d at 604 ("assuming, without concluding that 'say what' is a common phrase now, the Court cannot at the motion to dismiss stage conclude that this in fact a common phrase or was a common phrase at the time *Say What* was recorded"). The materials cannot form a basis to dismiss the action at this time. The materials are not referenced or included in the SAC. And while the Court may take judicial notice that these items are copies of material found on the internet, the existence of factual questions about their content militates against taking judicial notice for the purposes that Defendants ascribe to them.[38]

Accordingly, for purposes of this motion to dismiss, the Court deems the Phrase to be original to May.

2. <u>Whether the Phrase Can Be The Basis For Copyright Infringement</u>

Even if the Phrase is original to May, Defendants argue, it cannot be legally protected or serve as a basis for a copyright infringement claim because it lacks sufficient originality no matter who created it. Here too, Defendants overreach.

---

[38] *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (reversing grant of motion to dismiss because district court considered materials outside pleading where materials were not integral to or referenced in complaint and other conditions had not been met); *Stinnett v. Delta Airlines, Inc.,* 278 F.Supp.3d 599, 607 (E.D.N.Y. 2017) ("a court may not consider external materials in its ruling when reliance on such materials leads the court to 'making a finding of fact that controvert[s] the plaintiff's own factual assertions set out in its complaint.'") (quoting *Global Network Communications, Inc. v. City of New York,* 458 F.3d, 150, 156 (2d Cir. 2006).

It is well established that "[w]ords and phrases, such as titles or slogans, are insufficient to warrant copyright protection, as they do not exhibit the minimal creativity required for such protection."  *Bell v. Blaze Magazine*, No. 99 Civ. 12342, 2001 WL 262718, at *2 (S.D.N.Y. March 16, 2001), citing *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992); *see also McDonald v. West*, 138 F. Supp.3d 448, 454 (S.D.N.Y. 2015) ("short phrases, including titles and slogans, rarely if ever exhibit sufficient originality to warrant copyright protection").  This principle is codified in Copyright Office regulations, which provide: "[w]ords and short phrases such as names, titles, and slogans" are "not subject to copyright."  37 C.F.R. § 202.1.

Were it otherwise, the creative arts would be unduly stifled, contrary to the Constitution's stated goal of promoting the progress of the arts.  U.S. Const. Art. 1 § 8. "The principle excludes from copyright the 'raw materials' of art, like colors, letters, descriptive facts . . . as well as previous creative works that have fallen into the public domain.[39]  It likewise excludes the basic building blocks of music, including tempo and

---

[39] Just as the SAC is ambiguous about exactly what May alleges with respect to origination of the Phrase, May's briefing contains seemingly contradictory information about whether the Phrase was in the public domain prior to Defendants' use and thus available for use without permission.  In copyright law, the public domain refers to material that no longer is, or never was, protected by copyright.  *See* 3 Nimmer § [9A].01 ("Basically, the term connotes the opposite of legal protection"); *Feist*, 499 U.S. at 1289 (referring to facts as example of public domain material that is "available to every person").  Throughout much of his briefing, May argues that the Phrase was not in the public domain.  (Pl. Mem. at 20-21.)  Curiously, just a page later May's brief states "Plaintiff's original lyrics/lyrical phrase pre-existed Defendants' unlawful use of same and was in the public domain, as any Google or Internet search would reveal decades before Defendants' unlawfully took, copied and used same."  (Pl. Mem. at 22.)  As experienced copyright lawyers, May's counsel would be expected to know what they were conveying by saying the Phrase had been in the public domain for quite some time before Defendant's use.  At oral argument, however, May's counsel denied using the term in that instance to mean that the Phrase was free for anyone to use in any way.  (Argument Transcript at 15-16.)  Rather, as suggested by the context in which it appears, use of "the

individual notes." *McDonald v. West*, 138 F. Supp.3d at 454 (citations omitted).  Similarly, words, titles and short phrases, "rarely if ever exhibit sufficient originality to warrant copyright protection."  *Id.,* citing *Bell*, 2001 WL 262718 at *2 (citing *Arica*, 870 F.2d at 1072).

The Court agrees that if May applied for copyright protection for the Phrase alone, he likely would be denied.  But that is not what May did.  He applied for, and obtained, registration for his song of which the Phrase is an original (for purposes of this motion as explained above) "constituent element."  *Feist*, 499 U.S. at 361 (1991); *see also Estate of Smith*, 253 F. Supp.3d at 744 (same).  Where written works, including lyrics, are at issue, although an "'ordinary' [i.e., uncopyrightable] phrase may be quoted without fear of infringement, a copier may not quote or paraphrase the sequence of creative expression that includes such a phrase.'"  *McDonald*, 138 F. Supp.3d at 455, citing (*Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987).   Although May does not claim that Defendants' song as a whole infringes his song as a whole, the protection afforded to May should be considered in the context of his having obtained a copyright for the song in which the Phrase appears.

Indeed, several cases in this Circuit have addressed copyright infringement claims based on allegations of improperly using a lyrical phrase previously incorporated into a copyrighted song.  The varied procedural posture and outcome of those cases confirm that use of a lyrical phrase from one song in another song may in some instances be the basis for an infringement claim.

---

public domain" in this particular instance conveys that May's song was well known and widely available at the time of Defendants' use such that Defendants were aware of it and had access to it.

Some of these cases have denied motions to dismiss where defendants made the same or similar argument as Defendants do.  *See, e.g., TufAmerica, Inc.*, 968 F. Supp.2d at 604 (denying motion to dismiss copyright claim against defendant who used the lyrical phrase and recording "say what" sampled from plaintiff's song); *Williams v. Broadus*, 2001 WL 984714, at *4 (denying motion for summary judgment due to question of fact as to whether musical work sampling portions of music and lyrics from another song gave rise to substantial similarity).  By contrast, those cases where motions to dismiss were granted are distinguishable.  For instance, in *McDonald v. West*, the plaintiff claimed that the defendant's song titled *Made In America* was an unlawful copy of the entirety of plaintiff's song with the same title.  138 F.Supp.3d at 459 ("That the songs share their (ubiquitous, unprotectable) title is not enough to overwhelm the profound dissimilarity of the two works.").[40]  And some were resolved on summary judgment following discovery.  *See, e.g., Boone v. Jackson*, 206 Fed. App'x 30, 32 (2d Cir. 2006) (affirming summary judgment in favor of defendant as to use of lyrical phrase "holla back" and noting deposition testimony that contradicted plaintiff's prior assertions); *see also*, *Acuff-Rose v. Jostens*, 155 F.3d 140, 143-44 (2d Cir. 1998) (affirming decision after summary bench trial finding defendant's use of lyrical phrase "If you don't stand up for something, you'll fall for anything" in defendant's advertising for class rings did not infringe).

---

[40] Cases cited by Defendants regarding lack of protection for phrases used in other media similarly are distinguishable in that they were premised on titles and unprotectable ideas and concepts.  *See Bell*, 2001 WL 262718 at *3-4 (motion to dismiss granted where plaintiff, author of an article titled "Hip Hop Behind The Walls," claimed infringement by defendant's article titled "Hip Hop Behind Bars" based on copying his ideas and using a similar title); *Boyle v. Stephens*, No. 97 Civ. 1351, 1998 WL 80175, at *5-6 (S.D.N.Y. Feb. 25, 1998) (motion to dismiss granted against plaintiff claiming infringement by defendant's mutual fund advertising and promotional material based on use of the word "series," using graphics to illustrate fund characteristics and describing similar concepts).

Drawing all reasonable inferences in favor of May, as the Court must at this juncture, the Court cannot conclude that the Phrase lacks the requisite originality and cannot serve as the basis for May's claim.

B. Whether May Plausibly Claims Substantial Similarity

The choice of which substantial similarity test to apply in this case is pivotal. Defendants argue for application of the ordinary observer test, while May invokes the fragmented literal similarity test.  These legal postures are not surprising given that the ordinary observer test focuses on the "global" while the fragmented literal similarity test focuses on the "local," and May's copyright claim is based on Defendants' use of a phrase, not the overall similarity of the songs as a whole.  *See TufAmerica*, 968 F.Supp.2d at 598 (describing and adopting Plaintiff's argument that copying at issue was example of fragmented literal similarity and therefore substantial similarity turned on "localized" rather than "global" similarity between the two pieces). Indeed, no reasonable juror could conclude that, to the ordinary observer, the two songs are substantially similar as a whole. Despite sharing use of the Phrase, the songs' lyrics, compositions and recordings are substantially different.  *See, e.g., McDonald,* 138 F.Supp.3d at 458 ("listening to the two songs side by side . . . makes clear that no reasonable jury could conclude that they are substantially similar.").   As discussed below, however, the Court agrees that the fragmented literal similarity test applies here and that for purpose of this motion to dismiss, May has stated a plausible, though tenuous, claim of copyright infringement.

May's claim is precisely the type that fragmented literal similarity addresses. Rather than claiming the two songs are comprehensively similar, his claim is predicated

on Defendants' appropriation of a specific phrase "exactly or nearly exactly."[41] *TufAmerica,* 968 F. Supp.2d at 597 (applying fragmented similarity test to plaintiff's allegations that defendants copied several different small samples of plaintiff's songs into various of defendants' songs); *see also Estate of Smith*, 253 F.Supp.3d at 746 (quoting *TufAmerica*); *Broadus*, 2001 WL 984714, at *3 (applying fragmented similarity analysis where plaintiff claimed defendants incorporated exact, brief sample of defendant's song into plaintiff's song). As in *Broadus* and *TufAmerica*, "the alleged infringement in this case involves the literal use of a small portion of the pre-existing work in the later work, which 'is analogous to a direct quotation or close paraphrase, rather than the 'parroting [of] properties that are apparent only when numerous aesthetic decisions embodied in the the plaintiff's work of art . . . are considered in relation to one another.'" 968 F.Supp.2d at 597 (citing *Broadus*, 2001 WL 984714 at *3 and *Peter F. Gaito*, 602 F.3d at 66) (alterations in original).[42]

---

[41] Because nearly exact copying suffices, it is inconsequential that the Phrase as used in *We Can't Stop* substitutes "don't" for "no," so that the Phrase reads "We run things, Things don't run we."

[42] In a footnote, Defendants contend that the fragmented similarity test does not apply and only is appropriate for cases involving digitally copied samples of song recordings such as those at issue in *TufAmerica*. (Def. Mem. at 13 n.4.) But Defendants fail to offer any logical distinction between copying a fragment of a recording and copying a fragment of a composition's lyric that would make the fragmented literal similarity test inapplicable to the latter. Copying the lyric alone no doubt makes for a weaker infringement claim since fewer elements of the original are taken. That may ultimately merit a different outcome, but not a different test. *See Broadus*, 2001 WL 984714, at *3 ("That this case involves the practice of sampling does not alter the substantial similarity] analysis."); 4 Nimmer § 13.03 [A][2][b] (explaining faulty analysis in Sixth Circuit that conclusion musical recording sampling merits different analysis). Moreover, fragmented literal similarity is applied to copyright claims involving other media, not just music. *See, e.g., Best Cellars Inc. v. Grape Finds at Dupont, Inc.,* 90 F. Supp.2d , 431, 460 (S.D.N.Y. 2003) (applying fragmented similarity test to printed and web-based promotional materials); *Paramount*

As noted earlier, the fragmented literal similarity analysis turns on the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole. *TufAmerica*, 968 F.Supp.2d at 598 (citing cases as well as 4 Nimmer § 13.03[A][2], at 13-47 to 48 and note 97). Qualitatively, "a court considers the nature of the copying: did the defendant copy important features of the plaintiff's protected expression?" *Rose v. Hewson*, No. 17 Civ. 1471, 2018 WL 626350, at *4 (S.D.N.Y. Jan. 30, 208). Quantitatively, "a court determines how much of the plaintiff's protected expression has been copied." *Id.*

Two important aspects of this analysis merit emphasis. First, both quantitative and qualitative significance are taken into account. *See Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 71 (2d Cir. 1999) ("It is not possible to determine infringement through a simple word count; the quantitative analysis of two works must always occur in the shadow of their qualitative nature."). Because the copying is literal, "the copying of even a 'relatively small' quantitative 'portion of the pre-existing work may be substantial if it is of great qualitative importance to the pre-existing work as a whole.'" *Estate of* Smith, 253 F.Supp.3d at 747 (quoting *TufAmerica*, 968 F.Supp.2d at 597). Second, the significance is to be evaluated in relation to the plaintiff's work, not the alleged infringing work. *TufAmerica*, 968 F.Supp.2d at 599; *Broadus*, 2001 WL 984714, at *3; 4-13 Nimmer § 13.03 (The relevant question "is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work – not whether such material

---

*Pictures Corp. v. Carol Publishing Group*, 11 F.Supp.2d 329, 333-34 (S.D.N.Y. 1998) (applying fragmented similarity test to book's incorporation of synopses and verbatim quotes from *Star Trek* television series), *aff'd*, 181 F.3d 83 (2d Cir. 1999).

constitutes a substantial portion of defendant's work.").  Ultimately, the question is "'[a]t what point does such fragmented similarity become substantial so as to constitute the borrowing an infringement.'"  *TufAmerica*, 968 F.Supp.2d 598 (quoting 4-13 Nimmer § 1303[A][2][a]).

Here, May plausibly alleges that the Phrase is of sufficient qualitative and quantitative significance to his song that copying the Phrase can be actionable. Quantitatively, the Phrase appears nine times in *We Run Things*, and it is the repeated "hook" of the chorus.  (SAC ¶ 69.)  Qualitatively, it encapsulates the overriding theme of the song, which is male domination and control.[43]  The very title of the song draws upon the first half of the Phrase, and those three words make up six of the seven words it includes.  The Phrase may be viewed as "the heart of [May's] composition."  *Elsmere Music, Inc. v. National Broadcasting Company, Inc.*, 482 F. Supp. 741, 744 (S.D.N.Y. 1980), *affirmed* 623 F.2d 252 (2d Cir. 1980).  In short, May plausibly alleges that the Phrase is both quantitatively and qualitatively significant to his song sufficient to cross the line from a trivial to substantial.[44]

---

[43] As discussed below in connection with fair use, although May describes the theme of his song as personal freedom and control regardless of gender, a review of the lyrics shows otherwise; *We Run Things* distinctly focuses on control by men, including control of women.

[44] The cases Defendants cite in support of their argument that the alleged copying is merely trivial, *de minimis* and non-actionable were decided on summary judgment, not a motion to dismiss.  Further, they are distinguishable.  *See VMG Salsoul, LLC v.* Ciccone, 824 F.3d 871, 887 (9th Cir. 2016) (alleged infringement based on merely using a modified version of a .23-second segment of horns from an earlier song); *Bridgeport Music, Inc. v. Dimension* Films, 410 F.3d 792, 796-97, 805 (6th Cir. 2005) (reversing district court's grant of summary judgment that sampling, modifying and looping two-seconds of sound recording was *de minimis*).

C.    Whether Defendants' Use Is A Fair Use

Even assuming May has a plausible claim for copyright infringement, Defendants contend that the case should be dismissed because their use qualifies as fair use.  As with infringement, however, it is premature to conclude as a matter of law that May's claim must be dismissed based on Defendants' fair use.  Defendants also once again base their argument, in part, on the improper premise that "the saying admittedly preexisted plaintiff's use of it."  (Def. Mem. at 19 (discussing fourth fair use factor); *see also,* Def. Mem. at 17 (discussing second fair use factor) and 18 (discussing third factor.)

Fair use is an affirmative defense to copyright infringement, *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), and thus the party asserting fair use bears the burden of proof. *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994).  Courts developed the fair use doctrine to preclude a finding of infringement where "the copyright law's goal of 'promoting the Progress of Science and useful Arts' ... would be better served by allowing the use than by preventing it." *Castle Rock*, 150 F.3d at 141.  Congress codified the fair use doctrine in the Copyright Act of 1976. Section 107 of the Act provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research is not an infringement of copyright" and identifies four factors to be considered in determining whether a use is fair.  17 U.S.C. § 107.

The statutory fair use factors are: "(1) The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) The nature of the copyrighted work; (3) The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) The effect of the

use upon the potential market for or value of the copyrighted work." *Id.*  Because the fair use determination is "an open-ended and context-sensitive inquiry," the examples and factors in the statute are "illustrative and not limitative . . . [and] provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (quoting *Campbell*, 510 U.S. at 577-78). "Ultimately, fair use analysis asks a simple question: Is this the type of use that furthers the essential goal of copyright law and should be excused from liability for infringement?" *Estate of Smith*, 253 F. Supp.3d at 748.  *See Campbell*, 510 U.S. at 577 (Copyright Act's fair use provision "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity that it is designed to foster").

Fair use is a mixed question of law and fact.  *Cariou,* 714 F.3d at 704-05.  A court cannot engage in the fair use inquiry until it has been presented with facts relevant to evaluating the fair use factors. *See Harper & Row Publishers, Inc. v. Nation Enterprises*., 471 U.S. 539, 560 (1985) (an appellate court may determine that the fair use defense applies as a matter of law when there are "facts sufficient to evaluate each of the statutory factors").  Courts have granted motions to dismiss infringement claims based on a defendant's fair use defense when "discovery would not provide any additional relevant information" and "[a]ll that is necessary for the court to make a determination as to fair use are the two [works] at issue."  *Arrow Products, Ltd. v. Weinstein Co.,* 44 F. Supp.3d 359, 368 (S.D.N.Y. 2014); *cf. Lombardo v. Dr. Seuss Enterprises, L.P.*, 279 F. Supp.3d 497, 504 (S.D.N.Y. 2017), *affirmed* 729 Fed. App'x 131 (S.D.N.Y. 2018) ("Numerous courts in this district have resolved the issue of fair use on a motion for judgment on the

pleadings by conducting a side-by-side comparison of the works at issue"). "[D]ue to the fact-sensitive nature of the inquiry," however, "courts generally do not address the fair use defense until the summary judgment phase." *Graham v. Prince*, 265 F.Supp.3d 366, 377 (S.D.N.Y. 2017), citing *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). In this instance, the fair use factors taken as a whole, based on May's allegations, strongly favor a finding of fair use. However, as with the infringement issues identified above, further development of the record is required for an ultimate determination.

1. Purpose and Character of the Use

"The first statutory factor, which courts have referred to as '[t]he heart of the fair use inquiry,' focuses on the nature and purposes of the allegedly infringing use." *Estate of Smith*, 253 F. Supp.3d at 749 (citing *Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001)). This includes determining whether the defendant's use "is of a commercial nature or for nonprofit educational uses." 17 U.S.C. § 107(1). Defendants' production, distribution and performance of *We Can't Stop* indisputably is commercial. But "the Court need not make too much of this point . . . [given that] 'nearly all of the illustrative uses listed in the preamble of § 107 . . . are generally conducted for profit.'" *Castle Rock*, 150 F.3d at 132 (quoting *Campbell*, 510 U.S. at 584).

Rather, the salient question for the first factor is "whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579. "This is a critical issue because '[t]he more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives.'"

*Estate of Smith*, 253 F. Supp.3d at 749 (quoting *Authors Guild*, 804 F.3d at 214). "Accordingly, the relevant inquiry on this factor is whether the new work 'merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" *Id.* (quoting *Campbell*, 510 U.S. at 579).

The parties disagree about whether Defendants' use of the Phrase is transformative. On one hand, Defendants use the Phrase in the same creative medium as does May*,* namely a song lyric, rather than in a different creative modality such as affixing the Phrase in a collage. May also argues that both songs are thematically similar, using the Phrase to convey a message of control and self-determination.[45] On the other hand, Defendants argue that the songs are thematically opposite of each other. The songs' lyrics squarely confirm Defendants' characterization and contradict May's. *We Run Things* employs the Phrase to deliver a message of male dominance, including subjugation of women. The song's repeated refrain "We rule girl, girl no rule we" underscores exactly that. In contrast, Cyrus's *We Can't Stop* is a song of female independence and control. In *We Can't Stop*, women "own the night," they can do and say what they want, they can kiss and love who they want. Like other cases where the specific message conveyed is different than the larger common theme, *We Can't Stop*

---

[45] May acknowledges that the Court can take judicial notice of the songs' themes. (Pl. Mem. at 13.) *See, e.g., Kaye v. Cartoon Network, Inc.*, 297 F.Supp.3d 362, 367-370 (S.D.N.Y. 2017) (court assessed theme, among other elements, on motion to dismiss copyright infringement claim that television series infringed comic book series); *McDonald v. West,* 138 F. Supp. at 457 (comparing themes of original song and allegedly infringing song); *Allen v. Scholastic, Inc.*, 739 F.Supp.2d 642, 655 (S.D.N.Y. 2011) (when both works are attached or referenced in complaint, the court, on motion to dismiss, can assess theme, among other factors considered to determine substantial similarity of literary works).

"adds something new," transforming the Phrase "with new expression, meaning, or message." *See Estate of Smith*, 253 F. Supp.3d at 749-750 (defendants' incorporation of 35 seconds of plaintiff's song was transformative fair use where defendant used it to convey the message that all types of "real music" is "the only thing that's gonna last" whereas the key phrase of plaintiff's song conveyed the message that "Jazz is the only real music that's gonna last"); *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp.2d 499, 509 (S.D.N.Y. 2006) (finding transformative use where both songs were written to express the wish of the singer, but the lyrics were "strikingly different in tone and message").

Moreover, the Phrase is deployed differently in the two songs, enhancing the different messages.  *We Run Things* gives the Phrase a predominant role, including its title and the lead lyric of the chorus.  May characterizes the Phrase as the "anthem" of his song.  (Pl. Mem. At 13.)  In contrast, the Phrase cannot plausibly be considered the "anthem" of *We Can't Stop*.  The Phrase plays a much less prominent role in Cyrus' song, appearing only three times and each time toward the end of the chorus. In effect, the Phrase itself is dominated by the rest of the song whereas the opposite is true in *We Run Things*. Thus, Defendants' "purposes in using [the original work] are sharply different from [the original artist's] goals in creating it."  *Blanch v. Koons*, 467 F.3d 244, 252 (2d Cir. 2006).  This factor weighs in favor of fair use.

2. <u>Nature of the Copyrighted Work</u>

The second statutory factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.

"'Two types of distinctions as to the nature of the copyrighted work have emerged that have figured in the decisions evaluating the second factor: (1) whether the work is expressive or creative, such as a work of fiction, or more factual, with greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.'" *Estate of Smith*, 253 F. Supp.3d at 751 (quoting 2 Howard B. Abrams, *The Law Of Copyright*, § 15:52 (2006)). As the Second Circuit has noted, this factor "is rarely found to be determinative." *Davis*, 246 F.3d at 175.

May's song indisputably is expressive and creative, thus cutting against fair use. On the other hand, May published the song decades ago, which creates a wider berth for fair use than if the song had not been published.  Overall, however, "[t]his factor is of particularly 'limited usefulness,'" where, as here, "'the creative work of art is being used for a transformative purpose.'" *Estate of Smith*, 253 F. Supp.3d at 751 (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006)).

### 3. Amount and Substantiality of the Portion Used

The next factor requires considering "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "The 'clear implication' of this inquiry 'is that a finding of fair use is more likely when small amounts, or less important passages, are copied than when the copying is more extensive, or encompasses the most important parts of the original.'" *Estate of Smith*, 253 F. Supp.3d at 751 (quoting *Authors Guild*, 804 F.3d at 221).  "Thus, the test is 'whether the quantity and value of the materials used[ ] are reasonable in relation to the purpose of the copying.'" *Id.* (quoting *Blanch*, 467 F.3d at 257); *see also Castle Rock*, 150 F.3d at 144

("The inquiry must focus upon whether '[t]he extent of . . . copying' is consistent with or more than necessary to further 'the purpose and character of the use.") (quoting *Campbell*, 510 U.S. at 586-87) (alterations in original). This factor thus employs both a quantitative and qualitative assessment, tempered, however, by determining the extent to which the appropriation is consistent with the transformative use.

Here, the amount taken by Defendants appears to be reasonable in proportion to the needs of the transformative use.  As already described in the fragmented literal similarity analysis, Defendants used a lyrical phrase that is both a quantitatively and qualitatively substantial part of May's song.  However, Defendants used only the Phrase, without copying either the musical notes or sound accompanying it.[46]  And as noted in discussing the transformative use, Defendants deployed the Phrase consistently with the message of female empowerment.  Coming near the end of the chorus, the Phrase plays a subservient role in *We Can't Stop*, whereas it is the dominant element of *We Run Things*.

Ultimately, however, this factor cannot be assessed without further development of the record examining what Defendants sought to accomplish and how they did so.  For instance, why did Defendants include the Phrase in the recurring chorus of the song?  What purpose was served by selecting the particular version of the Phrase that they did?  Did Defendants consider varying the wording of the Phrase each time it was used in the

---

[46] The SAC alleges that "Defendants' infringement includes the unlawful appropriation of May's vocal melody/cadence/rhythm/inflection contained in" his song.  (*e.g.,* SAC ¶ 119.) These allegations are merely conclusory and never plausibly supported with alleged facts. Recordings of both songs suggest instead that the songs are musically very different. *See McDonald,* 138 F. Supp. at 453 ("Courts in this district regularly apply th[e] rule" that "'the works themselves supersede and control contrary descriptions of them' contained in the pleadings or elsewhere") (citing cases).

chorus?  Questions such of these may shed further light on "whether '[t]he extent of . . . copying' is consistent with or more than necessary to further the purpose and character of the use.") *Castle Rock*, 150 F.3d at 144 (quoting *Campbell*, 510 U.S. at 586-87) (alterations in original).

    4.  <u>Effect on the Market for the Copyrighted Work</u>

The fourth factor examines "the effect of the [secondary] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).  "At this stage, courts ask 'whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original.'" *Estate of Smith*, 253 F. Supp.3d at 752 (quoting *Authors Guild*, 804 F.3d at 223); *see also Castle Rock*, 150 F.3d at 145 (noting that the "concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work"). "The fourth factor is also, however, closely linked to the first, in the sense that 'the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original.'" *Estate of* Smith, 253 F. Supp.3d at 752 (quoting *Authors Guild*, 804 F.3d at 223); *see also Castle Rock*, 150 F.3d at 145 ("The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original.").

The SAC makes no allegation that *We Can't Stop* usurps any potential market for *We Run Things* as a whole or its derivatives. It does allege, however, that industry standard practice is to clear rights to such "lyrical similarities."  (SAC ¶ 115.)  May also

alleges that he previously "gave permission" for the Phrase, along with the entirety of his song, to be used in a movie soundtrack.  (SAC ¶ 73.)  That was 20 years ago, however, and May makes no allegations that he has received any revenue or credit from licensing the song or its lyrics since then.[47]  Whether there even is a "market" for licensing May's song in order to be able to use just the Phrase is dubious, but not a conclusion the Court can make on this motion.[48]  Meanwhile, Defendants saw fit to provide writing credit to the songwriters of "LaDiLaDi" for incorporating an interpolated sample of it in *We Can't Stop*. (SAC ¶ 104.)  That indicates that Defendants were willing to take a license to a lyrical phrase and that May was deprived of receiving similar credit or compensation for use of the lyrical phrase from his song.  Accordingly, taking May's allegations as true and making reasonable inferences in his favor, this factor potentially could weigh against finding fair use.

### 5.  Overall Assessment of Fair Use

In sum, analysis of the relevant factors strongly indicates that Defendants' use of the Phrase is a fair use.  Factual questions remain, however, as to certain of the fair use factors, particularly the amount and substantiality of the portion used in relation to the needs of Defendants' transformative use, and the effect on the market, if any, for May's

---

[47]  May never actually alleges that he licensed anything, but rather that he "gave permission."  The SAC does not expressly allege that May received any revenue for having given permission but does assert that May "was given proper credit in the film" for it.  (SAC. ¶ 73.)

[48]  May's brief states that he "would absolutely develop or license secondary uses of his lyrics/lyrical phrase/song," thereby implicitly suggesting the absence of any licensing history or existing market for his now 30-year-old work.  (Pl. Mem. at 19-20.)  The likelihood of there being a market for use of the Phrase in particular seems all the more unlikely given that there appear to be many sources other than May's song where the Phrase can be found.  (*See, e.g.,* Koonce Decl. Ex. F, G, H, J, L, P, S, U.)

work.  *See, e.g., Hirsch v. CBS Broadcasting, Inc.*, No. 17 Civ. 1860, 2017 WL 3393845, at *7 (S.D.N.Y. August 4, 2017) (denying motion to dismiss based on fair use due to fact issues requiring development and emphasizing the fact-intensive and context-sensitive nature of the fair use inquiry); *New Jersey Media Group, Inc. v. Pirro*, 74 F.Supp.3d 605, 623 (S.D.N.Y. 2010) (denying summary judgment of fair use due to questions of fact as to some but not all fair use factors).

## II. Damages Issues

A copyright plaintiff seeking monetary compensation must choose between two different types of damages – actual damages (including defendant's profits attributable to the infringement) or statutory damages.  Defendants contend that May's actual damages are limited to the three-year period before he filed suit.  Defendants also contend that May is not entitled to statutory damages, or attorney's fees for that matter, because May registered his copyright long after Defendants' alleged infringement began.  Defendants are correct as to actual damages.  Defendants may also be correct as to statutory damages and attorney's fees, but it is premature to make that determination.

## A.  Statute of Limitations

A copyright claim must be brought within three years from the time the claim accrues.  17 U.S.C. § 507; *see Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 676 (2014) (referring to the Copyright Act's "three-year look-back period").  "A copyright claim . . . arises or 'accrue[s]' when an infringing act occurs." *Id.*at 670.  Accordingly, "an infringement is actionable within three years, and only three years, of its occurrence."  *Id.* at 671.  The SAC alleges that the defendants' infringing acts extend back to at least June 3, 2013 when *We Can't* Stop was first released.  (SAC ¶ 90.)  May, however, filed this

action on March 13, 2018.  He therefore cannot recover damages for any infringement occurring prior to March 13, 2015, and his claims should be dismissed to the extent they seek damages for acts of infringement preceding that date.[49]

B.  Statutory Damages and Attorney's Fees

The question of whether May is entitled to statutory damages and attorney's fees is a somewhat closer question.  The Copyright Act permits a copyright plaintiff to receive statutory damages and attorney's fees only if the plaintiff's work has been registered with the Copyright Office prior to the act of infringement.   As the Act admonishes, "no award of statutory damages or of attorney's fees . . . shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration."  17 U.S.C. § 412; *see also Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1012 (2d Cir. 1995) (reciting and applying the principle); S*teele v. Bell*, No. 11 Civ. 9343, 2014 WL 1979227, at *3 (S.D.N.Y.) March 26, 2014) ("To encourage registration, Congress provided that owners of unpublished works could recover statutory damages and attorney's fees only for instances of infringement that occurred after registration."). According to May, *We Run Things* "was released to the public in 1988" (SAC ¶ 68), and the alleged infringement began as early as June 3, 2013.  But May did not register *We Run Things* until 2017.  (SAC ¶ 74.)  Under a plain application of Section 412, May is not entitled to statutory damages or attorney's fees because he registered his copyright long after infringement began.

---

[49] May does not address this issue in his brief and conceded the point at oral argument. (Argument Transcript at 23.)

To escape this limitation on his potential recovery, May argues that Defendants continued to infringe his work after he registered it.  (Pl. Mem. at 21.)  May further contends that discovery is needed to determine all of Defendants' infringing acts and when they occurred.  (*Id.*)  Courts in this Circuit, however, have rejected the "continuing" infringement theory.   "Repeatedly, these courts have concluded that 'Section 412 imposes a bright-line rule, barring the recovery of statutory damages for infringement occurring after registration if that infringement is part of an ongoing series of infringing acts and the first act occurred before registration.'"  *Steele v. Bell*, No.11 Civ. 9343, 2014 WL 1979227, at *8 (S.D.N.Y. March 28, 2014), quoting *U2 Home Entertainment, Inc. v. Hong Wei International Trading, Inc.*, No. 04 Civ. 6189, 2008 WL 3906889, at *15 (S.D.N.Y. Aug. 21, 2008) (plaintiff not entitled to statutory damages and attorney's fees for installments in television series released prior to registration and distributed by defendant as few as eight days or as much as two years post-registration); *see also Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2016 WL 4126543, at * 3 (S.D.N.Y. Aug. 2, 2018) (new edition of video game issued a year later was a continuing series of infringement precluding recovery of statutory damages and attorney's fees); *Shady Records, Inc. v. Source Enterprises, Inc.*, No. 03 Civ. 9944, 2005 WL 14920 (S.D.N.Y. Jan. 3, 2005) (reposting infringing content one month later was "nothing more than the continuation of a series of acts" that began prior to registration); *Singh v. Famous Overseas, Inc.*, 680 F. Supp. 533, 534-36 (E.D.N.Y. 1988) (concluding that post-registration sales of copyrighted songs constituted a continuing act of infringement), *aff'd without opinion*, 923 F.2d 845 (2d Cir. 1990).

In *Steele*, for example, the plaintiff obtained a default judgment against defendant for infringing plaintiff's copyrighted film. The defendant had displayed a trailer and photograph from the film on various websites. In response to cease and desist letters sent by plaintiff, the defendant removed the infringing material on October 19, 2011. A registration for plaintiff's copyright became effective on October 25, 2011. Three days later, the defendant reposted the infringing content. The plaintiff argued that the reposting was a new act of infringement for which plaintiff would be entitled to statutory damages. The court disagreed, applying the "bright-line" rule barring statutory damages and attorney's fees for a series of continuing infringements. *Id.* at *9. More specifically, the court held that "Defendant's re-posting of the same content through the same medium constitutes a continuing infringement, and Section 412 precludes the recovery of statutory damages and attorney's fees." *Id.*

The well-established "bright-line" application of Section 412 would seem to foreclose May's bid for attorney's fees and statutory damages. That said, the instant case potentially may be distinguished from *Steele* and the other similar cases in one respect. May alleges that Defendants have infringed his work not merely by issuing an infringing record, but also by performing the song live and in video, and through other media. (SAC ¶¶ 118-132,154, 164.) Unlike *Steele*, the infringement alleged by May is not limited to a recurrence of "the same medium." That distinction may prove to be inconsequential, but at this juncture, it is premature to determine that May cannot possibly recover statutory damages and attorneys' fees were he to succeed on the merits. Discovery is needed to

determine, for instance, the types and extent of media in which the Phrase was used and whether May sent cease and desist letters for each act of allegedly new infringement.[50]

To be sure, Defendants have a far stronger argument in this regard.  Although May alleges infringing conduct through various media, they all have one thing in common:  the song *We Can't Stop*.  As such, the evidence may well confirm that the alleged series of acts are sufficiently related to bar statutory damages and attorney's fees.  If that is the case, Defendants would be entitled to summary judgment on this issue.  At this stage, however, the Court cannot conclude that there are no aspects of the alleged infringing acts that would not constitute a new infringing act for purposes of the registration rule.  Accordingly, Defendants' motion to dismiss May's claim for statutory damages and attorney's fees should be denied.

Conclusion

For the foregoing reasons, I recommend that Defendants' motion to dismiss be GRANTED in part, limiting pre-filing damages to a three-year period, and DENIED in all other respects.  The current record suggests several ways in which Defendants may well prevail on the merits, from a determination that the Phrase was not original to May or that May made only trivial changes to a pre-existing strict Patois version of the Phrase, to indisputable proof that Defendants did not copy from May's song but instead adopted the Phrase from one of many other sources, to facts establishing fair use as a matter of law.  Those determinations, however, must await summary judgment.

---

[50] The absence of such letters would suggest that May did not consider subsequent events to be new acts of infringement.

The Court has considered the remaining arguments raised by the parties, and to the extent they are not addressed herein, finds them to be without merit.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the court, with extra copies delivered to the Chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

_____

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE


Dated:        February 13, 2019
              New York, New York


Copies transmitted this date to all counsel of record.